# EXHIBIT E

# Bank Regulation, Banking & Fin.

# Services Pol'y Rep., Dec. 2016

**35 No. 12 Banking & Fin. Services Pol'y Rep. 36**

Banking & Financial Services Policy Report
December, 2016

The Monitor [a1]

Copyright © 2016 by CCH Incorporated

# BANK REGULATION

### Fed Moves to Tighten Post-Employment Restrictions

A change in Federal Reserve Board policy will more than double the number of Federal Reserve Bank (FRBank) employees who are subject to post-employment restrictions, according to the Fed. About 250 employees will be covered, up from the current number of approximately 100. Also, a new policy will ban former FRBank officers from representing private parties before Fed employees and ban FRBank employees from discussing official business with former officers for one year.

According to the Fed, the policies apply to two groups of former employees:

> (1) Individuals who acted as senior examiners for a depository institution or holding company for two months or longer during their last 12 months as a Federal Reserve Bank employee; and

> (2) any Fed examiner or supervision staff member who accepts a job with a depository institution or holding company he examined in that final 12-month term.

The revised senior examiner policy will take effect Jan. 2, 2017, and the restriction on former officers will take effect Dec. 5, 2016, the Fed said.

*Senior Examiner*

The broader coverage comes about due to a change in who is considered to be a senior examiner. Currently, the post-employment restrictions apply generally to individuals thought of as "central points of contact," or CPCs. The restrictions are being expanded to deputy CPCs, senior supervisory officers (SSOs), deputy SSOs, enterprise risk officers, and supervisory team leaders. Functionally, these would be individuals who:

> • Were authorized to conduct examinations or inspections for the Fed;

> • Had "continuing, broad, and lead responsibility" for examining or inspecting a single institution, affiliated group of institutions, or holding company;

- Performed examinations, inspections, or supervision as a substantial part of their assigned duties; and

- Routinely interacted with the company's employees or officers.

### Violations

If a former employee violates the one-year ban, the Fed is required to seek an order prohibiting the individual from participating in the industry for up to five years, a civil penalty of up to $250,000, or both. However, the Fed chairman has the authority to waive the restriction.

The FRBanks are to review examiners' duties regularly and notify an examiner if a change in her job duties would make her a senior examiner who is covered by the rule or remove her from that status.

### Conflicts of Interest

The Fed also has a policy designed to uncover possible conflicts of interest. If any examiner—even an individual not considered to be a senior examiner— takes a job with a company he examined in the 12 months before leaving the Fed, the FRBank is to review all of his work papers for any indication that the upcoming change in employment might have compromised any examination findings or supervisory proceedings.

### Minneapolis Fed Issues Plan to End 'Too Big to Fail'

The Federal Reserve Bank of Minneapolis has released a plan that sets forth a policy solution intended to enable the US economy to flourish without exposing it to large risks of financial crises and taxpayer bailouts. The "Minneapolis Plan" is the culmination of an initiative launched by Reserve Bank President Neel Kashkari in February 2016 that sought to create an actionable plan to end the problem of too-big-to-fail (TBTF) banks.

*37  The plan envisions four steps that Kashkari believes would strengthen the financial system:

(1) Dramatically increase common equity capital for banks with assets exceeding $250 billion, which would substantially reduce the chance of public bailouts relative to current regulations from 67 percent to 39 percent.

(2) Call on the Secretary of the Treasury to certify that individual large banks are no longer systemically important or else subject those banks to extraordinary increases in capital requirements—up to 38 percent over time. This level of capital reduces the 100-year chance of a crisis to 9 percent.

(3) Prevent future TBTF problems in the shadow financial sector by imposing a tax on the borrowings of shadow banks with assets of more than $50 billion. This tax rate would apply to shadow banks that are not

systemically important as certified by the Treasury Secretary. A tax rate equal to 2.2 percent would apply to the shadow banks that the Treasury Secretary refuses to certify as not systemically important.

(4) Reduce the unnecessary regulatory burden on community banks while maintaining regulators' ability to identify and address bank risk-taking that threatens solvency.

