# Exhibit 3

United States Securities and Exchange Commission v...., F.Supp.3d (2018)
Case 2:18-cv-00504-CW Document 15-4 Filed 07/03/18 Page 2 of 29
2018 WL 1633818, Fed. Sec. L. Rep. P 100,073

2018 WL 1633818
United States District Court, S.D. New York.

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION, Plaintiff,
v.
ALPINE SECURITIES CORPORATION, Defendant.

17cv4179(DLC)
|
Signed March 30, 2018

**Synopsis**

**Background:** Securities and Exchange Commission (SEC) brought action alleging that clearing broker-dealer breached its duty to file suspicious activity reports (SARs). SEC moved for partial summary judgment.

**Holdings:** The District Court, Denise Cote, J., held that:

[1] SEC had authority through its enforcement authority to pursue violations of Exchange Act to enforce alleged violations of rule requiring compliance with Bank Secrecy Act (BSA) regulations that, inter alia, governed filing of SARs by broker-dealers;

[2] reporting of potentially suspicious transactions by broker-dealers was jointly enforceable by Financial Crimes Enforcement Network (FinCEN) and SEC;

[3] SEC did not have any burden to prove scienter to show violation of rule that imposed duty on broker-dealers to file SARs;

[4] SARs did not describe "who" and "why" of transaction, or describe why the underlying transactions were suspicious;

[5] SEC had burden to prove that SAR was required to be filed;

[6] broker-dealer breached its duty to file SARs with SEC;

[7] evidence of stock promotion was particularly relevant to transaction involving deposits of many millions of shares of penny stock; and

[8] customers' dramatic increase of their holdings in penny stock with deposit of physical certificates and then selling off most of those holdings over few weeks in number of discrete, small transactions required supplemental reporting to SEC.

Motion granted in part.

**Attorneys and Law Firms**

For plaintiff United States Securities and Exchange Commission: Zachary T. Carlyle, Terry R. Miller, U.S. Securities and Exchange Commission, 1961 Stout Street, 17th Floor, Denver, CO 80294

For defendant Alpine Securities Corporation: Maranda E. Fritz, Thompson Hine LLP, 335 Madison Avenue, 12th Floor, New York, NY 10017, Brent R. Baker, Aaron D. Lebenta, Jonathan D. Bletzacker, Clyde Snow & Sessions, One Utah Center, 201 South Main Street, Suite 1300, Salt Lake City, Utah 84111

OPINION & ORDER

DENISE COTE, District Judge:

**\*1** This litigation addresses the duty of a broker-dealer to file suspicious activity reports ("SARs"). The Securities and Exchange Commission ("SEC") alleges that Alpine Securities Corporation ("Alpine") has violated 17 C.F.R. § 240.17a–8 ("Rule 17a–8"), promulgated under the Securities Exchange Act of 1934 (the "Exchange Act"), by filing fatally deficient SARs or by failing to file any SAR when it had a duty to do so. Rule 17a–8 requires compliance with Bank Secrecy Act ("BSA") regulations that, inter alia, govern the filing of SARs by broker-dealers.

Because the SEC alleges several thousand violations of Rule 17a–8, the Court invited the parties to move for partial summary judgment using exemplar SARs. The SEC has done so, submitting several SARs in each of four categories that it alleges reveal violations of Rule 17a–8. Alpine has submitted its own motion for summary judgment and for judgment on the pleadings, principally arguing that the SEC is without authority to enforce BSA regulations. For the reasons that follow, the SEC's motion is granted in part and Alpine's motion is denied.

United States Securities and Exchange Commission v...., F.Supp.3d ---- (2018)
2018 WL 1633818, Fed. Sec. L. Rep. P 100,073

Case 2:18-cv-00504-CW Document 15-4 Filed 07/03/18 Page 3 of 29

**Background**

The following facts are taken from the parties' evidentiary submissions. In the sections of this Opinion addressing each party's summary judgment motion, inferences are drawn in favor of the nonmovant. Insofar as this Opinion addresses Alpine's motion for judgment on the pleadings, solely the operative pleadings are considered.

I. Alpine's Business

Alpine is a broker-dealer that primarily provides clearing services for microcap securities traded in the over-the-counter market. [1] As a clearing broker, Alpine's role is principally to prepare trade confirmations, receive and deliver customers' funds, maintain books and records, and maintain custody of customer funds and securities. An introducing broker, in contrast, is responsible for opening customer accounts, directly interacting with customers, and executing trades. An introducing broker transmits transaction information to a clearing broker, which then completes the transaction.

[1] The term "over-the-counter market" is used to describe "the trading of securities other than on a formal centralized exchange" such as the New York Stock Exchange. 4 Hazen, Treatise on the Law of Securities Regulation § 14:3 (2017).

For all of the SARs submitted by the SEC in support of its motion for partial summary judgment, Alpine acted as the clearing broker. For a majority of the transactions at issue in this suit, and all but one of the transactions at issue in the SEC's motion, the introducing broker was Scottsdale Capital Advisors ("SCA"). SCA and Alpine are owned by the same individual.

Alpine has an anti-money laundering ("AML") program consisting of written standard procedures ("WSPs"). Alpine represents that it updates its WSPs to account for guidance provided by the Financial Crimes Enforcement Network ("FinCEN") [2] and other regulators; the parties have submitted excerpts from WSPs dated January 2012, April 2013, August 2014, and October 2015.

[2] FinCEN is a division of the Department of the Treasury ("Treasury") with primary authority for enforcing the BSA

**\*2** Alpine's WSPs relating to the filing of SARs incorporate regulatory language from 31 C.F.R. § 1023.320 ("Section 1023.320"), the principal regulation at issue in this case, which requires broker-dealers such as Alpine to file SARs in certain circumstances. The WSPs also incorporate relevant language from guidance documents published by FinCEN regarding "red flags" that a broker-dealer should investigate if they appear in a transaction subject to the SAR regulation. See Alpine Apr. 11, 2013 WSPs at 152. These include the following:

> The customer (or a person publicly associated with the customer) has a questionable background or is the subject of news reports indicating possible criminal, civil, or regulatory violations.
>
> ...
>
> The customer engages in suspicious activity involving the practice of depositing penny stocks, liquidates them, and wires proceeds. A request to liquidate shares may also represent engaging in an unregistered distribution of penny stocks which may also be a red flag.
>
> ...
>
> The customer, for no apparent reason or in conjunction with other "red flags," engages in transactions involving certain types of securities, such as penny stocks ....

Alpine Jan. 5, 2012 WSPs at 40–41. [3] This list is consistent across the WSPs. In addition, the 2014 WSPs give as an example of "transactions that may be indicative of money laundering" those involving "heavy trading in low-priced securities" and "unusually large deposits of funds or securities." Alpine Aug. 29, 2014 WSPs at 180.

[3] Alpine contends, in response to several portions of the SEC's motion, that its customer was the introducing broker and not the individual or entity whose securities transaction is reported on Alpine's SARs. This contention is plainly meritless. Section 1023.320 uses the term "customer" to mean the party conducting the transaction that is reported. See 31 C.F.R. § 1023.320(a)(2)(ii). Further, Alpine's WSPs also use the term "customer" to refer to the individual or entity transacting securities through Alpine. E.g.,

Alpine Jan. 5, 2012 WSPs at 40 (describing suspicious types of transactions in which a "customer" engages).

Alpine's AML Officer describes its AML procedures as follows. For each transaction cleared by Alpine, Alpine receives from the introducing broker a "due diligence packet" containing information about the customer and transaction. The due diligence packet is transmitted to an Alpine compliance analyst, who reviews the transaction based on "various pre-determined areas of focus" set by Alpine's AML managers. In addition, Alpine created and maintained a "heightened supervision list," which Alpine claims to have created

> as an aid to Alpine employees conducting AML review, and to ensure Alpine's own enhanced scrutiny of transactions. The reasons for inclusion on the list vary and inclusion on the list, or reference to the list, did not constitute any finding by Alpine that there was anything criminally suspicious about the transaction itself. In filing SARs on this basis, and highlighting the list in the SAR narrative, Alpine was providing what it understood to be useful information to regulators, even though a SAR filing was not required.

Alpine contends that many of the SARs it filed "did not meet the requirements for when a SAR must be filed" under Section 1023.320, and were merely "voluntary SARs."

After an Alpine compliance analyst drafted a SAR, the draft SAR would be sent to Alpine's AML Officer, Chief Compliance Officer, and/or a legal analyst for review. The review process could include "additional review of the due diligence packet ..., additional research on Google of the parties involved, research of any stock promotions, and review of trading volume, including discussions with the trading desk if necessary."

**\*3** The SEC's principal allegation in its complaint is that Alpine's AML program and WSPs "did not accurately represent what Alpine did in practice," and that in reality, Alpine's AML program failed to comply with Section 1023.320, and that Alpine thereby violated Rule 17a–8. The complaint divides this general allegation into four

categories of failures. The SEC alleges that Alpine has (1) failed to include pertinent information in approximately 1,950 SARs, (2) failed to file additional or continuing SARs for certain suspicious patterns of transactions in approximately 1,900 instances, (3) filed at least 250 SARs after the 30–day period for filing had elapsed, and (4) failed to maintain supporting information for approximately 1,000 SARs as it is required to do for five years after filing.

## II. The Exemplar SARs

The SEC moves for summary judgment on 36 SARs, on a number of different grounds. For the purposes of this motion, the SEC first contends that Alpine filed 14 SARs with deficient narratives. The SEC has labeled these SARs A through H, J through N, and P. A brief summary of each of the 14 SARs follows. [4]

[4]     The SARs have been submitted under seal. Certain information in the SARs has been omitted from this Opinion to maintain confidentiality. Section 1023.320 prohibits broker-dealers and government entities from "disclos[ing] a SAR or any information that would reveal the existence of a SAR" in all but a few enumerated instances. 31 C.F.R. § 1023.320(e). Given that a major purpose of the BSA is to enable law enforcement to react quickly to evidence of money laundering, SARs are required to be kept confidential in part to prevent the subject of a SAR from learning that their transactions were regarded as suspicious. This Opinion redacts the exact numbers of shares and transaction values to balance confidentiality concerns with clarity regarding the rulings on the transactions at issue.

SAR A was filed April 24, 2012. The SAR A narrative states that the customer "is a client of [SCA], a firm for which Alpine Securities provides clearing services. On or around [date, this customer] deposited a large quantity (4–,––,–– shares) of [issuer], a low-priced ($0.11/share) security. This transaction amounted to approximately $4,––,––.–." The SEC alleges that SAR A insufficiently conveys why the transaction was suspicious, is deficient because it fails to note the involvement of a shell company, and improperly fails to disclose that a foreign entity participated in the transaction; these last two pieces of information are contained in the SAR A support file.

SAR B was filed on April 28, 2012. The narrative portion of the SAR states that the customer

2018 WL 1633818, Fed. Sec. L. Rep. P 100,073

is a client of [SCA], a firm for which Alpine Securities provides securities clearing services. On or around [date, this customer] made a DWAC deposit representing a large quantity (5,—,—— shares) of [issuer], a low-priced ($.0176/share) security into brokerage account [number]. The brokerage account is maintained through Alpine Securities. Alpine is also filing a SAR due to the heightened sensitivity surrounding this client. This proposed transaction is expected to amount to approximately $8–,——.—. [This customer] acquired the shares as a partial settlement of $3,——,—.— owed to them by the issuer. Alpine is filing a SAR due to the heightened sensitivity surrounding the client.

No SAR B support file was submitted. The SEC alleges that the SAR B narrative is deficient because it does not disclose why Alpine thought the transaction was suspicious.

SAR C was filed July 6, 2011. The narrative portion states as follows: The customer

is a client of [SCA], a firm for which Alpine Securities provides securities clearing services. Due to the activity within this account, it has been placed on a Heightened Supervisory list. It is policy of Alpine to file a SARs [sic] related to each deposit of securities into it's [sic] account. On or around [date, this customer] deposited a large quantity (5,——,—— shares) of [issuer], a low-priced ($.019/share) security. This transaction amounted to approximately $1—,——.—.

**\*4** The SAR C support file contains information indicating that a shell company was involved with the transaction, as well as a foreign entity; the SEC alleges that the narrative was deficient because it failed to disclose

that information or why Alpine found the transaction suspicious.

