# Exhibit 5

No. _____

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

_____

**In Re ALPINE SECURITIES CORPORATION**

**Petitioner.**

_____

**PETITION FOR WRIT OF MANDAMUS TO THE UNITED STATES
DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____

# TABLE OF CONTENTS

I.    RELIEF REQUESTED ........................................................................1

II.   ISSUES PRESENTED ......................................................................1

III.  FACTS NECESSARY TO UNDERSTAND THE ISSUE PRESENTED .........2

     A.    The SEC's Complaint and Background ....................................................2

     B.    The "Summary Judgment" Briefing Schedule Set by the Court Prior to Any Discovery.........................................................................3

     C.    The District Court's Opinion....................................................................4

     D.    The Submission of an Expert Declaration and Motion for Reconsideration ........................................................................7

     E.    The Status of the Proceedings Below.......................................................8

IV.  REASONS WHY THE WRIT SHOULD ISSUE ............................................11

     A.    Because this Case Presents a Novel Issue of First Impression Concerning Enforcement of the Bank Secrecy Act, the SEC's Lack of Authority to Pursue this Case is Clear and Indisputable, and There Will be No Opportunity for Adequate Review on Appeal, The Writ Should Issue........................................................................11

     B.    Enforcement Authority for the BSA Was Expressly Delegated to Treasury and Cannot be Usurped by the SEC.........................................16

     C.    The Court Misapplied *Chevron,* Deferring Improperly and To the Wrong Agency........................................................................21

     D.    Rule 17a-8 Did Not Automatically Incorporate the SAR Provisions of the BSA Nor Did the SEC Properly Promulgate any Rule in 2002 When Those SAR Provisions Became Applicable to Broker Dealers....22

V.   CONCLUSION........................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams Fruit Co. v. Barrett*,
  494 U.S. 638 (1990)..................................................................................19

*Am. Express Warehousing, Ltd. v. Transamerica Ins. Co.*,
  380 F.2d 277 (2d Cir. 1967) ......................................................................12

*American Bankers Ass'n v. S.E.C.*,
  804 F.2d 739 (D.C. Cir. 1986)..................................................................20

*Bayou Lawn & Landscape Servs. v. Sec'y of Labor*,
  713 F.3d 1080 (11th Cir. 2013) ................................................................20

*California v. Klepp*,
  604 F.2d 1187 (9th Cir. 1979) ..................................................................20

*Catskill Mts. Chptr. of Trout Unlimited v. EPA*,
  846 F.3d 492 (2d Cir. 2017), *cert. denied*, 138 S. Ct. (Feb. 26, 2018)..................26

*Cheney v. U.S. Dist. Court for Dist. of Columbia*,
  542 U.S. 367 (2004)..................................................................................11

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)..................................................................20, 21, 22, 26

*City of Idaho Falls v. F.E.R.C.*,
  629 F.3d 222 (D.C. Cir. 2011)..................................................................25

*Dinler v. City of New York (In re City of New York)*,
  607 F.3d 923 (2d Cir. 2010) .....................................................................13

*Encino Motorcars LLC v. Navarro*,
  136 S. Ct. 2117 (2016)..............................................................................26

*F.D.A. v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000)..................................................................................19

*Nutritional Health Alliance v. F.D.A.*,
  318 F.3d 92 (2d Cir. 2003) ...............................................................*passim*

ii

*SAS Inst. Inc. v. Iancu,*
   138 S. Ct. 1348 (2018) .................................................................................21

*SEC v. Rajaratnam,*
   622 F.3d 159 (2d Cir. 2010) ......................................................................11

*Semon v. Stewart (In re SEC ex rel. Glotzer),*
   374 F.3d 184 (2d Cir. 2004) .............................................................12, 13

*In re United States,*
   903 F.2d 88 (2d Cir. 1990) ........................................................................12

*United States v. Coppa,*
   267 F.3d 132 (2d Cir. 2001) ......................................................................12

*United States v. Picciotto,*
   875 F.2d 345 (D.C. Cir. 1989) ............................................................25, 26

*United States v. Stein,*
   No. S 1 05 Crim. 0888(LAK), 06 Civ. 5007(LAK),
   2007 U.S. Dist. LEXIS 1825 (S.D.N.Y. Jan. 8, 2007) ...........................11

*U.S. Alkali Export Ass'n v. U.S.,*
   325 U.S. 196 (1945) ...................................................................................13

*In re von Bulow,*
   828 F.2d 94 (2d Cir. 1987) ..................................................................11, 12

**Statutes**

1 C.F.R.
   § 51.1(f)......................................................................................................24
   § 51.3.........................................................................................................24

17 C.F.R.
   § 17a-8............................................................................................*passim*

31 C.F.R.
   § 1010.820(f)..............................................................................................27
   § 1010.820(h)..............................................................................................27
   § 1023.320...................................................................................................5

28 U.S.C. § 1651 .............................................................................................1, 29

31 U.S.C.
  § 5318(g) ................................................................................................20
  § 5321(a)(1) ...........................................................................................27
  § 5321(a)(6) ...........................................................................................27

52 Fed. Reg. 11,436 (Apr. 8, 1987) ...........................................................17

67 Fed. Reg. 44,048 (July 1, 2002) ..............................................................8

73 Fed. Reg. 74010 (Dec. 5, 2008) ..............................................................4

Administrative Procedure Act, 5 U.S.C. § 553 ....................................*passim*

Bank Secrecy Act, 31 U.S.C. § 5311, *et seq.* ......................................*passim*

Securities Enforcement Remedies and Penny Stock Reform Act of 1990,
  15 U.S.C. § 78u(d) ...........................................................................22, 23

## Other Authorities

Emily J. Bremer, *Incorporation by Reference in an Open-Government
  Age*, 36 Harv. J. L. & Pub. Pol'y 131, 184 (Winter 2013) ...............23, 24

# I.
# RELIEF REQUESTED

Petitioner Alpine Securities Corporation ("Alpine"), a Salt Lake City clearing firm, requests the issuance of a writ of mandamus under 28 U.S.C. § 1651 compelling the Hon. Denise J. Cote, United States District Judge, to dismiss the action entitled *Securities and Exchange Commission v. Alpine Securities Corp.,* Case No. 17-cv-4179 (DLC), pending in the United States District Court for the Southern District of New York, on the grounds that (1) the Plaintiff's action directly contravenes the Congressional delegation of authority granted to the Department of Treasury in relation to enforcement of the provisions of the anti-money laundering legislation, the Bank Secrecy Act ("BSA"); and (2) the plaintiff's attempt to use Rule 17a-8 to pursue claims for violation of the BSA, undertaken without compliance with the critical requirements of the Administrative Procedure Act ("APA") and related statutes, and in violation of the governing provisions contained in the Federal Register, is invalid.