### Reducing Risks

Commenting on the plan, Kashkari stated, "We believe the Minneapolis Plan does a much better job of reducing risks at reasonable costs to society than current regulations. Ultimately, the public needs to make their own determination. We hope this process will equip them with the data and analyses they need to make an informed judgment."

The Minneapolis Fed is also seeking comments on specific questions regarding the plan. Comments must be received within 60 days.

### How Much Control Do Consumers Have Over Financial Records?

The Consumer Financial Protection Bureau (CFPB) has asked consumers for their input on difficulties accessing, using, and securely sharing their financial records. The bureau also wants to know how much choice consumers have in the use of their records, how secure it is for them to share their records, and the amount of control they have over their records.

The CFPB said its goal is to foster an environment in which competing providers can securely obtain, with the consumer's permission, the information needed to deliver innovative products and services that will benefit consumers.

"The technology around digital financial records continues to develop, and so far there are many unanswered questions about how the information is being shared, by and to whom, and how safely," CFPB Director Richard Cordray said in prepared remarks for a field hearing on consumer access to financial records. "As with any emerging industry, we are hearing about some bumps in the road. FinTech companies and financial institutions, as well as consumer groups, are describing to us the various challenges, risks, and technological obstacles to further progress in this area."

### Request for Information

The bureau is seeking public comment through a Request for Information to better understand the consumer benefits and risks associated with market developments that rely on access to consumer financial account and account-related information. Specifically, the CFPB is seeking information from consumers on:

 • Whether consumers are being given appropriate opportunities to access and allow others to securely access their personal financial records and what business burdens must be addressed to facilitate access and use of financial records;

 • What options consumers are given for ensuring that financial records are securely obtained, stored, and used; and

• What information consumers are given about how their records will be accessed and used and to what extent consumers are able to control how the information will be used by companies.

### Blog Post

In a post to its blog, the bureau asked consumers to share their stories on the difficulties they face when accessing and sharing their financial records with other financial companies. If consumers are using products or services that access their financial records stored by another company, the CFPB wants to know about their *38 experiences. Consumers can comment on Facebook or Twitter, but those who want to provide more details can share their stories via the bureau's Web site.

The CFPB's notice appeared at 81 *Federal Register* 83806 on Nov. 22, 2016.

### OCC Seeks Comments on Stress Test Reporting Revisions

The Office of the Comptroller of the Currency (OCC), as part of its continuing effort to reduce paperwork and respondent burden, has requested comments on revisions to its regulatory reporting requirement for national banks and federal savings associations. Comments on the reporting requirement, "Company-Run Annual Stress Test Reporting Template and Documentation for Covered Institutions with Total Consolidated Assets of $50 Billion or More under the Dodd-Frank Wall Street Reform and Consumer Protection Act," must be received by Jan. 17, 2017.

The Dodd-Frank Act requires certain financial companies to conduct annual stress tests and requires the primary financial regulatory agency of those financial companies to issue regulations implementing the stress test requirements. On Oct. 9, 2012, the OCC published in the *Federal Register* a final rule implementing the annual stress test requirement. This rule describes the reports and information collections required to meet the reporting requirements.

### Purpose of Revision

According to the notice, the OCC intends to use the data collected to assess the reasonableness of the stress test results of covered institutions and to provide forward-looking information to the OCC regarding a covered institution's capital adequacy. The OCC also may use the results of the stress tests to determine whether additional analytical techniques and exercises could be appropriate to identify, measure, and monitor risks at the covered institution. The stress test results are expected to support ongoing improvement in a covered institution's stress testing practices with respect to its internal assessments of capital adequacy and overall capital planning.

### Minimizing the Burden

The OCC recognized that many of the institutions that are also required to comply with Federal Reserve Board reporting requirements use form FR Y-14A. The OCC has expressed its intent to keep its reporting requirements consistent with FR Y-14A in order to minimize the burden on covered institutions.