SAR D was filed on January 13, 2012. The narrative states in relevant part that

[d]ue to the activity within this account, it has been placed on a Heightened Supervisory list. It is policy of Alpine to file a SARs [sic] related to each deposit of securities into accounts of this nature. On or around [date, this customer] deposited a large quantity (2,——,——) of [issuer], a low-priced ($.0062/share) security. This transaction amounted to approximately $1–,——.—.

The SEC alleges that this SAR was deficient because it failed to include information contained in the SAR support file that the customer and its CEO were engaged in litigation with the SEC.

SAR E was filed on August 21, 2012. The narrative reads in relevant part that

[o]n or about [date, this customer] deposited a large quantity (2–,——,—— shares) of [issuer], a low-priced ($0.0096/share) security. This transaction amounted to approximately $2—,——.—. Alpine Securities is filing a suspicious activity report because this deposit involves a large volume of shares of a low-priced security and also has a high estimated value.

The SAR E support file contains search results indicating that the customer had previously pleaded guilty to conspiracy relating to counterfeiting, and the SEC contends that SAR E was deficient because it failed to disclose that information.

SAR F was filed on May 5, 2014. The narrative states as follows:

[Customer] is a client of [SCA], a firm for which Alpine Securities provides securities clearing services.

United States Securities and Exchange Commission v...., F.Supp.3d ---- (2018)
2018 WL 1633818, Fed. Sec. L. Rep. P 100,073

Case 2:18-cv-00504-CW Document 15-4 Filed 07/03/18 Page 6 of 29

On or around [date, this customer] deposited a physical stock certificate(s) representing a large quantity (1–,–––,–––– shares) of [issuer], a low-priced ($.0033/ share) security into brokerage account [number]. The brokerage account is maintained through Alpine Securities. Alpine is filing this SAR because of the potentially suspicious nature of depositing large volumes of shares involving a low-priced security(ies). This proposed transaction is expected to amount to approximately $4–,–––.–––.... [This customer] purchased a convertible note for $1–,–––.–– pursuant to an [agreement] on [date]. [This customer] converted $1,–––.–– dollars into 1–million shares. Alpine is also filing a SAR as, shortly thereafter, the shares are worth about 33 times their purchase price, which may be potentially suspicious.

The SAR F support file includes information indicating that the customer had a history of being investigated by the SEC for misrepresentations, and the SEC alleges that Alpine was required to include this information.

SAR G was filed on March 8, 2013. The narrative states

[Customer] is a client of [SCA], a firm for which Alpine Securities provides securities clearing services. It is Alpine's policy to file a SAR for each security deposited into the account because of the heightened sensitivity around this particular account as this account historically makes deposits of large volumes of low-priced securities. For that reason this transaction may be suspicious in nature. On or around [date, this customer] deposited a physical stock certificate(s) representing a large quantity (6,–––,–––– shares) of [issuer], a low-priced ($0.0062/ share) security, into brokerage

account [number]. The brokerage account is maintained through Alpine Securities. This transaction amounted to approximately $4–,–––.–––.

**\*5** The SAR G support file contains information indicating that no company website was found for the issuer, that the issuer was not current in its SEC filings, that the over-the-counter markets placed a stop signal on the issuer's stock, and that there was a history of stock promotion. The SEC alleges that this SAR is deficient because Alpine did not include this information.

SAR H was filed on August 26, 2013. The narrative states that the customer

is a client of [SCA], a firm for which Alpine Securities provides securities clearing services. It is Alpine's policy to file a SAR for each security deposited into the account because of the heightened sensitivity around this particular account as this account historically makes deposits of large volumes of low-priced securities. For that reason this transaction may be suspicious in nature. On or around [date, the customer] deposited a physical stock certificate(s) representing a large quantity (1–,–––,–––– shares) of [issuer], a low-priced ($0.0006/ share) security, into brokerage account [number]. The brokerage account is maintained through Alpine Securities. This transaction amounted to approximately $7,–––.–––.

The SEC alleges that SAR H is deficient because it fails to disclose a history of stock promotion by the issuer and that a foreign entity was involved in the transaction, both pieces of information contained in the SAR H support file.

SAR J was filed on July 16, 2012. The SAR narrative states that the customer is a client of SCA, and that

[d]ue to the activity within this account, it has been placed on

United States Securities and Exchange Commission v..., F. Supp.3d ---- (2018)
2018 WL 1633818, Fed. Sec. L. Rep. P 100,073

Case 2:18-cv-00504-CW Document 15-4 Filed 07/03/18 Page 7 of 29

a Heightened Supervisory list. It is policy of Alpine to file a SARs [sic] related to each deposit of securities into accounts of this nature. On or around [date, this customer] deposited a large quantity (6–,——,—— shares) of [issuer], a low-priced ($.0002/share) security. This transaction amounted to approximately $1–,——.—.

The SEC alleges that SAR J was deficient because the narrative does not disclose that the stock had been promoted, information contained in the SAR J support file.

SAR K was filed on May 6, 2013. The narrative states that the customer in question is a client of SCA, and that Alpine files

a SAR for each security deposited into the account because of the heightened sensitivity around this particular account as this account historically makes deposits of large volumes of low-priced securities. For that reason this transaction may be suspicious in nature. On or around [date, this customer] deposited a physical stock certificate(s) representing a large quantity (1–,——,—— shares) of [issuer], a low-priced ($0.001/share) security, into brokerage account [number]. The brokerage account is maintained through Alpine Securities. This transaction amounted to approximately $1–,——.—.

The SEC alleges that SAR K is deficient because it does not report that the issuer's website is not currently functioning, information contained in the SAR K support file.

SAR L was filed on June 7, 2013. The narrative recites that the customer is a client of SCA, and that it is

Alpine's policy to file a SAR for each security deposited into the account

because of the heightened sensitivity around this particular account as this account historically makes deposits of large volumes of low-priced securities. For that reason this transaction may be suspicious in nature. On or around [date, the customer] deposited a physical stock certificate(s) representing a large quantity (2,——,—— shares) of [issuer], a low-priced ($0.003/share) security, into brokerage account [number]. The brokerage account is maintained through Alpine Securities. This transaction amounted to approximately $8,——.—.

**\*6** The SEC alleges that SAR L is deficient because it does not report that the issuer's corporate registration was in default, information contained in the SAR L support file.

SAR M was filed on April 17, 2013. The SAR M narrative reports that the customer is client of SCA and that

[i]t is Alpine's policy to file a SAR for each security deposited in to the account because of the heightened sensitivity around this particular account as this account historically makes deposits of large volumes of low-priced securities. For that reason this transaction may be suspicious in nature. On or around [date, this customer] deposited a physical stock certificate(s) representing a large quantity (5,——,—— shares) of [issuer], a low-priced ($0.0159/share) security, into brokerage account [number]. The brokerage account is maintained through Alpine Securities. This transaction amounted to approximately $1–,——.—. [This customer] acquired the shares from a promissory note dated [date] in the principal amount of $1–,——.—— issued to [the customer]. The note

is specifically disclosed in 10Q filed [date] period ending [date]. [This customer] converted the entire note into 5,——,—— shares pursuant to the notice of conversion dated [date].

The SEC alleges that because the SAR M narrative does not report that the average shares traded per day over the last three months for the security was 59,108, roughly one hundred times smaller than the single deposit reported in SAR M, SAR M is deficient.

SAR N was filed on June 6, 2013. The SAR narrative states that the customer is a client of SCA, and that on a given date, the customer

> deposited a physical stock certificate(s) representing a large quantity (6–,——,—— shares) of [issuer], a low-priced ($0.0055/ share) security into brokerage account [number]. The brokerage account is maintained through Alpine Securities. The entity is a foreign broker-dealer. Alpine is filing this SAR because of the potentially suspicious nature of depositing large volumes of shares involving a low-priced security(ies). This transaction amounted to approximately $3—,——.—. [This customer] deposited the shares for the benefit of [the customer's] sub-account [name] who is a resident of Panama.

The SEC alleges that SAR N is deficient because it fails to report that the security at issue had a trading volume of around 100,000 shares per day, more than 600 times smaller than the single deposit reported in the SAR, information contained in the support file.

SAR P was filed on March 6, 2014. The SAR P narrative states that the customer is a client of SCA, and that on a given date the customer

> deposited a physical stock certificate(s) representing a large quantity (5—,—— shares) of [issuer], a low-priced ($.55/share)

security into brokerage account [number]. The brokerage account is maintained through Alpine Securities. Alpine is filing this SAR because of the potentially suspicious nature of depositing large volumes of shares involving a low-priced security(ies). This proposed transaction is expected to amount to approximately $2—,——.—. The shares stem from debt owed to [the customer] from the issuer. [This customer] converted a $2–,——.—— portion of the debt into the 5—,—— shares. Alpine is also filing a SAR as the shares represent a potential large return on the investment, which may be suspicious.

**\*7** The SEC alleges that SAR P is deficient because it fails to report that the average trading volume is 10,971, roughly fifty times smaller than the deposit reported in the SAR, information found in the support file.

The SEC also moves for summary judgment on the ground that Alpine failed to file necessary SARs for three of its customers who engaged in patterns of deposit-and-liquidation transactions that are suspicious as a matter of law; the SEC refers to these customers as Customers A, B, and C. The SEC has submitted the SARs that Alpine did file as Customer A SARs 1 through 5, Customer B SARs 1 through 5, and Customer C SARs 1 and 2. Each of these SARs notes that the customer has deposited a large number of certificates of a penny stock. The SEC has also submitted charts that it alleges represent subsequent sales of shares in that same penny stock. The SEC alleges that the pattern of a large deposit of securities followed by successive sales of a large proportion of that deposit required Alpine to file SARs reporting those sales.

The SEC further moves for summary judgment on five SARs it alleges were filed late; these SARs are labeled Late SARs 1 through 5. Each of these five SARs was filed between 189 and 211 days after the underlying transaction.

Lastly, the SEC moves for summary judgment on five SARs for which it alleges Alpine has not maintained support files for five years, as it is required to do. These SARs are labeled Missing File SARs 1 through 5. The SEC

2018 WL 1633818, Fed. Sec. L. Rep. P 100,073

has submitted the SARs and alleges that Alpine did not produce any support files for those SARs when requested to do so by the SEC in 2016.


### Procedural History

The SEC filed this action on June 5, 2017. On August 3, Alpine moved to dismiss under Rules 12(b)(2) and 12(b)(3) for lack of personal jurisdiction and improper venue, or to transfer venue to the District of Utah under 28 U.S.C. § 1404(a). The August 3 motion to dismiss or to transfer was denied at a conference on September 15.

Alpine answered the complaint on September 29, 2017, and filed an amended answer on October 27. On November 13, the SEC filed a motion to strike affirmative defenses of estoppel, waiver, and unclean hands asserted in Alpine's amended answer. The November 13 motion to strike was granted January 12, 2018.

A Scheduling Order of September 15, 2017 set the discovery schedule, which is ongoing. Fact discovery was scheduled to conclude on March 30, 2018. Expert reports and disclosures of expert testimony were due to be served by April 20, and identification of rebuttal experts and disclosure of their expert testimony to be served by May 11. Any motion for summary judgment, or a joint pretrial order, is due July 13, 2018. [5]

[5] On March 21, the parties jointly sought to extend this schedule by 21 days. The Court denied the motion on March 22 insofar as it sought to extend the July 13 date on which summary judgment motions or pretrial materials are due, but permitted the parties to extend the interim dates on consent.

As invited by the Court, the SEC moved for partial summary judgment on December 6, 2017. In connection with its motion, and pursuant to an Order of December 13, the SEC submitted 36 SARs under seal as examples of the four categories of Rule 17a–8 violations it asserts. The SEC's motion became fully submitted on February 9, 2018. Alpine moved for summary judgment and for judgment on the pleadings on January 19. Alpine's motion became fully submitted on February 26.

### Discussion

**\*8** The parties have cross-moved for summary judgment. "On a motion for summary judgment, the court must resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Dufort v. City of New York, 874 F.3d 338, 347 (2d Cir. 2017) (citation omitted). "For the court to grant summary judgment, the movant must show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 113 (2d Cir. 2017) (citation omitted).