# II.
# ISSUES PRESENTED

This proceeding presents an issue of first impression: whether the SEC can pursue an action for violation of the Suspicious Activity Reporting ("SAR") provisions of the BSA notwithstanding clear Congressional delegation of enforcement authority to the Department of Treasury; consistent statements from the relevant bureau of Treasury, Financial Crimes Enforcement Network ("FinCEN"),

1

that it has retained that enforcement authority while delegating to the SEC only *examination* authority; and controlling precedent from this Court confirming that, under these circumstances, that delegation of authority by Congress precludes an invasion of that authority by another agency.

As a separate and distinct basis for dismissal of the SEC's claims, this case presents another issue of first impression: whether this pending action is invalid because Rule 17a-8, the rule on which the SEC relies for its BSA claims, was promulgated *10 years before* the enactment of the SAR provisions and *20 years* before they became applicable to broker-dealers, and the SEC failed to engage in even a pretense of compliance with the APA in relation to those SAR provisions of the BSA.

## III.
## FACTS NECESSARY TO UNDERSTAND
## THE ISSUE PRESENTED

### A.    The SEC's Complaint and Background

The SEC filed its complaint on June 5, 2017 asserting a single cause of action purportedly under the strict liability books-and-records provision of the Securities Exchange Act ("Exchange Act"), Rule 17a-8.  The SEC alleged that Alpine violated the SAR provisions of the BSA *not* by failing to file SARs – the conduct that has formed the basis for previous filed BSA actions -- but rather by filing SARs that were "deficient" because they failed to include certain items of information in the narrative

portion of the filing.[1]  The Complaint does not allege that Alpine was a participant in any wrongdoing associated with the underlying transactions, nor does it claim that it failed to report any transaction that actually involved money laundering.  Nor is Alpine alleged to be engaged in any current books-and-record violation; the SARs underlying the SEC's claims overwhelmingly date back to 2011 and 2012 – the period immediately following  the acquisition of Alpine by its current owners.  Since that time, Alpine has made continuous improvements to its program by responding to and working with its regulators, including FINRA, adding additional legal and compliance personnel, increasing training for its compliance personnel, and revising and enhancing its policies and procedures.

### B.    The "Summary Judgment" Briefing Schedule Set by the Court Prior to Any Discovery

At a conference with the Court in November of 2017, approximately a month after issue was joined, the District Court *sua sponte* decided that the parties would file motions for summary judgment even though fact discovery was beginning and the commencement of expert discovery was still months away.  When the Court directed that the SEC would immediately file a summary judgment motion, Alpine expressed concern that any motion by the SEC was "premature" because the issues relating to the filing of SARs under the BSA, 31 U.S.C. § 5311, *et seq.,* are by

---

[1] The SEC also advances a completely unsupported theory that, on transactions where Alpine *filed a SAR* relating to the customer's deposit of stock, it also had to file additional SARs every time any portion was sold, even if the sale was not found to be "suspicious" within the meaning of the BSA.

definition fact-intensive, dependent on the facts and circumstances of a particular transaction and the particular industry,[2] and could only be evaluated in the context of information that would be developed through both lay and expert discovery.   (*See* Ex. 2 to the Fritz Decl.: Hr'g Tr., Nov. 2, 2017, at 26:10-29:10, 30:14-22, 31:10-15, 32:11-13.)

The Court nonetheless set an expedited briefing schedule and the parties filed cross motions that addressed the legal issues pertaining both to the question of whether the SEC possessed enforcement authority under the BSA and whether the SEC had established violations of the SAR provisions of the BSA.

## C.    The District Court's Opinion

In a telephonic conference on March 30, 2018, in response to Alpine's counsel's reiteration of the request for oral argument on the summary judgment

---

[2] As detailed in Alpine's Summary Judgment Opposition and not addressed by the District Court, FinCEN has continuously defined the SAR analysis as a "subjective determination" by a firm predicated on all of the "facts and circumstances" relating to the transaction and its business.  For example:

- William J. Fox, Director of FinCEN, stated that "suspicious activity reporting requires financial institutions to "make judgment calls," and that "compliance should not be about second guessing individual judgment calls on whether a particular transaction is suspicious."  (Ex. 1 to the Declaration of Maranda E. Fritz ("Fritz Decl."), dated June 22, 22, 2018: Alpine's Additional Statements of Facts ("Add'l SOF") 13.)

- FinCEN states in the Federal Register that a SAR "requires a financial institution to make a subjective determination of what is suspicious prior to its filing . . . ."  73 Fed. Reg. 74010, 74011 (Dec. 5, 2008).

- The Federal Financial Institutions Examination Counsel's ("FFIEC") examination manual states that the "decision to file a SAR is an inherently subjective judgment, and thus "examiners should focus on whether the [financial institution] has an effective SAR decision-making process, not [on] individual SAR decisions."  (Ex. 1 to the Fritz Decl.: Alpine Add'l SOF 11.)

motions, the District Court stated that it had not yet identified a need for oral argument but "was not finished with [its] review of your motion."  (Ex. 3 to the Fritz Decl.: Hr'g Tr., Mar. 30, 2018 at 17:11-20.).  The Court stated also that it would be issuing a "preliminary" decision "laying out what I understand the law is and was at the relevant period," and stating: ***"to the extent that [the parties] have further authority to provide to [the Court] on those issues, they'll feel free to do so . . . .***" (*Id.* at 11:18-24).