### Revisions

The proposed revisions to the OCC reporting templates consist of the following:

• Adding line items to the Regulatory Capital Instruments schedule;

• Updating the Summary schedule to collect items related to the supplementary leverage ratio;

• Removing and adding sub-schedules to the Operational Risk schedule;

• Creating a new supplemental schedule to collect certain items not included in the Fed's FR Y-14A;

• Requiring a bank-specific scenario—covered institutions would be required to submit bank-specific baseline and stress scenarios; and

• Requiring the assumption of largest counterparty default. The largest trading covered institutions that also submit the Global Market Shock scenario would be required to assume the default of their largest counterparty in the supervisory severely adverse and adverse scenarios.

The OCC's notice appeared at 81 *Federal Register* 80717 on Nov. 16, 2016.

## OCC Seeks Comments on Volcker Rule Reporting, Disclosure

The Office of the Comptroller of the Currency has issued a notice seeking comments on various reporting, recordkeeping, and disclosure requirements associated with its regulations that implemented the Volcker Rule. The Volcker Rule, contained in Section 619 of the Dodd-Frank Act (12 U.S.C. §1851), prohibits or restricts certain types of proprietary trading or investment fund activities conducted by "banking entities" and nonbank financial companies supervised by the Federal Reserve Board.

Among other things, the OCC is seeking comments on:

• Whether the information sought is necessary for the OCC to perform its supervisory functions;

• The accuracy of the OCC's estimate of the information collection burden;

**\*39** • Ways to enhance the quality, utility, and clarity of the information to be collected while also minimizing the collection burdens on respondents; and

BANK REGULATION, 35 No. 12 Banking & Fin. Services Pol'y Rep. 36

• Estimates of capital or start-up costs and costs of operation, maintenance, and purchase of services to provide the information.

Comments on the OCC's notice are due by Jan. 17, 2017.

### FDIC Adopts Deposit Recordkeeping for Big Banks

At its Nov. 15, 2016, meeting, the Federal Deposit Insurance Corporation (FDIC) adopted a final rule that is intended to facilitate the rapid payment of insured deposits to customers if an FDIC-insured institution with a large number of deposit accounts were to fail. The final rule requires that insured depository institutions with more than two million deposit accounts maintain complete and accurate data on each depositor and ensure that their information technology systems are capable of calculating the amount of insured money for most depositors within 24 hours of a failure. The FDIC anticipates the final rule will take effect on April 1, 2017.

According to the FDIC, the rule would currently apply to 38 institutions. The institutions would have three years to develop the recordkeeping and IT systems required for compliance.

The FDIC is required to provide depositors with access to their insured accounts as soon as possible after an institution fails. While the funds are typically available by the next business day, for a bank with a large number of deposit accounts in which records are unclear or incomplete, the payments might be delayed, the FDIC said.

### *Final Rule*

Under the final rule, insured depository institutions with more than two million deposit accounts must configure their IT systems to be capable of accurately calculating the deposit insurance available for each deposit account in accordance with the FDIC's deposit insurance rules should the covered institutions fail.

Under the final rule's general recordkeeping requirements, a covered institution will need to ensure that its deposit account records contain the information needed for its IT system to be able to calculate deposit insurance coverage for those deposit accounts for which it already maintains the necessary information.

A covered institution should, in the normal course of business, already maintain in its deposit account records the information necessary to do this for single ownership accounts; joint ownership accounts; accounts held by a corporation, partnership, or unincorporated association for themselves; informal revocable trust (*i.e.*, "payable-on-death" or "in-trust-for") accounts; and any account of an irrevocable trust for which the covered institution itself is the trustee.

With respect to certain types of deposit accounts for which a covered institution is not currently required to maintain in its deposit account records the necessary information, the covered institution may meet alternative recordkeeping requirements as long as the covered institution maintains in its deposit account records certain information that will facilitate the FDIC's prompt collection of the information needed.

The alternative recordkeeping requirements would apply to deposit accounts insured on a "pass-through" basis (such as brokered deposits) because beneficial owner information is not maintained by the covered institution, and to deposit accounts for which the amount of insurance is dependent on additional facts (such as deposit accounts held in connection with a trust).