[1] In assessing a motion for judgment on the pleadings under Rule 12(c), Fed. R. Civ. P., the court "accept[s] all factual allegations in the complaint as true and construe[s] them in the light most favorable to the non-moving party." Latner v. Mt. Sinai Health Sys., Inc., 879 F.3d 52, 54 (2d Cir. 2018). This is the "same standard as that applicable to a motion under Rule 12(b)(6)." Mantena v. Johnson, 809 F.3d 721, 727 (2d Cir. 2015) (citation omitted).

[2] [3] [4] [5] An agency to which Congress has delegated authority to administer a statute is entitled to judicial deference to its views of the statute it administers. If an agency promulgates a regulation and complies with the notice-and-comment procedures defined in the Administrative Procedure Act ("APA"), 5 U.S.C. § 500, et seq., a court reviews the regulation under the two-part framework established in Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Formal adjudications by an agency are also binding on a court if the agency view passes Chevron review. See, e.g., ABF Freight Sys., Inc. v. NLRB, 510 U.S. 317, 324, 114 S.Ct. 835, 127 L.Ed.2d 152 (1994). Giving an agency the power to regulate via adjudication as well as via rulemaking implies the power to govern conduct prospectively, via rules and retrospectively, in the form of adjudications. See SEC v. Chenery Corp., 332 U.S. 194, 201–02, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947); see also Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 221, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (Scalia, J., concurring) (defining adjudication as "that form of administrative action where retroactivity is not only permissible but standard").

**[6] [7]** "Step One of Chevron analysis requires the court to determine whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Lawrence + Memorial Hosp. v. Burwell, 812 F.3d 257, 264 (2d Cir. 2016) (citation omitted). If the statute is ambiguous or silent on the question, however, "[t]he question for the reviewing court ... is whether the agency's answer to the interpretive question is based on a permissible construction of the statute." Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA, 846 F.3d 492, 520 (2d Cir. 2017) (citation omitted). "The agency's view need not be the only possible interpretation, nor even the interpretation deemed most reasonable by the courts," so long as the interpretation is "reasonable" and not "not arbitrary, capricious, or manifestly contrary to the statute." Id. (emphasis in original) (citation omitted).

**[8] [9]** Similarly, a court must defer to an agency's "interpretation of its own regulations unless that interpretation is plainly erroneous or inconsistent with the regulation." Nat. Res. Def. Council v. EPA, 808 F.3d 556, 569 (2d Cir. 2015) (citation omitted). This is true even if the agency's interpretation of its regulation was not promulgated through formal procedures prescribed by the APA, but, for example, is advanced in a legal brief. See Talk Am., Inc. v. Mich. Bell Tel. Co., 564 U.S. 50, 59, 131 S.Ct. 2254, 180 L.Ed.2d 96 (2011). This kind of deference is referred to as "Auer deference" after Auer v. Robbins, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997), but it is "warranted only when the language of the regulation is ambiguous." Christensen v. Harris Cty., 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). If a regulation is unambiguous, the clear meaning of the regulation controls and may not be overridden by an inconsistent agency interpretation. See id.

**\*9 [10] [11]** An agency may announce an interpretation of a statute it administers in a variety of ways that do not receive Chevron deference but that nonetheless receive "a respect proportional to [their] power to persuade." United States v. Mead Corp., 533 U.S. 218, 235, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944) ). This level of deference is referred to as Skidmore deference. A less formal agency interpretation of this nature is often referred to as "guidance," although whether it is entitled to Auer deference or merely Skidmore deference depends both on the ambiguity of the agency regulation and on whether the guidance is interpreting the statute, in which case it is merely persuasive, or the regulation, in which case Auer deference may be appropriate. See, e.g., Alaska Dep't of Envtl. Conservation v. EPA, 540 U.S. 461, 487–88, 124 S.Ct. 983, 157 L.Ed.2d 967 (2004); Christensen, 529 U.S. at 588, 120 S.Ct. 1655. The weight given to a guidance document of this sort "in turn depends on, inter alia, the thoroughness evident in its consideration, the validity of its reasoning, and its consistency with earlier and later pronouncements." Catskill Mountains, 846 F.3d at 509 (citation omitted). This kind of agency action can take many forms, including agency opinion letters, policy statements, agency manuals, and enforcement guidelines. See New York v. Next Millenium Realty, LLC, 732 F.3d 117, 125 n.8 (2d Cir. 2013).

**I. The SAR Regulatory Framework**

**[12]** The Exchange Act delegates to the SEC broad authority to regulate brokers and dealers in securities. See 15 U.S.C. § 78b; id. § 78q–1. A broker is "any person engaged in the business of effecting transactions in securities for the account of others." Id. § 78c(a)(4) (A). A dealer is "any person engaged in the business of buying and selling securities ... for such person's own account through a broker or otherwise." Id. § 78c(a)(5) (A). Brokers and dealers may not engage in the business of buying and selling securities unless they register with the SEC. See id. § 78o.

Because of their importance to the national markets, broker-dealers are subject to a number of regulations, both state and federal, administered by a variety of organizations. See generally 1 Hazen, Treatise on the Law of Securities Regulation § 1:12 (2017). Although the SEC is the primary federal regulator of broker-dealers, SEC oversight is "supplemented by a system of self regulation" also created by the Exchange Act. 4 id. § 14:7. The self-regulatory organization ("SRO") that governs broker-dealers such as Alpine is the Financial Industry Regulatory Authority ("FINRA"), the successor organization to the National Association of Securities Dealers ("NASD"). See generally Fiero v. FINRA, Inc., 660 F.3d 569, 571 & n.1 (2d Cir. 2011).

Section 17(a) of the Exchange Act mandates that

United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2018)
Case 2:18-cv-00504-CW Document 15-4 Filed 07/03/18 Page 11 of 29
2018 WL 1633818, Fed. Sec. L. Rep. P 100,073

[e]very ... registered broker or dealer... shall make and keep for prescribed periods such records, furnish such copies thereof, and make and disseminate such reports as the Commission, by rule, prescribes as necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter.

15 U.S.C. § 78q(a)(1). In 1981, the SEC promulgated with notice and comment Rule 17a–8, which provides that "[e]very registered broker or dealer ... shall comply with the reporting, recordkeeping and record retention requirements of chapter X of title 31 of the Code of Federal Regulations." 17 C.F.R. § 240.17a–8. That title contains regulations promulgated by the Treasury and FinCEN under the BSA.

FinCEN and the Treasury promulgated, with notice and comment, Section 1023.320, which defines a broker-dealer's obligation to file SARs. In pertinent part, it reads as follows:

A transaction requires reporting under the terms of this section if it is conducted or attempted by, at, or through a broker-dealer, it involves or aggregates funds or other assets of at least $5,000, and the broker-dealer knows, suspects, or has reason to suspect that the transaction (or a pattern of transactions of which the transaction is a part):

**\*10** (i) Involves funds derived from illegal activity or is intended or conducted in order to hide or disguise funds or assets derived from illegal activity (including, without limitation, the ownership, nature, source, location, or control of such funds or assets) as part of a plan to violate or evade any Federal law or regulation or to avoid any transaction reporting requirement under Federal law or regulation;

(ii) Is designed, whether through structuring or other means, to evade any requirements of this chapter or of any other regulations promulgated under the Bank Secrecy Act;

(iii) Has no business or apparent lawful purpose or is not the sort in which the particular customer would

normally be expected to engage, and the broker-dealer knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction; or

(iv) Involves use of the broker-dealer to facilitate criminal activity.

31 C.F.R. § 1023.320(a)(2) (emphasis supplied).

The regulations define "transaction" broadly. The definition states that a transaction is

a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, security, contract of sale of a commodity for future delivery, option on any contract of sale of a commodity for future delivery, option on a commodity, purchase or redemption of any money order, payment or order for any money remittance or transfer, purchase or redemption of casino chips or tokens, or other gaming instruments or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected.

Id. § 1010.100(bbb)(1) (emphasis supplied). These regulations are found in chapter X of title 31 of the Code of Federal Regulations, so compliance is required by Rule 17a–8.

As is plain from its text, Section 1023.320 requires reporting in broadly defined situations. In targeting all possible types of illegal activity, the regulation covers a large range of conduct such that it is susceptible to a number of interpretations. Due to the breadth of Section 1023.320, FinCEN's interpretation of Section 1023.320 as expressed in guidance and other documents is entitled to

deference and is binding so long as it is reasonable and is consistent with earlier and later pronouncements.

The BSA's regulations do not define "pattern of transactions." In the notice of final rule published in the Federal Register with the implementation of Section 1023.320, however, FinCEN explained that

> [t]he language in the rule requiring the reporting of patterns of transactions is not intended to impose an additional reporting burden on broker-dealers. Rather, it is intended to recognize the fact that a transaction may not always appear suspicious standing alone. In some cases, a broker-dealer may only be able to determine that a suspicious transaction report must be filed after reviewing its records, either for the purposes of monitoring for suspicious transactions, auditing its compliance systems, or during some other review. The language relating to patterns of transactions is intended to make explicit the requirement that FinCEN believes implicitly exists in the suspicious transaction reporting rules for banks: if a broker-dealer determines that a series of transactions that would not independently trigger the suspicion of the broker-dealer, but that taken together, form a suspicious pattern of activity, the broker-dealer must file a suspicious transaction report.

**\*11** FinCEN, Amendment to the Bank Secrecy Act Regulations—Requirement that Brokers or Dealers in Securities Report Suspicious Transactions, 67 Fed. Reg. 44,048, 44,051 (July 1, 2002) ("FinCEN Section 1023.320 Notice") (emphasis supplied).

The current form of Section 1023.320 was promulgated in 2002, after the USA PATRIOT Act of 2001 significantly increased the scope of the Bank Secrecy Act. See USA PATRIOT ACT of 2001, Pub. L. No. 107–56, 115 Stat. 272 ("Patriot Act"). As relevant here, Congress specifically found that money laundering was being used

to finance terrorist organizations, and sought to increase reporting of transactions that potentially involved money laundering. See id., sec. 302, 115 Stat. at 296–98.

The Treasury has delegated enforcement of the BSA to FinCEN, and FinCEN has issued a number of guidance documents interpreting Section 1023.320. See Treasury Order 180–01, Financial Crimes Enforcement Network, 67 Fed. Reg. 64,697 ¶ 3 (Oct. 21, 2002). In guidance documents, FinCEN indicates that SARs should include the who, what, when, why, where, and how of the suspicious activity (the "Five Essential Elements").[6] See SAR Narrative Guidance at 3–6; SAR Activity Review, Issue 22, at 39–40;[7] 2012 SAR Instructions at 110–12.[8] The who encompasses the "occupation, position or title ..., and the nature of the suspect's business(es)," the what includes "instruments or mechanisms involved" such as wire transfers, shell companies, and "bonds/notes," and the why includes "why the activity or transaction is unusual for the customer; consider[ing] the types of products and services offered by the [filer's] industry, and the nature and normally expected activities of similar customers." SAR Narrative Guidance at 3–4. The obligation to identify involved parties extends to all "subject(s) of the filing," and "filers should include as much information as is known to them about the subject(s)." SAR Activity Review, Issue 22, at 39.

---

[6]  FinCEN guidance refers to the who, what, where, when, and why, as the "five essential elements" of a SAR narrative, but also adds that a sixth element, "the method of operation (or how?)[,] is also important." FinCEN, Guidance on Preparing a Compete & Sufficient Suspicious Activity Report Narrative 3 (2003), https://www.fincen.gov/sites/default/files/shared/sarnarrcompletguidfinal_112003.pdf ("SAR Narrative Guidance"). For clarity, this Opinion follows FinCEN in calling these the Five Essential Elements of a SAR.

[7]  FinCEN, The SAR Activity Review: Trends, Tips & Issues, Issue 22 (Oct. 2012), https://www.fincen.gov/sites/default/files/shared/sar_tti_22.pdf.

[8]  FinCEN, FinCEN Suspicious Activity Report (FinCEN SAR) Electronic Filing Instructions (2012), https://www.fincen.gov/sites/default/files/shared/FinCEN%20SAR%

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

20ElectronicFilingInstructions-% 20Stand% 20Alone
% 20doc.pdf.