Only hours later, the 77 page Opinion issued.[3]  Ex. 4 to the Fritz Decl.: Opinion.  In relation to the SEC's motion for summary judgment, the Opinion expressly acknowledged that it was the SEC's burden to establish that each of the SARs at issue was a required filing under 31 C.F.R. § 1023.320, and found that the SEC failed to carry this burden.  *Id.* at 46.  However, instead of denying the motion, the Court proceeded apace to grant "partial summary judgment," endorsing the SEC's claims of entirely new, unworkable and unfounded SAR requirements that supposedly exist regardless of the facts and circumstances relating to a particular transaction.

---

[3] In a lengthy opinion that endorsed virtually every aspect of the SEC's theory, the Court devoted 6 pages to a terse rejection of the issues relating to the SEC's enforcement authority.  *See* Ex. 4 to the Fritz Decl.: Opinion at 34-40.

Even as the District Court fashioned new BSA requirements, based on the SEC's cobbling together of various forms of FinCEN and FINRA "guidance,"[4] the District Court also expressed concern regarding the lack of relevant "lay and/or expert testimony." The Court also acknowledged that the parties' failure to provide expert testimony was likely due to the Court's scheduling of the motions months before expert discovery. Ex. 4 to the Fritz Decl.: Opinion at 46 n.21.

In relation to the cross-motion filed by Alpine, predicated on the fact that the SEC does not have authority to enforce the SAR provisions of the BSA and that it failed to comply with the APA in relation to the rule on which it relied, the Court failed even to consider the clear and detailed history and content of the BSA, the express and incontrovertible delegation of enforcement authority only to Treasury, or the extensive case law that demonstrated that the SEC lacked that authority. The

---

[4] The SEC had selected purported "red flags" mentioned in various forms of industry "guidance" and argued that those "flags" had to be included in the narrative portion of the SAR. A failure to discuss those "red flags" – and apparently countless other "red flags" scattered across periodic industry issuances – allegedly constitute an actual violation of the BSA subject not to the penalties set forth in the BSA but to the much harsher penalties under the Exchange Act.

Alpine cited extensive authority confirming that there is no automatic requirement that any particular "flag" be included in a SAR narrative. A broker-dealer is only required to describe the factors that caused it suspicion in the SAR narrative is driven home by the SAR Forms, which require "[f]ilers" to "provide a clear, complete, and concise description of the activity, including what was unusual or irregular that *caused suspicion*." Ex. 5 to the Fritz Decl.: 2012 SAR Form at 110, emphasis added). By making an assumption that the SAR filings were "required," without consideration of the firm's reason for the filing, the Court literally reversed the analysis ordained by FinCEN and replaced this analysis with an unprecedented shortcut: adoption of a bright-line rule that a SAR narrative is deficient as a matter of law unless it mechanically lists all red flags identified in guidance even if they have no relevance to the underlying transaction or to the reason why the SAR was actually filed.

Court effectively ignored the pertinent provisions of the BSA and instead looked only at the Exchange Act, concluding that the SEC has broad authority to impose reporting and recordkeeping requirements on those in the securities industry. With respect to the SEC's failure to promulgate properly any rule that addressed the SAR provisions, the Court held, without citation to any authority, that the SEC had managed to prospectively incorporate into its 1981 issuance of Rule 17a-8 any and all subsequently enacted provisions of the BSA -- without any need to comply with the APA.

### D. The Submission of an Expert Declaration and Motion for Reconsideration

Because the Court failed to acknowledge or engage in any legal analysis regarding the background and history of the BSA or the authorities confirming that the Congressional delegation of authority precluded usurpation of that authority by the SEC, Alpine filed a motion for reconsideration. In light of the Court's description of its decision as "preliminary," its invitation to the parties to provide additional authority, and its concern regarding the lack of expert testimony, Alpine accompanied that motion with a Motion for Leave to file relevant testimony including the declaration from Alpine's expert witness, Beverly E. Loew, a former FinCEN employee who was directly involved in issues relating to the allocation of authority for the BSA. Ex. 6 to the Fritz Decl.: Expert Declaration of Beverly Loew. Alpine also provided deposition testimony from current and former Alpine employees that

countered various factual assumptions made by the Court, and provided additional SARs that rebutted the claim that Alpine had failed to prepare and file detailed SARs.

On the first business day after that filing, without any response from the SEC, the Court denied Alpine's Motion for Leave to Submit the additional material, including the declaration from a former FinCEN employee and expert, without opinion and with one word: "Denied." Ex. 7 to the Fritz Decl.: Endorsed Notice of Motion. The Court did not offer any explanation for its refusal to consider precisely the information that it had invited and that would certainly elucidate the issues, nor did it acknowledge its own statement that expert submissions had not previously been available because of the peculiar briefing schedule set by the Court.

### E. The Status of the Proceedings Below

On June 18, 2018, the District Court denied the motion for reconsideration. Ex. 8 to the Fritz Decl.: Memorandum Opinion & Order. Again, the Court declined to consider or address the background and history of the BSA or the fact or impact of the Congressional delegation of authority. The District Court instead based its denial on the assertion that Alpine had failed to address "the most important" part of its prior decision," *i.e.*, that FinCEN had supposedly "acknowledged" that the SEC had enforcement authority. *See id*. at 4.[5] The District Court apparently was referring to the following quotation from a FinCEN notice of final rule: "[t]he SEC adopted rule

---

[5] It should be noted that FinCEN also *could not* have conveyed authority in violation of the Congressional mandate.

8

17a-8 in 1981 under the [Exchange Act], which enables the SROs, subject to SEC oversight, to examine for BSA compliance. Accordingly, both the SEC and SROs will address broker-dealer compliance with this rule." Ex. 4 to the Fritz Decl.: Opinion at 39 (quoting 67 Fed. Reg. 44,048, 44,049 (July 1, 2002)).