**FinCEN Must Improve Case Management Procedures, says OIG**

The Treasury Department's Office of Inspector General (OIG) has concluded that the Financial Crimes Enforcement Network (FinCEN) must do a better job of documenting and tracking its enforcement actions involving civil money penalties (CMPs) for violations of the Bank Secrecy Act (BSA). As a result, the OIG recommended that FinCEN take several steps to identify and address deficiencies in its case management procedures. FinCEN concurred with the recommendations and responded that it has implemented a new enforcement organization and made improvements to its policies and procedures since the audited period--2008 through 2014.

**FinCEN is responsible for the overall administration and enforcement** of the BSA. Although it delegates *40 BSA compliance examination authority to other federal regulators, FinCEN retains enforcement authority, including the authority to impose CMPs for violations.

FinCEN investigates potential BSA violations or deficiencies referred by federal and state regulators, as well as those referred by its own Enforcement Division. After investigating a BSA case referral, FinCEN determines which enforcement action to pursue, if any. FinCEN typically resolves a case in one of three ways: (1) sending a warning letter to the violator; (2) assessing a CMP; or (3) taking no action. During the period 2008 through 2014, FinCEN assessed 32 CMPs totaling $1.19 billion.

### New Intelligence Repository

According to the report, in June 2013, FinCEN underwent a reorganization and implemented the Financial Intelligence Repository (FIR) to share information (including case information) across all FinCEN Divisions. Although there were known performance issues, FinCEN's Enforcement Division replaced its legacy Case Management System with FIR. Due to the performance issues and limited staffing, FinCEN could not track backlogged CMP cases, including cases in danger of exceeding their statute of limitations.

FinCEN officials reported that they became aware of the CMP case backlog; however, they could not categorize cases as backlogged or otherwise age them in FIR.

### Incomplete Files, No Procedures

The OIG also found that the CMP case files lacked full documentation and approvals as required by FinCEN's policies and procedures. Of the 21 case files the OIG reviewed, 19 lacked one or more documents required by FinCEN's policies and procedures, including referrals from regulators, enforcement memoranda, or rationale for changing recommended CMP amounts.

In addition, the OIG found that FinCEN also failed to have standards for determining penalty amounts in consideration of aggravating and mitigating factors, and in some cases FinCEN did not document the rationale for assessed penalty amounts. During the OIG investigation, FinCEN officials provided the OIG with interim draft penalty procedures--dated September 2015.

### OIG Recommendations

Specifically, the OIG recommends that FinCEN:

(1) Ensure FIR performance deficiencies are identified and resolved;

(2) Review open FIR case records to ensure the accuracy and completeness of the data recorded;

(3) Require key relevant case information to be entered into FIR so that FinCEN can monitor areas such as the CMP case backlog and CMP cases approaching the SOL;

(4) Continue to refine the interim enforcement procedures currently used by FinCEN to, among other things, provide guidance for the consideration of aggravating and mitigating factors in CMP assessments, documentation requirements for CMP assessments, and provisions for proper segregation of duties, including supervisory reviews; and

(5) Develop and implement a process to periodically notify federal and state regulators of the status of and action taken on referred cases.

## Response

FinCEN responded that case processing and documentation are important elements of its broad enforcement program. FinCEN also stated that in conjunction with its 2013 reorganization, it implemented a new enforcement organization and made improvements to its policies and procedures. The OIG conceded that the scope of its audit included a number of years prior to the 2013 FinCEN reorganization.

## GAO Report: Congress Should Set Objectives, Transition Plan for GSEs

In reviewing the Federal Housing Finance Agency's (FHFA) role as conservator of Fannie Mae and Freddie Mac and looking toward the future, the Government Accountability Office (GAO) has issued a report recommending that Congress provide legislation setting clear objectives for the government-sponsored enterprises and establishing a transition plan for their exiting conservatorship. The November 2016 report examines the extent to which the FHFA's goals for the conservatorship of Fannie Mae and Freddie Mac have changed over the years. Further, the GAO's report evaluates the implications of the FHFA's actions for the future of the enterprises as well as for the broader secondary mortgage market.