Examples of relevant information listed by FinCEN include "bursts of activities within a short period of time," SAR Narrative Guidance at 5, whether foreign individuals, entities, or jurisdictions are involved, 2012 SAR Instructions at 112, or the involvement of unregistered businesses, SAR Narrative Guidance at 5. A common scenario identified by FinCEN as suspicious involves a "[s]ubstantial deposit ... of very low-priced and thinly traded securities" followed by the "[s]ystematic sale of those low-priced securities shortly after being deposited." SAR Activity Review, Issue 15, at 24.[9] FinCEN has explained that "[t]ransactions like these are red flags for the sale of unregistered securities, and possibly even fraud and market manipulation," and firms need to "investigate[ ] thoroughly" such questions as "the source of the stock certificates, the registration status of the shares, how long the customer has held the shares and how he or she happened to obtain them, and whether the shares were freely tradable." Id.

[9]     FinCEN, The SAR Activity Review: Trends, Tips & Issues, Issue 15 (May 2009), https://www.fincen.gov/ sites/default/files/shared/sar_tti_15.pdf.

 *12  To implement its suspicious activity reporting system, FinCEN issued, after notice and comment, two forms relevant to Alpine's conduct. The first, form SAR–SF, was mandatory from 2002 until 2012 ("2002 Form").[10] The second became mandatory in 2012 ("2012 Form").[11]

[10]     See FinCEN, Proposed Collection, Comment Request, Suspicious Activity Report by the Securities and Futures Industry, 67 Fed. Reg. 50,751 (Aug. 5, 2002).

[11]     See FinCEN, Proposed Collection, Comment Request, Bank Secrecy Act Suspicious Activity Report Database Proposed Data Fields, 75 Fed. Reg. 63,545 (Oct. 15, 2010).

The 2002 Form contains instructions and a checklist that directs filers to include a number of pieces of information when filing a SAR. The instructions state that the narrative

> section of the report is **critical**.
> The care with which it is

> completed may determine whether
> or not the described activity and
> its possible criminal nature are
> clearly understood by investigators.
> Provide a clear, complete and
> chronological description ... of the
> activity, including what is unusual,
> irregular or suspicious about the
> transaction(s), using the checklist
> below as a guide.

2002 Form at 4 (emphasis in original). The checklist has 22 items, each directing filers to include a specific type of information. The following items are particularly relevant to the present motions:

> h. Indicate whether the suspicious activity is an isolated incident or relates to another transaction.
>
> i. Indicate whether there is any related litigation. If so, specify the name of the litigation and the court where the action is pending.
>
> ...
>
> l. Indicate whether U.S. or foreign currency and/or U.S. or foreign negotiable instrument(s) were involved. If foreign, provide the amount, name of currency, and country of origin.
>
> ...
>
> o. Indicate any additional account number(s), and any foreign bank(s) account number(s) which may be involved.
>
> p. Indicate for a foreign national any available information on subject's passport(s), visa(s), and/or identification card(s). Include date, country, city of issue, issuing authority, and nationality.
>
> q. Describe any suspicious activities that involve transfer of funds to or from a foreign country, or transactions in a foreign currency. Identify the country, sources and destinations of funds.

Id.

Beginning in 2012, FinCEN switched to an e-file system.[12] The SEC has submitted excerpts from a document entitled "FinCEN Suspicious Activity Report (FinCEN SAR) Electronic Filing Requirements." This

United States Securities and Exchange Commission v...., F.Supp.3d ---- (2018)
Case 2:18-cv-00504-CW Document 15-4 Filed 07/03/18 Page 14 of 29
2018 WL 1633818, Fed. Sec. L. Rep. P 100,073

document, dated October 2012, directs that "[f]ilers must provide a clear, complete, and concise description of the activity, including what was unusual or irregular that caused suspicion." 2012 SAR Instructions at 111. The document contains a checklist similar in all material respects to the checklist on the 2002 Form. [13] Seeid. at 111–12.

[12]    SARs submitted by the SEC filed on the 2012 Form do not themselves contain instructions. The parties have not indicated in their submissions whether FinCEN's e-filing website contains such instructions on the screens where SARs are submitted.

[13]    The 2012 Form does not state, however, that filers should indicate additional bank account numbers or foreign bank account numbers that may be involved.

A broker-dealer is required to "maintain a copy of any SAR filed and the original or business record equivalent of any supporting documentation for a period of five years from the date of filing the SAR." 31 C.F.R. § 1023.320(d). If multiple broker-dealers are involved in a transaction, "[t]he obligation to identify and properly and timely to report a suspicious transaction rests with each broker-dealer involved ... provided that no more than one report is required to be filed by the broker-dealers involved in a particular transaction (so long as the report filed contains all relevant facts)." Id. § 1023.320(a)(3).

*13  SARs must be filed "no later than 30 calendar days after the date of the initial detection by the reporting broker-dealer of facts that may constitute a basis for filing a SAR under this section." Id. § 1023.320(b)(3). Where no suspect of the potentially illegal activity can be immediately identified, a broker-dealer may take an additional 30 days to attempt to identify a suspect. Id. § 1023.320(b)(3). In addition, "[a] broker-dealer may also file with FinCEN a report of any suspicious transaction that it believes is relevant to the possible violation of any law or regulation but whose reporting is not required by this section." Id. § 1023.320(a)(1).

Broker-dealers are required to file SARs for continuing activity that follows the original SAR. For instance, FinCEN guidance provides that a "continuing report should be filed on suspicious activity that continues after an initial FinCEN SAR is filed," and that "[f]inancial institutions ... may file SARs for continuing activity after a 90 day review with the filing deadline being 120 days

after the date of the previously related SAR filing." 2012 SAR Instructions at 84. "Continuing reports must be completed in their entirety" and the narrative section "should include all details of the suspicious activity for the 90–day period encompassed by the report, and only such data from prior reports as is necessary to understand the activity." Id. Moreover, "[a]n amended report must be filed on a previously-filed FinCEN SAR ... whenever new data about a reported suspicious activity is discovered and circumstances will not justify filing a continuing report." Id. at 83.

Finally, broker-dealers are required to maintain written AML policies that define how the broker-dealer detects potential money laundering and files SARs. This requires broker-dealers to engage in "ongoing customer due diligence," which includes

(i) Understanding the nature and purpose of customer relationships for the purpose of developing a customer risk profile; and

(ii) Conducting ongoing monitoring to identify and report suspicious transactions and, on a risk basis, to maintain and update customer information ... includ[ing] information regarding the beneficial owners of legal entity customers.

31 C.F.R. § 1023.210(b)(5). [14]  These duties to maintain ongoing reviews of customers and transactions are in addition to a broker-dealer's obligation to verify the identities of its customers such that it is able "to form a reasonable belief that it knows the true identity of each customer" based on

the broker-dealer's assessment of the relevant risks, including those presented by the various types of accounts maintained by the broker-dealer, the various methods of opening accounts provided by the broker-dealer, the various types of identifying information available and the broker-dealer's size, location and customer base.

Id. § 1023.220(a)(2).

[14]    FINRA similarly requires broker-dealers to "use reasonable diligence, in regard to the opening

and maintenance of every account, to know (and retain) the essential facts concerning every customer and concerning the authority of each person acting on behalf of such customer." FINRA Rule 2090 (2012), http://finra.complinet.com/en/display/ display_main.html?rbid=2403& element_id=9858. FINRA Rule 2090 relates to the obligation of broker-dealers to be aware of their customers' investment objectives when recommending securities. See generally 5 Hazen, Treatise on the Law of Securities Regulation § 14:138 (2017).

In 2002, FinCEN delegated its BSA authority over broker-dealer AML programs to the SEC. FinCEN, Anti–Money Laundering Programs for Financial Institutions, 67 Fed. Reg. 21,110 (Apr. 29, 2002) (interim final rule effective April 24, 2002); see also 31 C.F.R. § 1023.210(c) (requiring a broker-dealer AML program to "[c]ompl[y] with the rules, regulations, or requirements of its self-regulatory organization governing such programs"). The SEC then delegated this authority to SROs, and approved AML best practices submitted by the SROs. See SEC, Order Approving Proposed Rule Changes Relating to Anti–Money Laundering Compliance Programs, 67 Fed. Reg. 20,854 (Apr. 26, 2002). FINRA Rule 3310 currently governs its members' AML programs. See SEC, Order Approving Proposed Rule Change to Adopt FINRA Rule 3310 (Anti–Money Laundering Compliance Program) in the Consolidated FINRA Rulebook, SEC Release No. 60645, 2009 WL 2915633 (Sept. 10, 2009). Rule 3310 requires member firms to have a written AML policy that receives approval from FINRA's senior management and that "[e]stablish[es] and implement[s] policies, procedures, and internal controls reasonably designed to achieve compliance with the Bank Secrecy Act and the implementing regulations thereunder." FINRA Rule 3310 (2015). [15]

15    Found at http://finra.complinet.com/en/display/ display_main.html?rbid=2403& element_id=8656. The current version of Rule 3310 was adopted in 2015. The version of the rule that was effective between 2011 and 2015 is materially the same. See FINRA Rule 3310 (2011), http://finra.complinet.com/en/display/ display_main.html?rbid=2403& record_id=11859.

II. Alpine Motion for Summary Judgment and for Judgment on the Pleadings

*14 Alpine moves for summary judgment principally on the ground that the SEC is not authorized to enforce BSA regulations via Rule 17a–8. Alpine also moves for judgment on the pleadings on the ground that the SEC's complaint fails to plead that Alpine willfully or recklessly violated BSA regulations. For the reasons that follow, Alpine's motion for summary judgment and for judgment on the pleadings is denied.

A. Alpine Motion for Summary Judgment

Alpine makes two related arguments in support of summary judgment. First, it argues that in the instant action the SEC is suing under the BSA, a statute it is not authorized to enforce. Because the gravamen of the SEC's complaint is Alpine's alleged failure to comply with the BSA SAR regulation, Alpine argues that this suit is not actually brought under Rule 17a–8, despite what the complaint itself says. Alpine is incorrect.

The SEC promulgated Rule 17a–8. The plain text of that rule requires broker-dealers to "comply with the reporting, recordkeeping and record retention requirements of chapter X of title 31 of the Code of Federal Regulations." 17 C.F.R. § 240.17a–8. Alpine does not contest that the SEC has enforcement authority to pursue violations of the Exchange Act. Since this suit is brought pursuant to the Exchange Act, Alpine's first argument fails.

[13] This leads to Alpine's second argument. Alpine contends that even if this suit is brought under Rule 17a–8, that rule is an impermissible interpretation of Section 17(a) of the Exchange Act, 15 U.S.C. § 78q(a). Alpine raises two principal issues with Rule 17a–8. First, Alpine argues that the rule itself is not a reasonable interpretation of the Exchange Act, and is therefore invalid. [16] Second, Alpine argues that to the extent Rule 17a–8 was ever a valid interpretation of the statute, the failure to update the regulation or to engage in notice-and-comment procedures after the significant 2002 revisions to the relevant part of Title 31 precludes the SEC from enforcing Rule 17a–8 against Alpine for its allegedly deficient SARs. Each contention is addressed in turn.

16    To some extent, Alpine's papers can be read to assert that the SEC lacks jurisdiction to enforce suspicious activity reporting regulations. "[T]he distinction between jurisdictional and nonjurisdictional interpretations" of statutory ambiguity is "a mirage." City of Arlington v. FCC, 569 U.S. 290, 297, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013). Accordingly, insofar as the question is

whether the Exchange Act confers jurisdiction on the SEC over suspicious transaction reporting, the same framework of analysis supplies the rule of decision. See New York v. FERC, 783 F.3d 946, 953 (2d Cir. 2015).

The validity of an agency's regulation interpreting a statute is judged by the familiar two-part test derived from Chevron. The Exchange Act provides that entities, including brokers and dealers, subject to the Exchange Act

> shall make and keep for prescribed periods such records, furnish such copies thereof, and make and disseminate such reports as the Commission, by rule, prescribes as necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter.

15 U.S.C. § 78q(a)(1) (emphasis supplied). Under Chevron step one, this regulation expressly commits to the SEC discretion to determine which reports are "necessary or appropriate" to further the goals of the Exchange Act, and empowers the SEC to promulgate rules defining recordkeeping and reporting obligations of broker-dealers. Id.