The District Court's statement was inaccurate in two respects. First, and as was clear from Alpine's submission, that FinCEN notice only served to emphasize that the SEC had *examination* -- not enforcement – authority. Further, Alpine did not "fail[] to address" that FinCEN notice; in fact, Alpine relied squarely on it. *See* Alpine's Cross-Motion for Summ. J. at 13 (quoting 67 Fed. Reg. at 44,049). And in its motion for reconsideration, Alpine committed over two full pages to presenting and discussing *additional* authorities that confirmed the SEC had been granted *only* examination authority and not enforcement authority, and explaining the distinction between the two.[6] *See* Alpine Motion for Reconsideration of Cross-Motion at 7-8.

Notably, the District Court's misreading of that FinCEN notice followed on the Court's refusal even to consider the report from the FinCEN expert who had been directly involved in issues relating to allocation of authority. And again, the District Court failed to address the SEC's failure to comply with the APA or the fact that the claimed "incorporation by reference" of the BSA violated the directives of both the APA and Office of the Federal Register.

---

[6] Examination authority is carefully defined to include only examination of a firm, reporting to FinCEN, and submission to FinCEN of any "[e]vidence of specific violations of any of the requirements of this chapter." § 1010.810(e).

9

On the same day, and with the entry only of the word "[d]enied" on a letter motion, the District Court also denied Alpine's request for a conference to address the SEC's failure to produce *inter alia* the actual Memorandum of Understanding that was entered into between the SEC and FinCEN – the document that articulates the SEC's role in relation to the BSA and, as confirmed by Alpine's expert, contains the specific language confirming that the SEC obtained **no** enforcement authority. Ex. 9 to the Fritz Decl.: Endorsed Letter.

Through these recent decisions, the District Court has charted a course designed to enable it to grant judgment to the SEC in short order, without even allowing proper expert discovery,[7] and with the SEC poised to seek more than $400 million in penalties under its theory that it can impose Exchange Act penalties for alleged BSA violations. It will bestow on the SEC, without any consideration of its failure to adhere to the APA and in contravention of Congressional mandates, a new enforcement regime that will impose previously unknown, unworkable and artificial automatic SAR requirements. It will enable the SEC to obtain summary judgment on those claimed violations *on a strict liability basis* without consideration of the actual facts and circumstances relating to the transaction at issue. That result will occur

---

[7] The Court has set July 13, 2018 for the filing of dispositive motions. The SEC recently sought to amend the expert discovery schedule to include time for a reply report from its expert, and to extend the time for expert discovery through August. Alpine objected, pointing out that under the SEC's proposal, its opposition to the motion for summary judgment would be due *before* Alpine had the opportunity to depose the SEC's expert. The Court granted the SEC's motion, adjusting the SEC's proposed schedule only to the extent of shifting the close of expert discovery to a date *four days* prior to the due date of Alpine's opposition.

without the District Court having actually engaged in an analysis of the SEC's lack of authority and without consideration of the havoc that will be wrought by the SEC managing to superimpose on the BSA – and all of the financial firms subject to the BSA – its own narrow and aggressive enforcement and penalty oriented approach to those provisions. The SEC will then proceed to seek penalties under the Exchange Act that are exponentially higher than those set forth in the BSA, without the need to demonstrate the elements of scienter and fault that exist in the BSA, and will be able to literally put Alpine out of business and avoid any appeal.

## IV.
## REASONS WHY THE WRIT SHOULD ISSUE

**A.    Because this Case Presents a Novel Issue of First Impression Concerning Enforcement of the Bank Secrecy Act, the SEC's Lack of Authority to Pursue this Case is Clear and Indisputable, and There Will be No Opportunity for Adequate Review on Appeal, The Writ Should Issue**

Mandamus is available where there is a confluence of circumstances that warrant the court's exercise of that "extraordinary remedy." This Court will "invoke this extraordinary remedy in exceptional circumstances amounting to a judicial usurpation of power, or a clear abuse of discretion." *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 380 (2004) (citations and internal quotation marks omitted). As stated in *United States v. Stein*, petitioner's right to relief must be "clear and indisputable" and a direct appeal from a final judgment must fail to provide an adequate remedy. No. S 1 05 Crim. 0888(LAK), 06 Civ. 5007(LAK), 2007 U.S.

11

Dist. LEXIS 1825, at *23 (S.D.N.Y. Jan. 8, 2007); *see also SEC v. Rajaratnam*, 622 F.3d 159, 171 (2d Cir. 2010).

This Court has confirmed that mandamus may be available to consider a question "of extraordinary significance or [where] there is extreme need for reversal of the district court's mandate before the case goes to judgment.'" *In re von Bulow*, 828 F.2d 94, 97 (2d Cir. 1987) (quoting *Am. Express Warehousing, Ltd. v. Transamerica Ins. Co.*, 380 F.2d 277, 282 (2d Cir. 1967)); *accord Semon v. Stewart (In re SEC ex rel. Glotzer)*, 374 F.3d 184, 187 (2d Cir. 2004). Specifically, this Court "will entertain a petition for a writ of mandamus . . . if the petitioner demonstrates '(1) the presence of a novel and significant question of law; (2) the inadequacy of other available remedies; and (3) the presence of a legal issue whose resolution will aid in the administration of justice.'" *United States v. Coppa*, 267 F.3d 132, 137-38 (2d Cir. 2001) (quoting *In re United States*, 903 F.2d 88, 89 (2d Cir. 1990)).