## *41 Findings

In connection with the FHFA's respective 2012 and 2014 strategic plans for the conservatorship of the enterprises, the GAO report found that the main goals of the 2014 strategic plan were "broadly similar" to the 2012 strategic plan. However, the FHFA "changed the weight and wording of the goals" in the 2014 plan "to align the plan more closely with FHFA's statutory responsibilities." More specifically, the FHFA's 2014 strategic plan: (1) increased its emphasis on maintaining credit availability and foreclosure prevention options; (2) shifted away from shrinking the enterprises as a way to reduce taxpayer risk and, instead, focused on transferring credit risk to private investors; and (3) reduced the scope of the securitization infrastructure being built.

On the whole, although the FHFA established goals for the Fannie Mae and Freddie Mac conservatorships, the goals "have been somewhat in tension with each other," the report found. In addition, some of the actions taken by the FHFA to implement its goals "have lacked a consistent direction over time," and the FHFA "has not clarified how to balance different priorities."

According to the GAO's report, an "absence of congressional direction" influenced the FHFA's shift in priorities. Moreover, the shift "has altered market participants' perceptions and expectations about the enterprises' ongoing role and added to uncertainty about the future structure of the housing finance system." Because Congress "has not established objectives for the future of the enterprises after conservatorships or the federal role in housing finance, FHFA's ability to shift priorities may continue to contribute to market uncertainty," the report asserts.

Notably, the FHFA agreed with the GAO's "overall findings," the report states.

### Recommendations

Based on its findings, the GAO recommends that Congress "consider legislation that would establish clear objectives and a transition plan to a reformed housing finance system that enables the enterprises to exit conservatorship." From the GAO's perspective, by setting "a clear direction for the future of the housing finance system," Congress would enable the FHFA "to use the conservatorships of the enterprises to facilitate the transition to a new structure."

### Ease Servicemember Access to Student Loan Rate Cap, GAO says

The Government Accountability Office (GAO) has issued a report on the implementation of the 6 percent interest-rate cap that servicemembers are entitled to receive for student loans when they are on active duty under the Servicemembers Civil Relief Act (SCRA). The GAO review evaluates: the number of servicemembers who received the cap for student loans; challenges that servicemembers face in doing so; and the extent to which federal agencies oversee implementation of the cap. The report, delivered to the Senate Committee on Homeland Security and Governmental Affairs, is titled *Student Loans: Oversight of Servicemembers' Interest Rate Cap Could Be Strengthened.*

The number of servicemembers receiving the SCRA interest rate cap for their student loans has greatly increased since student loan servicers began using an automatic eligibility check to identify those who are eligible, according to the GAO. However, according to the report, challenges still exist, including:

- Inaccurate SCRA information from the Department of Defense;

- Private loan servicers are not required to use the automatic eligibility check to identify eligible servicemembers; and

- No routine oversight of SCRA compliance exists for nonbank private student loan lenders and servicers.

To address these issues, GAO suggested that the Department of Justice (DOJ) update its proposed SCRA changes by requiring private loan servicers to use the automatic eligibility check to identify eligible borrowers. This could lead to legislative action that would provide consistent treatment for all eligible servicemembers regardless of type of student

loan. The report also highlighted an issue with the Department of Education's new borrower complaint system, which lacks the ability to track SCRA complaints systematically. "Without a systematic way to track complaints about the rate cap, Education will not be certain whether servicemembers continue to experience problems, making it difficult for Education to meet its strategic goal of providing superior service," stated the report.

*42 *Recommendations*

The GAO made four recommendations to address the challenges it identified.

(1) The Secretary of Defense should direct the secretaries of each service branch to ensure that all information about the SCRA interest rate cap for student loans is accurate when provided to servicemembers and to those who work with servicemembers to help them obtain SCRA benefits, including information contained in outreach materials.