**\*15** This express delegation of rulemaking authority satisfies the Chevron test. Even if it were necessary to proceed to Chevron's step two, the SEC has easily shown that Rule 17a–8, which requires compliance with certain BSA regulations, is a reasonable interpretation of Section 17(a) of the Exchange Act. It has shown that the duty to file a SAR is reasonably "necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of" the Exchange Act. Id. SARs are reports that assist law enforcement in detecting whether transactions have "no apparent or lawful purpose," or involve "funds derived from illegal activity," "structuring or other means" of evading requirements of the BSA, or the "facilitat[ion] of illegal activity." 31 C.F.R. § 1023.320(a)(2). The purposes of the Exchange Act are to protect the national securities market and "safeguard[ ] ... securities and funds related thereto." 15 U.S.C. § 78b; see also 15 U.S.C. § 78q–1. It is reasonable to conclude that the same reports that help the Treasury target illegal securities transactions for its purposes also help protect investors by providing

information to the SEC that may be relevant to whether a stock or a market is being manipulated in violation of the nation's securities laws.

Alpine resists this conclusion by arguing that the SEC may not incorporate the regulations of another agency. Not surprisingly, Alpine does not cite any authority to support that counter-intuitive proposition. Instead, Alpine presents a parade of horribles—such as the SEC enforcing broker-dealers' tax-filing obligations through Section 17(a)—or relies on cases where a statute expressly excluded certain remedies or actions. See, e.g., United States ex rel. Lissack v. Sakura Global Capital Mkts., Inc., 377 F.3d 145, 152 (2d Cir. 2004) (False Claims Act has express bar stating that it does not apply to claims brought under the Internal Revenue Code.).

Moreover, neither the Exchange Act nor the BSA expressly precludes joint regulatory authority by FinCEN and the SEC over the reporting of potentially suspicious transactions. And Alpine itself cites at least one case where Congress's silence regarding whether a state remedy precluded a concurrent federal remedy was held not to bar concurrent remedies. See Adams Fruit Co. v. Barrett, 494 U.S. 638, 649–50, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990) (declining to defer to agency conclusion that federal statute was preempted by state law and holding that both state and federal remedies were available to migrant workers).

Alpine's second contention is that, regardless of whether Rule 17a–8 could be a validly promulgated regulation, the SEC never properly solicited public comment on Rule 17a–8 as it relates to the expanded BSA regulation of broker-dealers upon the enactment of the Patriot Act. Alpine's position is unpersuasive.

First, the text of the regulation itself, as well as the SEC's 1981 notice of final rule, unambiguously demonstrate the SEC's intent for the nature of the Rule 17a–8 reporting obligation to evolve over time through the Treasury's regulations. The text of the rule simply incorporates the entirety of "chapter X of title 31 of the Code of Federal Regulations." 17 C.F.R. § 240.17a–8. Rather than imposing a separate and competing set of reporting obligations on broker-dealers, the SEC made government more efficient by incorporating the obligations that had been and would be imposed by the Treasury. As the notice of final rule states: "[t]he rule does not specify the required

reports and records so as to allow for any revisions the Treasury may adopt in the future." SEC, Recordkeeping by Brokers and Dealers, 46 Fed. Reg. 61,454, 61,455 (Dec. 17, 1981).

Moreover, FinCEN saw Rule 17a–8 the way the SEC does, namely that Rule 17a–8 was promulgated to impose the same obligations on broker-dealers under the Exchange Act as the Treasury imposed under the BSA, including any changes to those obligations over time. The notice of final rule for the original version of Section 1023.320 acknowledged that the scope of the SEC's Rule 17a–8 would include the new BSA broker-dealer regulations:

> The SEC adopted rule 17a–8 in 1981 under the Securities and Exchange Act of 1934 ("Exchange Act"), which enables the SROs, subject to SEC oversight, to examine for BSA compliance. Accordingly, both the SEC and SROs will address broker-dealer compliance with this rule.

**\*16** FinCEN Section 1023.320 Notice, 67 Fed. Reg. at 44,049.

Finally, in a formal adjudication the SEC has announced its view that Rule 17a–8 encompasses the post-2002 BSA regulations. SeeIn re Bloomfield, SEC Release No. 9553, 2014 WL 768828, at \*15–\*17 (Feb. 24, 2014), vacated in part on other grounds, In re Gorgia, SEC Release No. 9743, 2015 WL 1546302 (Apr. 8, 2015) (vacating sanctions as to one individual who died during the pendency of the administrative proceedings), aff'd, 649 Fed.Appx. 546, 549 (9th Cir. 2016). It has also issued several settled orders expressing its view that a broker-dealer's failure to file SARs violates Rule 17a–8. SeeIn re Biremis Corp., SEC Release No. 68456, 2012 WL 6587520, at \*13 (Dec. 18, 2012); seealsoIn re Oppenheimer & Co., FinCEN Assessment No. 2015–01 (Jan. 26, 2016), https://www.fincen.gov/sites/default/files/enforcement_action/ Oppenheimer_Assessment_20150126.pdf; In re Oppenheimer & Co., SEC Release No. 3621, 2015 WL 331117, at \*8 (Jan. 27, 2015). These expressions of the SEC's view have been consistent over the years and Alpine has not presented any contrary SEC position that would undermine the agency's interpretation of Rule 17a–8. Accordingly, Alpine's motion for summary judgment

is denied. Rule 17a–8 is a valid interpretation of the Exchange Act, and validly encompasses the suspicious activity reporting obligation of Section 1023.320.

### B. Alpine Motion for Judgment on the Pleadings
**[14]** In addition to its motion for summary judgment, Alpine moves for judgment on the pleadings. Alpine asserts that the SEC failed to plead that it negligently or willfully violated the BSA, as required to prove a violation of that statute.

Given the foregoing analysis, Alpine's motion for judgment on the pleadings is easily denied. This suit is brought solely under the Exchange Act, specifically under Section 17(a) and Rule 17a–8. Although Alpine's intent is relevant to the remedy if the SEC carries its burden of proving a violation of Rule 17a–8, see15 U.S.C. § 78u(d)(3), neither Section 17(a) nor Rule 17a–8 includes a separate element of scienter. [17] See15 U.S.C. § 78q; 17 C.F.R. § 240.17a–8. AccordStead v. SEC, 444 F.2d 713, 716–17 (10th Cir. 1971) (holding that a defendant's knowledge that a securities transaction was not recorded was sufficient to show a violation of Section 17(a) of the Exchange Act). In those provisions of the Exchange Act in which Congress has imposed a scienter requirement for a violation to be found, it has done so expressly with language not found in Section 17(a).

[17]    Alpine's suggestion that this holding would deprive it of constitutionally required notice is meritless, as it is plain from the text of Rule 17a–8 and the Exchange Act's penalty provisions that liability may be imposed without regard to scienter.

### III. SAR Narratives Missing Information
**[15]** The remainder of this Opinion addresses the SEC's motion for summary judgment. The SEC's first category of alleged violations consists of SARs whose narrative sections the SEC alleges lack certain required information. Within this category are seven subcategories. The SEC has submitted 14 SARs in support of this branch of its motion. Each subcategory of SARs is addressed in turn.

### A. Basic Customer and Suspiciousness Information
**\*17** The SEC contends that Alpine omitted some of the Five Essential Elements in the narratives of SARs A, B, and C. The SEC is correct.

United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2018)
2018 WL 1633818, Fed. Sec. L. Rep. P 100,073

Case 2:18-cv-00504-CW  Document 15-4  Filed 07/03/18  Page 18 of 29

SARs A and C were completed on the 2002 Form. The 2002 Form warns that the narrative section of the report is "critical." It instructs the filer to "[p]rovide a clear, complete and chronological description ... of the activity, including what is unusual, irregular or suspicious about the transaction(s), using [a] checklist" also found on the form. The 2012 SAR Instructions contains the same instruction.

Each of the three narratives at issue reports an enormous deposit of shares in a penny stock: over 40, over 5 and over 5 million shares, respectively. But, none of the narratives describe who the client is by, for instance, describing the nature of its business. The SAR A narrative also fails to describe why the transaction is unusual for the customer's business or to convey why Alpine thought the transaction was suspicious. The narratives for SARs B and C are similarly unhelpful. SAR B states that "Alpine is filing a SAR due to the heightened sensitivity surrounding the client" without explaining what led to that heightened sensitivity. SAR C states that "[i]t is the policy of Alpine to file a SAR[ ] related to each deposit of securities into it[ ]s account" without explaining why Alpine adopted the policy of filing a SAR for every deposit made by that customer. The SEC has carried its burden to show that three SARs are deficient as a matter of law for their failure to describe the "who" and "why" of the transaction, and to describe why the underlying transactions were suspicious.

Alpine does not argue that it was not required to include information on the SARs regarding the Five Essential Elements, that the three SARs included such information, or that the SARs A, B, or C otherwise met the requirements of the law for completeness. Instead, Alpine opposes the entry of summary judgment with three other arguments. [18] First, it states that summary judgment is not warranted because the SEC has not offered evidence that Alpine knew or suspected that the transaction at issue was criminal. But, as described above, the SEC has no burden to prove scienter to show a violation of Rule 17a–8. Moreover, Section 1023.320 itself imposes an objective test: a SAR must be filed when the broker-dealer has "reason to suspect" that the transaction requires the filing. 31 C.F.R. § 1023.320(a)(2).

[18] Alpine makes many of these arguments in opposition to each of the prongs of the SEC's summary judgment motion. To the extent they are rejected here, they are also rejected in connection with Alpine's arguments regarding the remaining SARs.

[16]  Second, Alpine argues that it was entitled to rely on SARs filed by the introducing broker for the transaction, and that the SEC has the burden to disprove the existence of such a SAR. While Alpine is correct that it may rely on such SARs, it carries the burden of showing that an introducing broker filed SARs and that the filed SARs were complete.

Section 1023.320 explicitly places that burden on Alpine. It provides that

> [t]he obligation to identify and properly and timely report a suspicious transaction rests with each broker-dealer involved in the transaction, provided that no more than one report is required to be filed by the broker-dealers involved in a particular transaction (so long as the report filed contains all relevant facts).

*18 31 C.F.R. § 1023.320(a)(3) (emphasis supplied). Section 1023.320 also provides that introducing and clearing brokers who file joint SARs may share the SARs with each other. See id. § 1023.320(e)(1)(ii)(A)(2)(i). Alpine has not provided any evidence that any joint filings were made, that the introducing brokers for these transactions filed the necessary SARs, or that any filed SARs were sufficiently complete to meet the law's requirements for disclosure.

[17]  Finally, Alpine argues that the SEC has failed to show that it was required to file a SAR for these transactions. Alpine contends that it routinely filed voluntary SARs when it was not required to file any SAR and that that practice included these three SARs. [19] It is certainly true that Section 1023.320 allows for the voluntary filing of SARs, that is, the filing of a SAR even when a filing is not required by law. See 31 C.F.R. § 1023.320(a)(1). It is noteworthy, however, that none of the three SARs (or any of the SARs at issue on this motion) indicates that it is being filed voluntarily and not because of any legal duty to make a filing. Accordingly, it would have been unreasonable for Alpine to assume that FinCEN and the SEC would know the SAR was simply a "voluntary" filing. [20] The reporting requirements set out

in the law are not casual. The SAR framework allocates scarce government resources to protect public security by placing the burden of compliance, and of distilling a wide range of possibly relevant information into a SAR narrative, on broker-dealers. As the 2002 Form explains: "the care with which [the SAR] is completed may determine whether or not the described activity and its possible criminal nature are clearly understood by investigators."

19    Alpine has not offered admissible evidence that such a policy or practice was in place in 2011 and 2012 when SARs A, B and C were filed, and has not offered any evidence that these three SARs were filed pursuant to such a practice, even if it were in place. Because this Opinion is intended to provide guidance to the parties, it proceeds to the merits of this argument.

20    It is worth noting that the SEC has represented that the SARs presented on this motion are representative of thousands of similar SARs. To the extent it is able to show a pattern of suspicious trading activity for which SARs were filed, the inference that each of those filings was "voluntary" will be undermined.

The burden rests on the SEC, however, to prove that a SAR was required to be filed. It would appear that this will not be an onerous task in connection with the SARs at issue here, each of which reflected an enormous deposit of shares in a penny stock and, as reflected in Alpine's files, had other indicia of suspicious activity. [21] Nonetheless, because the SEC's motion assumed that Alpine had a duty to file each of the 14 SARs, this Opinion will not reach this contested issue. It will assume, for the purposes of that portion of the SEC's motion which addresses the adequacy of a SAR's narrative, that the SARs were required to be filed.