The writ of mandamus is appropriate here. First, as discussed more fully below, the question of law presented by this petition is certainly novel and is of enormous importance to any financial firm that is subject to the BSA. Neither this circuit nor any other court has addressed whether the SEC possesses the authority to pursue an enforcement action for violation of the SAR provisions of the BSA employing a strict liability books-and-records provision, contrary to the delegation of enforcement authority to Treasury. In fact, this case presents an issue equivalent to

12

the one that led the Court to grant the SEC's request for a writ of mandamus in *Glotzer,* in which the petitioner was "not just arguing that the district court abused its discretion; it is asserting that the court entirely lacked jurisdiction." Because the "need for relief is more pressing than it would be absent a jurisdictional issue," and "[t]here are no cases directly addressing the issue," the Court found mandamus to be warranted. 374 F.3d at 188. A similar jurisdictional issue is presented here: the SEC is acting in derogation of a clear Congressional conferral of authority. That fact, particularly when combined with the hardship that would flow from "a long postponed appellate review," supports this Court's exercise of its power to review and resolve the substantial issues raised by the SEC's unprecedented action. *Cf. U.S. Alkali Export Ass'n v. U.S.,* 325 U.S. 196, 203 (1945) (granting writ because "[t]he hardship imposed on petitioners by a long postponed appellate review, coupled with the attendant infringement of the asserted Congressional policy of conferring primary jurisdiction on the Commission, together support the appeal to the discretion of this Court to exercise its power to review the ruling of the district court in advance of final judgment."); *see also Dinler v. City of New York (In re City of New York)*, 607 F.3d 923, 943-44, 945, n.22-23 (2d Cir. 2010) (granting petition where court "adopted erroneous view[s] of the law" and issue presented was one "rarely considered" and therefore "underdeveloped" in the court's jurisprudence and review could "forestall future error" caused by a decision that had "potentially broad applicability and influence" going forward) (alteration in original).

This Court's review of the authorities relating to the jurisdictional and APA issues, discussed below, will confirm that petitioner has  a "clear and indisputable right" to the writ.  These are not issues that are susceptible of differing interpretations or that implicate conflicting authority.  As to not just one but two separate and distinct legal precepts, abundant and controlling authority applied in straightforward fashion to critical undisputed facts leads inevitably to the conclusions that (1) enforcement authority was delegated to Treasury – not the SEC; *and* (2) the SEC never engaged in any proper rulemaking to establish a rule that would absorb and imbue the SEC with authority to enforce the SAR provisions of the BSA.  Alpine has shown, and the SEC concedes, that this is an issue of first impression.  No precedent cited by the SEC supports its claims.  There is no case that supports the assertion of jurisdiction by one agency where Congress has delegated that authority to another.  And the SEC offers no support for the counterintuitive notion that an agency regulation can automatically evolve to incorporate other regulations, adopted *post hoc,* relating to a statutory reporting regime that did not exist until long after the agency's rule.

Further, the District Court failed to engage in even a cursory analysis of these issues.  It did not acknowledge or analyze the Congressional delegation of authority under the BSA or whether that express Congressional delegation can be overridden by the SEC.  The District Court inexplicably refused even to consider the submission from former FinCEN representative Beverly Loew that discussed in detail the precise

statutory and regulatory background bearing on matters on which the Court was making unfounded assumptions. It did not analyze the SEC's lack of proper rulemaking or the patent invalidity of the SEC's purported incorporation by reference.[8]

Only through this Petition will these issues be considered in advance of the SEC's deployment of the District Court's decision not only against Alpine but also against other market participants. And only through this Petition will there be an opportunity to prevent the disruption in the financial industry that will result from this rewriting of SAR requirements and penalties, and the pursuit of other similar cases by the SEC that could be destructive of other similar financial firms. Resolution of this issue will, therefore, aid the administration of justice in this case while at the same time providing a comprehensive analysis of these issues that can alleviate the industry's concerns about the SEC's action and can be used as a guidepost in other cases and jurisdictions if the SEC continues to pursue these claims.

Finally, this writ of mandamus is the only adequate means available to Alpine to obtain review of these issues. The District Court has steadfastly declined to address them. Instead, it has communicated at fairly high volume that it intends to grant summary judgment to the SEC on novel claims on which the SEC asserts that it

---

[8] That the Court failed to address or acknowledge even controlling precedent was acknowledged by the SEC, which was left to try to posit a "plausible explanation" for the Court's failure to consider that authority. SEC Opp. to Motion for Reconsideration at 6, 11.

is entitled to penalties in excess of $400 million.[9]  Entry of a judgment in this case will literally drive Alpine out of business: it is subject to strict net capital requirements that could not be met if such an enormous liability suddenly accrued; it would be virtually impossible to bond any appeal if the District Court accepts the SEC's per-SAR penalty approach; and Alpine's counterparties would likely cease to do business with it.  If this action continues without this appellate review, Alpine may be forced out of business in a case in which it appears legally indisputable that the SEC lacks the authority to pursue it.  This writ likely constitutes the *only* opportunity to obtain a legal analysis of these threshold issues and a review of an unprecedented decision that is contrary to clear and controlling authority *and* would dramatically alter the landscape of enforcement and interpretation of the BSA.

### B.    Enforcement Authority for the BSA Was Expressly Delegated to Treasury and Cannot be Usurped by the SEC

That the SEC lacks authority to pursue claims for violation of the SAR provisions of the BSA is both clear and a matter of critical importance to the securities industry and the financial sector generally.  The undisputed facts are plain:

- In 1981, the SEC issued Rule 17a-8 which referenced a broker-dealer's obligation to comply with the currency transaction reporting ("CTR") regulations previously issued pursuant to the BSA.

---

[9]  The District Court's denial of Alpine's motion for certification of appeal includes its finding that the case will be resolved quickly.  That would obviously not be the case if the Court were to comply with FinCEN's consistent guidance that SAR decisions must be evaluated *in the context of all the facts and circumstances* of the transaction and the relevant market.

- In 1992, a decade *after* the Commission's issuance of Rule 17a-8, Congress enacted a new regulatory reporting regime authoring the Secretary of the Treasury to issue regulations requiring SARs.

- In 2002, the SAR requirements were extended to include broker-dealers.

- Congress expressly delegated authority for the administration, interpretation and enforcement of those SAR filing requirements to Treasury,[10] not the SEC, and Treasury, directly and through FinCEN, has consistently and explicitly stated in both regulation and public comments that it retained enforcement authority and that the SEC has only examination authority. For example, in a Report to Congress, FinCEN stated:

    FinCEN has retained the authority to pursue civil enforcement actions against financial institutions for non-compliance with the Bank Secrecy Act and the implementing regulations. Under the Bank Secrecy Act, FinCEN is empowered to assess civil monetary penalties against, or require corrective action by a financial institution committing negligent or willful violations of the Bank Secrecy Act. Generally, FinCEN identifies potential enforcement cases through: (1) referrals from the agencies examining for Bank Secrecy Act compliance; (2) self-disclosures by financial institutions; and, (3) FinCEN's own inquiry to the extent it becomes aware of possible violations. Ex. 10 to the Fritz Decl.: Alpine's Statement of Material Facts 3.