(2) The Attorney General should direct the Department of Justice to consider modifying its proposed changes to SCRA to require use of the automatic eligibility check for private student loans.

(3) The Office of Federal Student Aid should identify ways to modify the data collected in its unified borrower complaint system to allow the agency to more precisely identify and analyze complaints specifically about the SCRA interest rate cap.

(4) The director of the Consumer Financial Protection Bureau (CFPB) and the Attorney General should coordinate with each other, and with the four federal financial regulators, as appropriate, to determine the best way to ensure routine oversight of SCRA compliance for all nonbank private student loan lenders and servicers.

The report further noted that if the CFPB and DOJ determine that additional statutory authority is needed to facilitate such oversight, CFPB and DOJ should develop a legislative proposal for Congress.

*Agency Response*

The GAO provided a draft copy of the report to the Departments of Defense, Education, Justice, the CFPB, and the four federal financial regulators for review and comment, reporting that technical comments provided by federal financial regulators have been incorporated into the report as appropriate.

The Department of Defense disagreed with the GAO recommendation, saying it was unnecessary because the department was already providing accurate information about the SCRA interest rate cap for student loans. The department said that "information provided in 6 of the 8 documents GAO reviewed is accurately based on statute whereas Education's updated requirement to automatically apply the cap is based on policy which could change in the future."

The Department of Education said it is committed to accurately tracking the types of complaints it receives, and that its new feedback system and monitoring efforts allow it to identify SCRA-related issues by conducting keyword searches

using a variety of terms. However, the agency said that it will respond to GAO's recommendation by creating a complaint subcategory specifically for SCRA under the "Military and Veterans Benefits" category.

GAO responded to this by stating "As we point out in this report, one of the challenges with Education's keyword search process is that it may miss relevant loan complaints where SCRA is not specifically mentioned."

In its written comments, the CFPB did not specifically agree or disagree with the recommendation to provide oversight of SCRA compliance among nonbank private lenders and servicers, but acknowledged that it shares GAO's interest in maximizing SCRA protections. And the DOJ neither agreed nor disagreed with the second recommendation and agreed with the fourth recommendation.

### OCC Agrees to Assess Suspicious Activity Report Enforcement Program

The Office of the Comptroller of the Currency agreed to assess its Suspicious Activity Reports (SARs) Fast Track Enforcement Program as recommended by the Treasury Department's Office of Inspector General. OCC's Fast Track implements "streamlined enforcement" procedures by using information from SARs, examinations, alerts, or other sources to pursue prohibitions of bank insiders from working in a financial institution, when institution-affiliated parties commit criminal acts or acts of significant wrongdoing involving banks.

The report found that Fast Track was not as efficient in pursuing prohibitions as it could be because the staffing model limited the number of cases Fast Track could process. The OIG recommended that OCC assess Fast Track to determine whether the program's effectiveness could be increased with a review of program goals, requirements, performance results, staffing levels, and training needs.

**\*43** The OCC pursues enforcement actions against current or former bank employees for which there is evidence of wrongdoing, dishonesty, a breach of trust, or money laundering. The OIG found OCC's examination procedures reasonably address the prevention and detection of criminal activities by bank insiders if performed as warranted during ongoing safety and soundness examinations.

Although the OCC's SAR Fast Track database provides opportunities for OCC enforcement actions, the OIG said that Fast Track could make a larger impact by processing more cases to ban unethical bank insiders from working in the banking industry.

Footnotes

a1

The Monitor is an agenda of matters of interest to the financial services industry. The Monitor includes: (1) regulatory and related matters on which comment periods are open; (2) important regulatory initiatives that are still pending and under active consideration; (3) recent regulatory matters of continued urgency to the financial services community; and (4) cases pending before the US Supreme Court and other federal and state courts. All cases are listed by subject. Unless otherwise noted, this issue of The Monitor covers developments during the period Oct. 20, 2016, through Nov. 20, 2016.

35 No. 12 BNKFSPR 36

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.