21    The summary judgment submissions of both the SEC and Alpine assume a fact-finder's knowledge of the penny stock market, and manipulation of that market, as well as various other market and broker-dealer practices. In any subsequent summary judgment motion and at any trial, the parties will be required to offer admissible lay and/or expert testimony on many of the subjects with which they have assumed familiarity for purposes of this preliminary summary judgment motion. The parties' decisions not to include expert declarations with this preliminary summary judgment motion may be explained by the fact that the initial expert disclosures

are not due until at least April 20. Accordingly, even when it seems self-evident that Alpine had a legal obligation to file the SARs at issue in this section of the summary judgment motion, this Opinion will not reach the issue.

**\*19** As explained above, SARs A, B, and C each lack basic information regarding the Five Essential Elements. Accordingly, the SEC has carried its burden of showing that each SAR was deficient as a matter of law.

### B. Criminal or Regulatory History

**[18]** The SEC contends that SARs D, E, and F are deficient as a matter of law because Alpine failed to include the relevant regulatory or criminal history of the customer in the SARs' narratives. SARs D and E are on the 2002 Form, which specifically instructs the filer to "[i]ndicate whether there is any related litigation[, and i]f so, specify the name of the litigation and the court where the action is pending." A materially similar instruction appears in the 2012 SAR Instructions. FinCEN guidance from 2009 also explains that one common failure of broker-dealers in their suspicious activity reporting is

> [i]nadequate    due    diligence conducted    once    potentially suspicious activity is identified; for example, a firm may fail to use readily available public information about a customer's criminal or regulatory history when evaluating potentially suspicious activity for a SAR–SF filing.

SAR Activity Review, Issue 15, at 24.

In the case of each of these three SARs, Alpine's own files for the SARs contained information that the customer was the subject of criminal or regulatory proceedings. The SARs, however, did not include that information. The SAR D support file shows an SEC complaint against the customer and its CEO. The SAR E support file includes a news article regarding the customer's guilty plea to conspiracy related to counterfeiting. The SAR F support file notes the individual has an "SEC history for misrepresentation and misappropriation of funds."

Moreover, the narratives for each of these SARs contain minimal information other than describing an enormous deposit of shares in a penny stock. SAR D recites that

United States Securities and Exchange Commission v..., F.Supp.3d ---- (2018)
Case 2:18-cv-00504-CW   Document 15-4   Filed 07/03/18   Page 20 of 29
2018 WL 1633818, Fed. Sec. L. Rep. P 100,073

the customer deposited roughly 2 million shares, and "has been placed on a Heightened Supervisory list" and that "[i]t is the policy of Alpine to file a SAR[ ] related to each deposit of securities into accounts of this nature." SAR E notes only that the customer deposited over 27 million shares of a penny stock. SAR F explains that the customer deposited 15 million shares of a penny stock, purchased a convertible note, and that "the shares are worth about 33 times their purchase price, which may be potentially suspicious."

Again, assuming that the SEC has established that Alpine had a duty to file each of these SARs, it has easily carried its burden of showing that each of them was deficient as a matter of law for its omission of the criminal or regulatory history of a related party. This constituted a violation of Rule 17a–8, through its violation of Section 1023.320(a) (2). The information in Alpine's files not only provided Alpine with "reason to suspect" that the transactions were among those for which it was required to make a filing, but also constituted specific information that Alpine was required to include in the SAR narratives. This duty to describe the regulatory and criminal history of the customer is contained in the 2002 Form and the 2012 SAR Instructions, as well as the FinCEN Narrative Guidance. The information omitted from these three SARs was also responsive to the Five Essential Elements of these transactions.

**\*20** Alpine has not argued that it was free to omit the information because this particular information did not constitute information responsive to any of the Five Essential Elements, or because the information did not relate to Alpine's separate duty to report criminal and regulatory history. Nor has it argued more generally that the omitted information would not be important for an understanding of the transactions. Instead, Alpine argues that the regulatory and criminal history of each of these customers was a matter of public record. This argument fails.

To the extent Alpine has a duty to file a SAR, it has a duty to file one that complies with the reporting requirements described above. The law does not recognize any exception to that duty based on a determination that the government may also know through other sources the very information that Alpine was required to report.[22] The SEC has shown that it is entitled to summary judgment on SARs D, E, and F.

[22]   While it would not be a defense to the charged violation of Rule 17a–8, Alpine does not provide any evidence in support of an assertion that the reason it omitted the information was because it believed the information was already known to the SEC.

### C. Shell Company Involvement or Derogatory History of Stock

**[19]** **[20]** The SEC argues that SARs A and C are deficient because their narratives do not state that a shell company was involved in the transaction. It contends that SAR G omitted certain other issuer information.

FinCEN guidance explains that "[m]ost shell companies are formed by individuals and businesses for legitimate purposes." FinCEN Shell Company Guidance at 1.[23] This guidance advises that a SAR "narrative should use the term 'shell,' as appropriate." Id. at 5. The guidance lists, among several examples of suspicious activity FinCEN has observed in SARs, the "inability to obtain ... information necessary to identify originators or beneficiaries of wire transfers." Id. at 3–5. It also instructs that a company being a "suspected shell entit[y]" is one of many "common patterns of suspicious activity." SAR Narrative Guidance at 5.

[23]   FinCEN, FIN–2006–G014, Potential Money Laundering Risks Related to Shell Companies (Nov. 9, 2006), https://www.fincen.gov/sites/default/files/guidance/AdvisoryOnShells_FINAL.pdf.

Assuming that the SEC proves that Alpine was required to file SARs A, C, and G, the SEC has carried its burden to show that the omission of the customer information from the SARs at issue here was a violation of law. SARs A, C, and G report transactions where a customer deposited, respectively, over 40, 5, and 6 million shares of a penny stock. The SARs' narratives do not disclose the involvement of a shell company or provide other information that would help a regulator understand either the customer or the transaction at issue. Alpine's file for SAR A indicates that the issuer of the deposited stock was a shell company, and the file for SAR C indicates that the issuer had been a shell company within the last year. Alpine's file for SAR G indicates that the issuer was not current in its SEC filings, that no company website was found for the issuer, and that the over-the-counter market's website for the issuer marked its stock with a stop sign.

The SEC has shown that Alpine's failure to disclose in the three SAR narratives the above-described information about the issuer and customer was a violation of law. In each instance, the omitted information was necessary to describe the Five Essential Elements. Given the paucity of information in the SAR narratives for SARs A and C, the identity of the customer as a shell entity engaged in a large deposit of penny stock shares was particularly critical. Similarly, the lack of current SEC filings, a stop sign on a website listing the stock, and lack of an issuer website were obvious red flags for the penny stock transaction reported in SAR G. These facts raise serious questions about whether the issuer of the shares in the transaction reported in SAR G was a bona fide entity, and whether the transaction involved fraud.

**\*21** Alpine does not contend that the omitted information in the three SARs is not responsive to the Five Essential Elements, and therefore a required element of a SAR. It makes essentially three other arguments, none of which is persuasive.

**[21]** First, Alpine argues that, in light of FinCEN guidance stating that shell company involvement is not always suspicious, the involvement of a shell company in these transactions did not make them suspicious. But, if the SEC, using all the information on the SAR and in Alpine's possession, shows that Alpine was required to file a SAR for the transaction, then the SEC has shown that Alpine was required to disclose in both SARs A and C that the suspicious transactions were in fact conducted through a shell company. As is true with most if not all facts generating suspicion, the presence of a shell company may serve not only to identify the transaction as suspicious, thereby triggering the duty to file a SAR, but may also be a required fact to report in the SAR. Any complete description of the facts responsive to the Five Essential Elements would so demand. Alpine's conclusory argument to the contrary is insufficient to escape summary judgment.

With respect to SAR G, Alpine points out that the SEC has not explained in support of its motion what an OTC Market "stop" signal for trading in a stock means. Alpine is correct: the SEC has assumed the Court's familiarity with the significance of that market action. Alpine argues as well that Alpine's inability to locate a website for or confirm the existence of an issuer "is indicative of

nothing." Again, assuming that the SEC establishes that Alpine had a duty to file SAR G, then the SEC has carried its burden to show the stop order and the absence of a website for the issuer were facts that Alpine had to disclose in the SAR. They are at the very least responsive to the Five Essential Elements. SAR G explains that the customer "historically makes deposits of large volumes of low-priced securities," and that this transaction was for another such deposit. Alpine has failed to offer any evidence or persuasive argument to raise a question of fact regarding its obligation to add two other important pieces of information for this very transaction: there was no website for the issuer and there was a stop in place for trading shares for that issuer.

### D. Stock Promotion

**[22]** The SEC contends that SARs G, H, and J are deficient for their failure to describe the evidence of stock promotion activity that appears in Alpine's files for these SARs. It contends that such evidence is relevant to whether a transaction may be a component of a pump-and-dump scheme. In a pump-and-dump scheme, conspirators manipulate the price and volume of a particular stock through the dissemination of false and misleading promotional materials. See Fezzani v. Bear, Stearns & Co., 716 F.3d 18, 21 (2d Cir. 2013) (scheme in which a security appeared to be "the subject of an active, rising market" but where in fact "the market was principally a series of artificial trades" is a "paradigmatic 'pump and dump' scheme"). In 2016, the SEC concluded that SARs were deficient, in violation of Rule 17a–8, because they omitted an "additional red flag[] that should have further raised suspicions concerned [a customer's] trading," namely that the entity "knew or should have known that two of the issuers were the subject of promotional campaigns at the time of [the customer's] trading." In re Albert Fried & Co., SEC Release No. 77971, 2016 WL 3072175, at \*5 (June 1, 2016) (emphasis supplied). [24]

[24]      Although the adjudication occurred in 2016, the decision is entitled to deference as an authoritative and reasoned interpretation of Rule 17a–8.

**\*22** The SAR narratives for SARs G, H, and J state that it is "Alpine's policy to file a SAR for each security deposited into the account." Each SAR describes a transaction involving a sizable deposit of a penny stock: over 6 million shares in SAR G; over 13 million in SAR

Case 2:13-cv-00504-CW Document 15-4 Filed 07/03/18 Page 22 of 29

United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2018)
2018 WL 1633818, Fed. Sec. L. Rep. P 100,073

H; and 60 million shares in SAR J. No other information is included in the narrative.

The SAR G support file includes screenshots of Google search results indicating that stock promotion was occurring. The SAR H support file includes four pages of screenshots of websites indicating that the stock at issue was being promoted by a third party. The SAR J support file contains news articles that reveal that the stock was being promoted.

Alpine acknowledges that evidence of stock promotion activity is relevant if connected to a "pump and dump" scheme. Accordingly, should the SEC establish that Alpine had a duty to file these three SARs, it has carried its burden to show that Alpine was required to add to the SAR narrative the evidence of stock promotion activity that appeared in Alpine's files. The three transactions reported in SARs G, H, and J involved deposits of many millions of shares of a penny stock; evidence of stock promotion is particularly relevant to a transaction of this type because the combination is suggestive of illegal activity. As a result, the SEC is entitled to summary judgment on SARs G, H, and J.

### E. Unverified Issuers

 **[23]**  The SEC argues that SARs G, K, and L were defective for failing to include critical information about the issuers of securities that was contained in the Alpine files for these SARs. FinCEN guidance identifies unregistered and unlicensed businesses as indicative of suspicious transactions. It states that suspicious activity "common[ly]" includes transactions involving "parties and businesses that do not meet the standards of routinely initiated due diligence and anti-money laundering oversight programs (e.g., unregistered/ unlicensed businesses)." SAR Narrative Guidance at 5. As explained above, when a SAR is filed, it must include information about each of the Five Essential Elements of the suspicious activity, which includes "what" is involved in the transaction. Underscoring this duty, a 2012 issue of the SAR Activity Review directs filers to "include as much information as is known to them about the subject(s)" of a SAR. SAR Activity Review, Issue 22, at 39.

SARs G, K, and L each report a large deposit of a penny stock. SAR G reports a deposit of over 6 million shares; SAR K, over 11 million shares; and SAR L, nearly 3 million shares. The three SARs reported very little

additional information. Each of them explained that it was Alpine's policy to file a SAR for every deposit by this customer, but added no information about the issuer of the securities for that transaction. Each SAR support file for these SARs, however, indicates that an Alpine employee was unable to locate basic information about the issuer whose stock was deposited. For SARs G and K, the files indicate that Alpine could not locate a company website for the issuer. For SAR L, Alpine's file indicates that the issuer's corporate registration was in default. The SEC has shown that if Alpine was required to file any of these SARs, then it was required by law to include in its SAR the fact that it could not locate such information concerning an issuer.