- The SEC has admitted that it never received any delegation of authority to enforce the BSA or its implementing regulations.

- At no time, when those SAR provisions were enacted or in the decades since, has the SEC even purported to engage in any rulemaking process relating to them.

---

[10] In its briefs, Alpine presented in detail the history relating to the enactment of the BSA, the clear and consistent provisions as to the delegation of authority to Treasury and its subdelegation to its bureau, FinCEN, and the literally decades of statements by FinCEN emphasizing that it retained enforcement authority. As confirmed in the comments to a 1987 amendment to the BSA implementing regulations, the Treasury Department has "*exclusive* authority to impose civil penalties under the Bank Secrecy Act." *See* 52 Fed. Reg. 11,436, 11,440 cmt. 19, 11,445 (Apr. 8, 1987) (emphasis added).

The SEC may only *examine* broker dealers for BSA compliance. As discussed at length in Alpine's expert declaration, the background of these provisions are consistent and clear. Congress deliberately established Treasury as the Administrator of the BSA, and Treasury allocated authority to FinCEN, plainly and purposefully, to ensure consistent interpretation and enforcement of provisions that are, after all, banking regulations designed to target money laundering. Only Treasury, and FinCEN, stand at the intersection of the various financial firms, casinos, banks, money services businesses and other financial firms that are all subject to the same reporting regime, and only FinCEN can administer the BSA's provisions in a manner that is consistent with its purposes and rational for the disparate financial entities that are subject to it. The SEC cannot hijack the enforcement authority delegated to FinCEN to rewrite the requirements of and penalties relating to the BSA and the District Court's contrary conclusion, based on the assertion that FinCEN "acknowledge[d]" that the SEC could bring actions for violations of the BSA, is belied by the very authority on which it relied. *See supra* at 8-9.

In its decision accepting the SEC's theory concerning Rule 17a-8, the District Court relied almost exclusively on the extent of the SEC's authority under Section 17(a) of the Exchange Act. In the process, the Court completely disregarded the controlling authority in this Circuit explaining that the extent of the SEC's authority under Section 17(a) cannot be viewed in isolation; it is by definition constrained not only by its terms but also by subsequent and specific legislation. This issue was

addressed at length in *Nutritional Health Alliance v. F.D.A.,* 318 F.3d 92 (2d Cir. 2003), in which this Court held that the FDA did not have authority to regulate "packaging" of drugs and dietary supplements for "poison prevention purposes," despite the FDA's "broad authority" under the Food, Drug and Cosmetic Act ("FDCA") to regulate "food and drugs in order to protect public health." *Id.* at 95, 98. The Court noted that the later-enacted Poison Prevention Packaging Act ("PPP") and Consumer Product Safety Act ("CPS") transferred the regulation of poison prevention packaging from the FDA to another agency, the Consumer Product Safety Commission ("CPSC"). *See id.* at 94, 102-03. The Court observed that, in accordance with the Supreme Court's decision in *F.D.A. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)*,* it would not defer to, or adopt the interpretation of, the FDCA proffered by the FDA that allowed it to "circumvent the detailed regulatory scheme" put in place by Congress for poison-prevention packing because:

> (1) the PPP Act specifically and unambiguously targets the accidental poisoning problem and prescribes a specific regulatory approach to addressing the problem through packaging standards, (2) the CPS Act unambiguously transferred authority to administer and enforce the PPP Act from the FDA to the CPSC, and (3) ***the FDA's assertion of concurrent jurisdiction rings a discordant tone with the regulatory structure created by Congress***.

*Id.* at 104 (emphasis added).[11]

---

[11] Alpine cited numerous additional authorities in its moving papers that rejected agency action inconsistent with an express delegation of statutory authority – none of which were acknowledged or addressed by the District Court. *See, e.g., Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649-50, (1990) (delegation of authority to promulgate motor vehicle safety "standards" did not include the authority to decide the pre-emptive scope of the federal statute because "'[n]o such delegation

So it is here.  The BSA was enacted decades after the Exchange Act and expressly delegated rulemaking, administration and enforcement authority with respect to the BSA solely to the Treasury Department.  Congress could have elected to split this authority among various agencies, including in 2001 when it amended the BSA to authorize the Treasury Secretary to require suspicious activity reporting. But it did not.  *See* 31 U.S.C. § 5318(g).  The BSA and its implementing regulations "specifically and unambiguously" cover the subject matter of SAR enforcement authority.  As in *Nutritional Health,* the SEC's assertion of "concurrent jurisdiction" to enforce the SAR requirements of the BSA under Section 17(a) of the Exchange Act "rings a discordant tone with the regulatory structure created by Congress." 318 F.3d at 104.  Here, too, the SEC cannot unilaterally authorize itself to enforce alleged violations of the SAR provisions of the BSA and thereby invade another agency's authority.

---

regarding [the statute's] enforcement provisions is evident in the statute" and "an agency may not bootstrap itself into an area in which it has no jurisdiction.'") (citation omitted); *Bayou Lawn & Landscape Servs. v. Sec'y of Labor*, 713 F.3d 1080, 1084 (11th Cir. 2013) (where rulemaking authority was granted to the Department of Homeland Security ("DHS"), court rejected as an "absurd reading of the statute," the Department of Labor's ("DOL") argument that because DHS was required to "consult" with DOL, that this "empowered [DOL] to engage in rulemaking, even *without* the DHS," and finding that DOL "cannot bootstrap that supporting role into a co-equal one.") (emphasis in original); *American Bankers Ass'n v. S.E.C.,* 804 F.2d 739, 755 (D.C. Cir. 1986) ("[t]he SEC cannot use its definitional authority to expand its own jurisdiction and to invade the jurisdiction of other agencies, including the Board of Governors" of the Federal Reserve Board); *California v. Klepp*, 604 F.2d 1187 (9th Cir. 1979) (the Environmental Protection Agency could not exercise control of air quality in the outer continental shelf ("OCS") because it conflicted with the delegation of authority to the Secretary of the Interior under the later enacted amendments to the Outer Continental Shelf Lands Act).