 **\*23**  Alpine argues that, as a general matter, the absence of a website for an issuer or an issuer's failure to renew its incorporation is "indicative of nothing." It does not address the omission of this information in the context of what was and was not included in each of these SARs. Considering the entirety of the narrative portion of these three SARs, the SEC has shown that the failure to include this information about the issuers was a violation of Rule 17a–8. These were deposits of enormous quantities of penny stocks with absolutely no indication in the SAR itself that there was also a problem with the issuer. Accordingly, the SEC is entitled to summary judgment as to SARs G, K, and L with respect to the omissions regarding the issuers.

### F. Low Trading Volume

 **[24]**  The SEC contends that SARs M, N, and P are defective for their failure to disclose the low trading volume in the shares that these SARs reported were being deposited with Alpine. The 2002 Form and 2012 SAR Instructions required disclosures in the narrative of those circumstances that make the filing of a SAR a necessity. When a SAR was filed, as indicated repeatedly above, the filer had to include information responsive to the Five Essential Elements. A 2009 issue of the SAR Activity Review notes that one element of a transaction that is suspicious and should be reported is a "[s]ubstantial deposit, transfer or journal of very low-priced and thinly traded securities." SAR Activity Review, Issue 15, at 24. Accordingly, three elements for such events must be reported: the substantial deposit of a security, the low price of the security, and the low trading volume in the security.

These three SARs each reported a deposit of a very large quantity of shares of a penny stock. The SAR support files for SARs M, N, and P each included relevant information regarding the third element: the low trading volume. Yet, none of these SARs' narratives included that fact. SAR M's narrative reports a deposit of almost million shares of a low-priced security, but omits that the average trading volume over the last three months is 59,108, smaller than the single deposit by a factor of ten. SAR N's narrative lists a deposit of over 60 million shares of a low-priced security, but does not include the fact that the trading volume was 101,100 per day, a tiny fraction of the single deposit reported in SAR N. SAR P's narrative notes a deposit of 500,000 shares of a low-priced security, but states nothing about the trading volume, reported in the support file to be 10,971 per day. Thus, the reported deposit was 45 times larger than the average trading volume.

The SEC has demonstrated its entitlement to summary judgment as to SARs M, N, and P. The sizable deposits, when combined with the low trading volume of a low-priced security, constitute red flags. Alpine had a duty to disclose in the SAR the reasons that made the filing necessary. It did not do so.

Alpine does not argue that SARs M, N, and P were properly completed. It does not contest that it had a duty to report low trading volume in the narrative sections of these three SARs if it had a duty to file these SARs. Instead, it contends that the SEC has a burden to show that manipulative trading such as "wash trades" was actually occurring in order for the SEC to prevail on its claim that Alpine had a duty to file a SAR. Alpine is incorrect.

[25] Under Section 1023.320, Alpine had a duty to report a transaction when, as the regulated broker-dealer, it had "reason to suspect that a transaction (or a pattern of transactions) ... [i]nvolves", among other things, the use of the broker-dealer to facilitate criminal activity. The duty to report is not triggered by the existence of a government investigation, and the SEC has no burden at trial, when it has charged a violation of Rule 17a–8, to show that manipulative trading was actually occurring. Indeed, the entire regulatory scheme is set up to bring to the government's attention suspicious activity of which it might otherwise be unaware. Whether the government is aware or not of criminality, or able to confirm criminality or not, the duty to report suspicious activity exists. Thus,

the SEC has shown that it is entitled to summary judgment because SARs M, N, and P were defective as a matter of law.

### G. Foreign Involvement

**\*24** **[26]** In the seventh and final category, the SEC contends that SARs A, C, and H are defective because they failed to disclose the involvement of a foreign individual or entity in the transaction. The 2002 Form used for SARs A and C states that the filer should "[i]ndicate whether U.S. or foreign currency and/or U.S. or foreign negotiable instrument(s) were involved. If foreign, provide the amount, name of currency, and country of origin." The 2002 Form also states that "foreign bank(s) account number(s)" should be included, as should "passport(s), visa(s), and/or identification card(s)" belonging to an involved "foreign national." The 2012 SAR Instructions contain a materially identical instruction. Both instructions also state that filers should "identify the country, sources, and destinations of funds" if funds have been "transfer[red] to or from a foreign country."

FinCEN guidance from 2003 also emphasizes that the involvement of a foreign entity or individual must be included in a SAR. It states that a SAR should

> [s]pecify if the suspected activity or transaction(s) involve a foreign jurisdiction. If so, provide the name of the foreign jurisdiction, financial institution, address and any account numbers involved in, or affiliated with the suspected activity or transaction(s).

SAR Narrative Guidance at 4.

SARs A, C, and H each report a large deposit of shares of a penny stock. SAR A lists a foreign address for Alpine's customer, but omits information in the support file that identifies foreign correspondent accounts in two foreign jurisdictions that were involved in the underlying transaction. SAR C provides a foreign address for the customer in the "subject information" boxes of the SAR, but omits from the narrative section any reference to the foreign nature of the transaction, much less that the country in question has been identified as a jurisdiction of primary concern for money laundering activity. SAR

2018 WL 1633818, Fed. Sec. L. Rep. P 100,073

H does not disclose any foreign involvement with the transaction, omitting that the deposited shares were purchased by the customer through a transfer of funds to a foreign bank account, information that appears in Alpine's files.

The SEC has carried its burden of showing that, to the extent Alpine was required to file a SAR for these transactions, it was required to include in the narrative sections for the SARs the information about the foreign connections to the transactions that it had in its files. SARs A, C, and H each reflect enormous deposits of shares of penny stocks with a very opaque discussion in the narrative section of the SAR of the reasons for filing the SAR. The narrative does not comply with either the requirement to report on the Five Essential Elements, or the more specific duty to report the foreign connections to the transactions. As described above, these duties of disclosure apply specifically to the narrative section of the SAR.

Unlike its response in connection with each of the other deficiencies discussed above, Alpine's opposition to this portion of the SEC's motion switches gears and does discuss the three individual SARs and the identified deficiencies in the context of those individual SARs. None of its arguments, however, raises a question of fact regarding its obligation to add the omitted information about the foreign connections to the transactions.

 **[27]**  First, with respect to SARs A and C, it asserts that the foreign entity was the "introducing broker", and that it identified its foreign location in the "subject information" boxes of the SARs. But, the SAR identifies the foreign entity at issue as the customer and not the introducing broker. And, as explained above, a broker-dealer is required by law to include information constituting the Five Essential Elements and foreign connections to the transaction in the narrative section of any SAR that the filer is required to file. Correctly reporting an address in a "subject information" box does not excuse compliance with the law's additional obligations to identify why a transaction is suspicious in the narrative section of the SAR.

 **\*25 [28]**  Next, Alpine argues that it had no obligation to report in the foreign connection to the transaction in the narrative section of SAR C since SAR C's narrative indicated that Alpine had placed the customer on a

"Heightened Supervisory list" and as a matter of policy Alpine filed a SAR for each deposit of securities made by that customer. This opaque reference to Alpine's internal policy for that customer did not relieve Alpine of its obligation under the law to provide information in the SAR's narrative regarding each of the Five Essential Elements for, as well as the foreign connections to, the specific transaction.

 **[29]**  Finally, with respect to SAR H, Alpine does not dispute that it failed to disclose that the customer had purchased the deposited shares by transferring funds to a foreign bank account. It argues only that the disclosure was unnecessary because the support file did not show a foreign wire transfer _after_ the shares were deposited, and the prior transfer did not "involve" Alpine. These distinguishing features did not relieve Alpine of the obligation to report the foreign connection to the transaction. Nothing in the law, which is recited above, confines the reporting requirements for foreign connections to those specific transactions in which the broker-dealer participated or to occurrences after the reported transaction. As a result, the SEC is entitled to summary judgment on SARs A, C, and G on the ground that Alpine failed to include information regarding the transaction's foreign connections in the SAR narrative.

  H. Summary

In this section of the Opinion, the Court has assumed that Alpine had a duty to file the 14 SARs at issue. Assuming that obligation, the Opinion has addressed seven categories of omissions in the narratives of the SARs on which the SEC's summary judgment motion has focused. In each instance, the Opinion has concluded, following an examination of the specific SAR's narrative section, that Alpine had a duty under the law to include the omitted information that is the subject of the SEC motion, and that the SAR, as filed, violated the law's disclosure requirements for suspicious transactions.

 **[30]   [31]**  A broker-dealer must complete a SAR narrative that contains sufficient information for a regulator to understand what is suspicious about the reported activity. Any analysis of a Rule 17a–8 claim that a particular SAR is deficient in this regard is necessarily a context-specific analysis. If a SAR had had a fulsome disclosure of the Five Essential Elements and other information pertinent to the transaction that the law requires a broker-dealer to disclose, then the omission of repetitive or cumulative

United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2018)
2018 WL 1633818, Fed. Sec. L. Rep. P 100,073

Case 2:18-cv-00504-CW Document 15-4 Filed 07/03/18 Page 25 of 29

information found in the broker-dealer's files might raise a question of fact regarding an alleged violation of Rule 17a–8. As the descriptions of the individual SARs has shown, however, Alpine's SARs were woefully inadequate. Alpine has not shown that there is any question of fact regarding its compliance with the law's disclosure requirements. The SEC is therefore entitled to summary judgment regarding information omitted from SARs A, B, C, D, E, F, G, H, J, K, L, M, N, and P.

## IV. Deposit-and-Liquidate Patterns

[**32**] The SEC contends that Alpine violated Rule 17a–8 and Section 1023.320(a)(2) when it failed to file new or continuing SARs in connection with liquidations of share positions. Alpine filed SARs for large deposits of shares by three customers, but no additional SARs when they sold off a large proportion of those deposits in transactions within a month or so of the deposit. In support of its motion, the SEC submitted three charts summarizing the transactions, along with SARs that Alpine filed for the customers' deposits.

**\*26** The three customers are referred to as Customers A, B, and C. Customer A deposited over 12 million shares of a penny stock in February 2012, then sold, in a series of 12 transactions, 10 million shares of that same security in February and March 2012. The pattern then repeated itself in April through August 2012, with the customer depositing a very large number of shares in the same security and, within weeks, selling a large proportion of those shares in a series of smaller transactions. Alpine timely filed SARs on the deposits by Customer A, but not on the sales of the deposited shares. Similarly, Customer B and Customer C each deposited a large number of physical certificates of a penny stock, then sold an almost equal amount of shares in that security in a series of small transactions over the weeks immediately following the deposit.

The SEC has shown that it is entitled to summary judgment to the extent it carries its burden of showing the existence of the deposit-and-sales patterns on which it relies. The applicable regulations state that a broker-dealer must report a transaction if the transaction "or a pattern of transactions of which the transaction is a part" meets certain criteria. 31 C.F.R. § 1023.320(a)(2). As noted above, the notice of final rule published by FinCEN explains that the "pattern of transactions" phrase was included in the regulation so that if a broker-

dealer determines that a series of transactions, "taken together, form a suspicious pattern of activity, the broker-dealer must file a suspicious transaction report." FinCEN Section 1023.320 Notice, 67 Fed. Reg. at 44,051. Similarly, FinCEN has identified as suspicious a "[s]ubstantial deposit ... of very low-priced and thinly traded securities," followed by the "[s]ystematic sale of those low-priced securities shortly after being deposited." SAR Activity Review, Issue 15, at 24 (footnote omitted). This guidance explains that these transactions present "red flags for the sale of unregistered securities, and possibly even fraud and market manipulation." Id. And the same issue of the SAR Activity Review notes that "transactions involv[ing] the deposit of physical certificates ... have their own red flags, such as [the risk that] the shares were not issued in the name of the customer, or were recently issued or sequentially numbered." Id. at 24–25.

Alpine argues that the SEC has not shown that the sell-offs by these three customers are sales of the very same physical securities that had been deposited, and that as a result they are not suspicious as a matter of law. [25] Alpine is wrong.

[25]  Alpine argues further that the SEC must show that Alpine subjectively thought the transactions were suspicious before it can make out a violation. As described above, Rule 17a–8 contains no scienter element.