C.   **The Court Misapplied** *Chevron,* **Deferring Improperly and To the Wrong Agency**

The Court's use of *Chevron* deference to endorse the SEC's positions stands as a separate and clear analytical failure.[12] *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  First, where Congress has spoken on an issue, no *Chevron* analysis is appropriate, and the Second Circuit has laid out in clear terms that a plain grant of authority to another agency precludes invasion of that authority.  The Second Circuit's decision in *Nutritional Health* is right on point here too: the Court refused to give *Chevron* deference to the FDA's assertion of authority over "poison prevention packaging."  *See* 318 F.3d at 103-04.  The Court observed that "[e]ven if there is some ambiguity in the statutory text of the FDC Act . . . [u]nder the second prong of *Chevron,* we would find it necessary to analyze not only the FDC Act, which the FDA administers, but also the PPP Act [Poison Prevention Act] and the CPSC [Consumer Product Safety Act], both of which are administered by the CSPC [Consumer Product Safety Commission] and not the FDA."  *Id.* at 101-02.  After considering *all* of the relevant statutes (not just the FDC Act), the Court held it "would not defer to the FDA regarding its interpretation of ambiguous language in the FDC Act where doing so would allow the FDA to circumvent the detailed

---

[12]   The continued vitality and/or extent of *Chevron* deference has been widely questioned, particularly since the appointment of Justice Neil Gorsuch, and his opinion last month in *SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348 (2018).  While leaving the question of "whether *Chevron* should remain … for another day," a five member majority of the Court stated in no uncertain terms that "we owe an agency's interpretation of the law no deference" unless the Court is unable to discern the plain meaning of a pertinent statute.  *See id.* at 1358.

regulatory scheme, including express constraints, set forth by Congress in the PPP Act." *Id.* at 104.

Second, even if a *Chevron* deference were appropriate, *no deference* can or should be afforded to the SEC in its interpretation of statutory provisions entrusted to, and the "guidance" emanating from, *a different agency*.

### D.   Rule 17a-8 Did Not Automatically Incorporate the SAR Provisions of the BSA Nor Did the SEC Properly Promulgate any Rule in 2002 When Those SAR Provisions Became Applicable to Broker Dealers

The SEC has acknowledged that it does not possess authority to implement or enforce rules under the BSA but maintains that Alpine's alleged violations of the BSA "also violated the Exchange Act and the BSA does not preclude the Commission's authority to enforce its broker-dealer reporting and recordkeeping requirements." (SEC Opp. to Cross-Motion for Summ. J. at 1, 3.)   It insists that it can evade Congress' express delegation of authority to the Treasury Department by simply referencing the BSA, and thereby confer on itself the authority to enforce those provisions.   All of that was accomplished, the SEC claims, through its promulgation of Rule 17a-8 in 1981, decades prior to the existence of the SAR provisions.

This claim by the SEC suffers from layer upon layer of invalidity.  As an initial matter, the SEC's contention -- that when it promulgated Rule 17a-8 in 1981, it intended to authorize the SEC to pursue civil money penalties for a violation of the incorporated BSA regulations -- is pure fiction.  The SEC did not even have the

authority to impose penalties for a violation of the federal securities laws in 1981. Congress did not grant that authority until the Securities Enforcement Remedies and Penny Stock Reform Act of 1990. 15 U.S.C. § 78u(d).

In addition, and taken in roughly chronological order, (1) the SEC improperly attempted to incorporate, *ad infinitum* and without rulemaking, future substantive amendments to the BSA; (2) it failed to comply with the requirement that it specify the edition and version of the incorporated material; and (3) it failed, in 2002, to conduct the required rule-making that would have been necessary to update its regulation "[w]hen a more recent version of [the BSA] became available." Emily J. Bremer, *Incorporation by Reference in an Open-Government Age*, 36 Harv. J. L. & Pub. Pol'y 131, 184 (Winter 2013). Thus, even *if* Rule 17a-8, as promulgated in 1981, is valid, it did not, like some regulatory sponge, automatically and continually absorb all of the subsequent amendments to a separate piece of legislation.

The SEC's claim that it possesses authority to enforce the SAR provisions ultimately hinges on this notion that it could refer to the BSA in its 1981 rule, which expressly addressed only *currency transaction reporting*, and thereby not only effectively re-enact all subsequent BSA provisions but also do so without notice, comment, publication or even disclosure of that sweeping change to the contours of Rule 17a-8.

The SEC is wrong; that purported device of future and perpetual incorporation is invalid. Clear from case law and from OFR regulations is that a statutory reference

23

to or incorporation of another statute, as a matter of law, deals with the statute *that exists at that time*, not subsequent amendments. OFR regulations contain specific provisions that expressly prohibit the action purportedly taken by the SEC in Rule 17a-8, and render invalid any claim that the rule could automatically absorb subsequent legislative enactments. In particular, the OFR prohibits incorporation by reference unless it is submitted to and approved by the Director, refers to a publication that is eligible for incorporation by reference, and specifically identifies the version of the material and "is limited to the edition of the publication that is approved." 1 C.F.R. § 51.1(f), § 51.3. Under these regulations, material is available for incorporation by reference only if it fits within the Federal Register's incorporation by reference policy and is limited to a particular edition of the incorporated material. Bremer, *supra*, at 142.

The preclusion of "dynamic" incorporation is only one of many reasons that the SEC's claim concerning the scope of Rule 17a-8 is invalid. In addition, and even if the SEC viewed the language of Rule 17a-8 as being broad enough to capture the subsequently enacted SAR reporting requirements, the SEC was *still* required to comply with the APA in relation to that substantial change in the content of the regulation, and it did not. As confirmed by the authorities cited by Alpine, and overlooked by the District Court, the APA precludes an agency from sweeping into a regulation any "revised" or "updated" material that alters a regulated party's obligations. In *City of Idaho Falls v. F.E.R.C.,* 629 F.3d 222, 227-29 (D.C. Cir.