Alpine's argument that the transactions are not suspicious as a matter of law because the liquidations are not necessarily related to the deposit of physical certificates misses the point of the relevant FinCEN guidance. The three customers at issue here dramatically increased their holdings in a penny stock with a deposit of physical certificates—activity which FinCEN indicates independently raises concerns—and then sold off most of those holdings over a few weeks in a number of discrete, small transactions. That pattern of transactions requires supplemental reporting as a matter of law, and the SEC is entitled to summary judgment to the extent that it proves that such a pattern occurred and that Alpine failed to file SARs reflecting that trading.

Next, Alpine asserts that the SEC has improperly supported its motion with three charts that the SEC claims to have prepared based on data provided by Alpine without disclosing what data was used. As provided by the Federal Rules, voluminous data may be summarized

in a chart. Rule 1006, Fed. R. Evid., provides that "[t]he proponent may use a ... chart ... to prove the content of voluminous writings ... that cannot be conveniently examined in court." But the proponent "must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." Id.; see United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp., 95 F.3d 153, 163 (2d Cir. 1996). The SEC has shown it is entitled to summary judgment on these transactions, conditioned upon its ability to demonstrate to Alpine, and if necessary to this Court, that its charts are accurate.

### V. Late–Filed SARs

**\*27** **[33]** The SEC contends Alpine violated the law by filing five SARs late, specifically between 189 and 211 days late. Alpine argues that it was entitled to file a SAR up to 30 days after conducting an appropriate review, and the SEC has not shown when Alpine conducted its review. Alpine's view, if adopted, would allow broker-dealers to delay review of transactions indefinitely and thereby delay the filing of SARs indefinitely. The regulatory scheme does not support that somewhat startling proposition. As described below, a broker-dealer must conduct an ongoing due diligence review of transactions. It must promptly initiate a review upon identification of unusual activity that warrants investigation. It generally has 30 days thereafter to file a SAR. Accordingly, the SEC has shown it is entitled to summary judgment.

The starting point for the analysis of the deadline for filing a SAR is again Section 1023.320, which requires a covered transaction to be reported when the broker-dealer "knows, suspects, or has reason to suspect" that the transaction is a covered transaction. Broker-dealers have an ongoing duty to scrutinize all transactions they conduct. BSA regulations require broker-dealers to "maintain[ ] a written anti-money laundering program that," inter alia, "[i]ncludes ... [a]ppropriate risk-based procedures for conducting ongoing customer due diligence," including "[c]onducting ongoing monitoring to identify and report suspicious transactions." 31 C.F.R. § 1023.210(b)(5)(ii) (emphasis supplied); see also 31 C.F.R. § 1023.220(a)(2) (requiring a broker-dealer to be able to "form a reasonable belief that it knows the true identity of each customer" based on types of accounts, the methods of account opening, and identification documents).

Through a series of regulatory delegations, SROs review and approve their member organizations' AML policies; Alpine's AML policy was approved by FINRA. See SEC, Order Approving Proposed Rule Changes Relating to Anti–Money Laundering Compliance Programs, 67 Fed. Reg. 20,854 (Apr. 26, 2002). FINRA requires member firms to have a written AML policy that receives approval from FINRA's senior management and that "[e]stablish[es] and implement[s] policies, procedures, and internal controls reasonably designed to achieve compliance with the Bank Secrecy Act and the implementing regulations thereunder." FINRA Rule 3310 (2015), http://finra.complinet.com/en/display/ display_main.html?rbid=2403& element_id=8656.

As relevant here, Section 1023.320 provides that a "SAR shall be filed no later than 30 calendar days after the date of the initial detection by the reporting broker-dealer of facts that may constitute a basis for filing a SAR under this section." 31 C.F.R. § 1023.320(b)(3). The Federal Register notice explaining the final rule used slightly different phrasing, requiring a SAR to be filed "[w]ithin 30 days after a broker-dealer becomes aware of a suspicious transaction." FinCEN Section 1023.320 Notice, 67 Fed. Reg. at 44,054. Alpine's FINRA-approved WSPs state that Alpine will file a SAR "within 30 days of becoming aware of the suspicious transaction."

FINRA also publishes a template AML program for small firms such as Alpine. Given that FINRA is the ultimate delegee of FinCEN's authority to approve AML programs, this document is probative of whether an AML program complies with the BSA. The FINRA template states that

> The phrase "initial detection" does not mean the moment a transaction is highlighted for review. The 30–day ... period begins when an appropriate review is conducted and a determination is made that the transaction under review is "suspicious" within the meaning of the SAR requirements.

FINRA, Anti–Money Laundering Template for Small Firms 37–38 (2010), http://www.finra.org/industry/ anti-money-laundering-template-small-firms. With this explanation, firms are encouraged to flag transactions

United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2018)
Case 2:18-cv-00504-CW   Document 15-4   Filed 07/03/18   Page 27 of 29
2018 WL 1633818, Fed. Sec. L. Rep. P 100,073

liberally for review without fear of triggering the 30–day reporting requirement.

**\*28** FinCEN has also issued guidance related to this question in two publications of the <u>SAR Activity Review</u>. In one, FinCEN has said that

> [t]he phrase "initial detection" should not be interpreted as meaning the moment a transaction is highlighted for review. There are a variety of legitimate transactions that could raise a red flag simply because they are inconsistent with an accountholder's normal account activity. A real estate investment (purchase or sale), the receipt of an inheritance, or a gift, for example, may cause an account to have a significant credit or debit that would be inconsistent with typical account activity. The institution's automated account monitoring system or initial discovery of information, such as system-generated reports, may flag the transaction; however, this should not be considered initial detection of potential suspicious activity. <u>The 30–day</u> (or 60–day) <u>period does not begin until an appropriate review is conducted and a determination is made that the transaction under review is "suspicious" within the meaning of the SAR regulations</u>.
>
> <u>A review must be initiated promptly upon identification of unusual activity that warrants investigation</u>. The timeframe required for completing review of the identified activity, however, may vary given the situation. According to the FFIEC's 2005 <u>Bank Secrecy Act/Anti–Money Laundering Examination Manual</u>, "an expeditious review of the transaction or the account is recommended and can be of significant assistance to law enforcement. In any event, the review should be completed in a reasonable period of time." [26] What constitutes a "reasonable period of time" will vary according to the facts and circumstances of the particular matter being reviewed and the effectiveness of the SAR monitoring, reporting, and decision-making process of each institution. The key factor is that an institution has established adequate procedures for reviewing and assessing facts and circumstances identified as potentially suspicious, and that those procedures are documented and followed.

FinCEN, <u>The SAR Activity Review: Trends, Tips & Issues</u>, Issue 10, at 45–46 (May 2006), https://www.fincen.gov/sites/default/files/shared/sar_tti_10.pdf (other footnote omitted) (emphasis

supplied). In another relevant publication, FinCEN indicated that

> <u>[t]he time to file a SAR starts when a firm</u>, in the course of its review or on account of other factors, is able to make the determination that it knows, or <u>has reason to suspect, that the activity or transactions under review meet one or more of the definitions of suspicious activity</u>. Specifically, the 30–day (or 60–day) period does not begin until an appropriate review is conducted and a determination is made that the transaction under review is "suspicious" within the meaning of the SAR regulations. <u>Of course, a review must be initiated promptly and completed in a reasonable period of time</u>. Firms should maintain some type of record reflecting the date the transaction was deemed suspicious.

<u>SAR Activity Review</u>, Issue 15, at 15–16 (footnote omitted) (emphasis supplied).

[26]   While the <u>FFIEC BSA/AML Examination Manual</u> is specific to the banking industry, this piece of guidance is also applicable to other industries with suspicious activity reporting requirements.

**\*29** With this exposition in mind, the FinCEN guidance (on which Alpine and the SEC both rely) does not support the position Alpine takes, namely that Alpine was entitled to an indeterminate amount of time to initiate review of a transaction before the 30– or 60–day reporting period began. The FinCEN guidance specifically states that the time begins when an entity such as Alpine "is <u>able</u> to make the determination that it ... has reason to suspect[ ] that the activity or transactions under review meet one or more of the definitions of suspicious activity." <u>Id.</u> at 15 (emphasis supplied). Further, the FinCEN guidance emphasizes that "a review <u>must be initiated promptly</u> and completed in a reasonable period of time." <u>Id.</u> (emphasis supplied). And again, the BSA regulation on broker-dealer AML programs—the regulatory document out of the many canvassed above that defines AML obligations with the most specificity—states that a broker-dealer must engage

United States Securities and Exchange Commission v...., --- F.Supp.3d ---- (2018)
2018 WL 1633818, Fed. Sec. L. Rep. P 100,073

Case 2:18-cv-00504-CW   Document 15-4   Filed 07/03/18   Page 28 of 29

in "ongoing monitoring to identify and report suspicious transactions." 31 C.F.R. § 1023.210(b)(5)(ii).

The information that triggered the duty to file a SAR was available to Alpine at the very time that the five transactions reported in these SARs occurred. This included that each transaction was a large deposit of a penny stock and that the account was flagged for heightened review. Three of the SARs themselves state that it is Alpine's practice to file SARs for transactions from the accounts at issue. Alpine had a duty to file these SARs, therefore, within 30 days of the transactions.

Alpine does not dispute that the SARs were filed between 189 and 211 days after the transactions reflected in the SARs. It does not identify any recently-acquired information regarding the transaction that converted it from one for which no SAR was required to one that required a SAR. While it contends, without any admissible evidentiary support, that the AML officer responsible for reviewing these transactions determined that the transactions were not suspicious and did not require a SAR, as described above, negligence provides no defense to a violation of Rule 17a–8. Alpine also represents that it filed the SAR within 30 days of a re-examination of the transactions, following discussions with FINRA. But, for the reasons explained above, this late filing violated Section 1023.320(b)(3), which requires the filing to be within 30 days, and thereby violated Rule 17a–8. Accordingly, the SEC is entitled to summary judgment on the five late-filed SARs.

VI. Missing Supporting Documents

 **[34]**  The SEC contends that Alpine has not produced the supporting documentation for five SARs, which the law required it to maintain and produce upon request. This portion of the SEC's motion concerns five SARs that were filed by Alpine with FinCEN between October 2013 and April 2015. The SEC made requests for the supporting documentation for these SARs beginning in 2016. Alpine asserts that it timely supplied the supporting documentation in response to the SEC's requests.

Section 1023.320 is cast in mandatory terms and requires two acts: the maintenance of records for five years after a SAR is filed, and the production of such records at the request of a federal regulatory agency such as the SEC. See 31 C.F.R. § 1023.320(d). A failure to either maintain or produce a SAR's supporting

documentation, then, violates Section 1023.320 and, as a result, violates Rule 17a–8 as well. Alpine agrees that it was required to maintain "all documents or records that assisted" Alpine "in making the determination that certain activity required a SAR filing", citing FinCEN guidance from June 2007. FinCEN, FIN–2007–G003, Suspicious Activity Report Supporting Documentation (June 13, 2007), https://www.fincen.gov/resources/statutes-regulations/guidance/suspicious-activity-report-supporting-documentation. This guidance explains that "[w]hat qualifies as supporting documentation depends on the facts and circumstances of each filing," and includes examples of "transaction records, new account information, tape recordings, e-mail messages, and correspondence. While items identified in the narrative of the SAR generally constitute supporting documentation, a document or record may qualify as supporting documentation even if not identified in the narrative." Id.

 **\*30**  Summary judgment is denied. The SEC has not produced evidence of a search of the 2016 document production that failed to locate the supporting documents. In the event the SEC produces such evidence at trial, Alpine will have an opportunity to identify the supporting documents for those SARs that it produced to the SEC in 2016. To the extent that Alpine seeks to avoid liability on this claim by relying on a more recent production of supporting files in the course of discovery, that effort is futile. Alpine was required to produce the files when they were requested in 2016. Of course, the exchange of pretrial interrogatories between the parties may eliminate this dispute with the identification by Alpine by Bates number or otherwise of the specific documents it asserts that it provided to the SEC in 2016 that support these five SARs.

<u>Conclusion</u>

The SEC's December 6, 2017 motion for partial summary judgment is granted in part. Alpine's January 19, 2018 motion for summary judgment and for judgment on the pleadings is denied.

All Citations

--- F.Supp.3d ----, 2018 WL 1633818, Fed. Sec. L. Rep. P 100,073

2018 WL 1633818, Fed. Sec. L. Rep. P 100,073

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

---