2011), for example, an agency's attempted incorporation of a revised fee schedule, developed by a different agency, was held to be invalid. The court determined that FERC violated the APA because the "revised" fee schedule was actually materially different from that which had been previously incorporated into the statute, and so "marked a change in its own regulations". For FERC to make such a change, "APA section 553 required notice-and-comment rulemaking." *Id.* at 230. In addition, the court confirmed that FERC's passive acceptance of material developed by a separate agency would contravene the agency's obligations to actually promulgate and to confirm the reasonableness of any directive that was being included in its regulations. *Id.* at 228-29. As the D.C. Circuit explained, it is FERC that has the responsibility to set annual charges "and that its duty to ensure that rates are reasonable is both mandatory and non-delegable." *Id.* at 229.

The decision in *United States v. Picciotto,* 875 F.2d 345 (D.C. Cir. 1989), likewise illustrates that the SEC's 1981 issuance of Rule 17a-8 did not and could not subsume the new reporting regime enacted under the BSA a decade later in 1992. There, the Park Service claimed that it had the authority to impose "additional conditions" on Park activities without publication, notice or comment, arguing that it had granted to itself "a valid exemption to the APA for all future regulations [regarding restrictions on Park activity] and [would] be free of APA's troublesome rulemaking procedures forever after." *Id.* at 346-47. That reading of its regulation, the Court succinctly stated, was "implausible as well as unlawful." *Id.* at 347.

Likewise, here, the SEC insists that it freed itself of APA's "troublesome rulemaking procedures."  And it engaged in none.  It *did not* prescribe or properly publish and promulgate any such rule relating to SARs.  Rule 17a-8 was not amended or revised; the Commission has never even issued a statement advising firms of its claim that the rule incorporated (and permitted enforcement of ) SAR requirements. The rulemaking process employed by the SEC and its plain failure to comply with the APA are subject to "the much stricter and more exacting review of the agency's rationale and decision-making process" than exists under the *Chevron* analysis.  The SEC's actions cannot survive that exacting review.  *See Catskill Mts. Chptr. of Trout Unlimited v. EPA*, 846 F.3d 492, 521 (2d Cir. 2017) (explaining that the *State Farm* standard, not the *Chevron* standard, "is used to evaluate whether a rule is procedurally defective" because of failures in the agency's rulemaking process), *cert. denied*, 138 S. Ct. (Feb. 26, 2018); *see also Encino Motorcars LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("where a proper challenge is raised to the agency procedures, and those procedures are defective, a court should not accord *Chevron* deference to the agency interpretation.").

Finally, the District Court asserted that the SEC's purported use of the Exchange Act in enforcing the BSA is permissible because no conflict exists between the Exchange Act and the BSA.  Ex. 4 to the Fritz Decl.: Opinion at 37.  The direct conflict between the provisions of the two statutes is, however, clear.  For example, the proposed SEC enforcement scheme is far more harsh and destructive to business

26

than the provisions of the BSA. The SEC insists that it can pursue a claim of a SAR violation under the Exchange Act, and thereby obtain summary judgment, on a *strict-liability* theory, and obtain penalties on a per-violation basis starting at $80,000 per violation, totaling in the hundreds of millions.

Neither strict liability, nor such massive penalty amounts, are available under the BSA. For FinCEN to pursue the exact same alleged violations, it would have to prove willfulness *and knowledge* of a violation of the law, and even then penalties would be capped at $25,000 per violation. 31 U.S.C. § 5321(a)(1); 31 C.F.R. § 1010.820(f). If FinCEN were only able to establish a negligent violation, penalties would be capped at $500 per violation, and where a "pattern" of negligent violations is established, the total penalty could not exceed $50,000.00. *See* 31 U.S.C. § 5321(a)(6); 31 C.F.R. § 1010.820(h). If FinCEN were unable to demonstrate willfulness or negligence, it could not recover any penalties. *See id.* The conflicts in the statutory provisions illustrate the unfairness, and the unmanageable and unproductive splintering that would occur, if multiple agencies across different industries could formulate their own interpretations, enforcement approaches and penalties in relation to a single statutory regime.

The invalidity of the SEC's use of Rule 17a-8 was ignored by the District Court. The District Court's decisions actually avoid any acknowledgement of the detailed and extensive procedural requirements imposed by the APA, including the notice and comment procedures of 5 U.S.C. § 553. The District Court failed even to

acknowledge this Court's decision in *Nutritional Health* and a quantity of other authorities discussed by Alpine which confirm that the Court's assumption – that the SEC could use the 1981 issuance of Rule 17a-8 to absorb in perpetuity all subsequently enacted provisions of the BSA – is invalid on multiple grounds. (*See* Ex. 4 to the Fritz Decl.: Opinion at 38-39 – holding that Rule 17a-8 was able to validly "evolve over time through Treasury's regulations" simply by "incorporat[ing]" them in 1981). Contrary to the District Court's view, not only did the SEC fail to comply with the provisions of the APA but also the mechanism that it supposedly adopted to accomplish perpetual incorporation of BSA provisions is invalid.

## V.
## CONCLUSION

For these reasons the Court should grant the writ of mandamus under 28 U.S.C.

§ 1651 compelling the dismissal of the SEC's use of Rule 17a-8 to pursue alleged

violations of the SARs provisions of the BSA.

Dated:  New York, New York
        June 22, 2018

                                Respectfully submitted,

                                Maranda Fritz
                                THOMPSON HINE LLP
                                335 Madison Avenue
                                New York, NY 10017
                                (212) 344-5680
                                maranda.fritz@thompsonhine.com


                                *Counsel for Petitioner*
                                *Alpine Securities Corporation*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) in that it is 7,742 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) in that it is proportionately spaced typeface Times New Roman using 14-point type by the Microsoft Word program.

Dated:  June 22, 2018                                      Respectfully submitted,

Maranda Fritz
*Counsel for Petitioner*