IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ALPINE SECURITIES CORPORATION, et al.,<br><br>             Plaintiffs,<br><br>v.<br><br>SECURITIES AND EXCHANGE COMMISSION,<br><br>             Defendant. | **AMENDED MEMORANDUM DECISION AND ORDER GRANTING MOTION TO DISMISS**<br><br>Case No. 2:18-cv-00504-CW-CMR<br><br>Judge Clark Waddoups |

Before the court is the Security and Exchange Commission's motion to dismiss the claims asserted in this case by Plaintiff Scottsdale Capital Advisors.[1] (ECF No. 39.) Each of Scottsdale's claims have been asserted under the Administrative Procedures Act ("APA"). (*See* Am. Compl., ECF No. 29.) In its motion, the SEC argues that Scottsdale's claims should be dismissed because (1) Scottsdale lacks Article III standing, (2) Scottsdale has failed to identify any final agency action that is subject to review under the APA, and (3) Scottsdale's claims are untimely because any final agency action that is subject to review under the APA occurred more than six years before the complaint was filed.

---

[1]     Claims originally asserted by Plaintiff Alpine Securities Corporation were voluntarily dismissed by Alpine on February 1, 2022. (*See* Notice of Voluntary Dismissal, ECF No. 27.) Therefore, Scottsdale is the sole remaining plaintiff in this action.

Because the court concludes, for the reasons stated herein, that Scottsdale lacks statutory standing to bring its claims under the APA, the court will grant the SEC's motion and dismiss Scottsdale's claims.[2]

## Background

In October 1970, Congress enacted the "Currency and Foreign Transactions Reporting Act," which is commonly referred to today as the "Bank Secrecy Act" (or "BSA"). Currency and Foreign Transactions Reporting Act of 1970, Pub. L. No. 91-508, 84 Stat. 1114, 1118-24 (1970) (codified as amended at 12 U.S.C. §§ 1829b, 1951-1960; 31 U.S.C. §§ 5311-5314, 5316-5336). The original purpose of the act was to require certain financial institutions to file and maintain certain reports or records relating to currency and foreign transactions "where such reports or records have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." *Id*. at § 202. Among the financial institutions that were subject to the BSA's reporting and record keeping requirements were brokers and dealers in securities and commodities.[3]

The BSA required the Secretary of the Treasury to adopt appropriate regulations to carry out the purposes of the act and authorized the Secretary to delegate authority to enforce the act to

---

[2]      In its original decision issued on November 4, 2024 (ECF No. 55), the court erroneous indicated that it was dismissing this case "with prejudice." Because the dismissal is on jurisdictional grounds, the case must be dismissed without prejudice. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006). Accordingly, the original decision will be replaced and superseded by the current decision dismissing this case without prejudice.

[3]      The BSA defined the term "financial institution" to include "a broker or dealer registered with the Securities and Exchange Commission under the Securities and Exchange Act of 1934" and "a broker or dealer in securities or commodities." § 203(e)(7)-(8), 84 Stat. at 1119.

"the appropriate bank supervisory agency, or other supervisory agency." §§ 203, 204, 84 Stat. at 1120.

The Treasury Department first adopted rules implementing the BSA, in accordance with the statute, in April 1972. *See* Financial Recordkeeping and Reporting of Currency and Foreign Transactions, 37 Fed. Reg. 6912 (Apr. 5, 1972) (to be codified at 31 C.F.R. Part 103).[4] The original Treasury rules assigned the responsibility for assuring compliance with BSA regulations to "the Securities and Exchange Commission with respect to brokers and dealers in securities." *Id*. at 6915 (§ 103.46(a)(6)).

In December 1981, the SEC adopted a new rule under the Securities Exchange Act of 1934 (the "Exchange Act") that incorporated by reference the Treasury Department's BSA regulations. The new rule, Rule 17a-8, required brokers and dealer to "file reports and make and preserve records pursuant to the Currency and Foreign Transactions Reporting Act of 1970 (the 'Currency Act') and the regulations of the Department of the Treasury promulgated thereunder." Record Keeping by Brokers and Dealers, 46 Fed. Reg. 61454 (Dec. 17, 1981) (to be codified at 17 C.F.R. § 240.17a). Rather than specifying what reports and records were required to be filed

---

[4]     When ruling on a motion to dismiss, the court must generally accept all factual allegations of the complaint as true and not consider matters that appear outside of the plaintiff's complaint. An exception to this general rule exists, however, for "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Therefore, the court may "'take judicial notice of its own files and records, as well as facts which are a matter of public record,' without converting a motion to dismiss into a motion for summary judgment." *Johnson v. Spencer*, 950 F.3d 680, 705 (10th Cir. 2020). This includes items that appear in the Federal Register. *See* 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed . . . ."). Accordingly, in evaluating the SEC's motion to dismiss, the court takes judicial notice of relevant material from the Federal Register as cited herein.

and preserved under Rule 17a-8, the rule incorporated by reference rules promulgated by the

Treasury Department as follows:

> Every registered broker or dealer who is subject to the
> requirements of the Currency and Foreign Transactions Reporting
> Act of 1970 shall comply with the reporting, recordkeeping and
> record retention requirements of Part 103 of Title 31 of the Code of
> Federal Regulations. Where Part 103 of Title 31 of the Code of
> Federal Regulations and § 240.17a-4 of this chapter require the
> same records or reports to be preserved for different periods of
> time, such records or reports shall be preserved for the longer
> period of time.

*Id*. at 61455. In adopting the rule, the SEC explained that the rule did "not specify the required

reports and records so as to allow for any revisions the Treasury may adopt in the future." *Id*. at

61455. Thus, since the adoption of Rule 17a-8 in 1981, the SEC has taken the position that a

violation of Treasury's BSA regulations also constitutes a violation of the Exchange Act.

In April 1990, the Secretary of the Treasury established the Financial Crimes

Enforcement Network ("FinCEN") as an office in the Office of the Assistant Secretary

(Enforcement) and delegated to FinCEN the authority to administer and ensure compliance with

the BSA. Organization, Functions, and Authority Delegations: Financial Crimes Enforcement

Network, Treasury Dep't Order No. 105-08, 55 Fed. Reg. 18433 (May 2, 1990).

Since the original adoption of Rule 17a-8, the BSA and its corresponding Treasury

regulations have been amended several times. Two significant amendments are particularly

relevant to this case.

First, in 1992, Congress enacted a new provision of the BSA allowing the Treasury

Secretary to require Financial Institutions and their agents to "report any suspicious transaction

relevant to a possible violation of law or regulation." Annunzio-Wylie Anti-Money Laundering

Act, Pub. L. No. 102-550, sec. 1517(b), § 5314(g), 106 Stat. 3672 (1992) (codified as amended at 31 U.S.C. § 5318(g)).

In 1996, FinCEN adopted new BSA regulations, pursuant to authority granted by Congress in the 1992 Anti-Money Laundering Act, requiring banks to report suspicious transactions involving at least $5,000 in funds or other assets to the Financial Crimes Enforcement Network ("FinCEN") through a Suspicious Activity Report ("SAR"). Amendment to the Bank Secrecy Act Regulations; Requirement to Report Suspicious Transactions, 61 Fed. Reg. 4326 (Feb. 5, 1996) (to be codified at 31 C.F.R. § 103.21). Notably, the 1996 amendments to Treasury's BSA regulations did not require brokers and dealers that were not affiliated with banks or other depository institutions to file SARs.

In 2001, as part of the Patriot Act, Congress enacted new legislation requiring the Treasury Secretary, after consultation with the SEC and the Board of Governors of the Federal Reserve, to adopt new regulations requiring brokers and dealers to submit SARs under 31 U.S.C. § 5318(g). International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, Pub. L. No. 107-56, § 356(a), 115 Stat. 324 (2001).

In 2002, as required by the Patriot Act, FinCEN adopted new regulations requiring all brokers and dealers to file SARs. Financial Crimes Enforcement Network; Amendment to the Bank Secrecy Act Regulations—Requirement that Brokers or Dealers in Securities Report Suspicious Transactions, 67 Fed. Reg. 44048 (July 1, 2022) (to be codified at 31 C.F.R. § 103.19). The regulations promulgated by FinCEN in 2002 largely mirrored the SAR regulations that had previously been imposed on banks and other depository institutions.

The SEC did not amend Rule 17a-8, or otherwise engage in rulemaking, to specifically incorporate the new SAR requirements imposed by FinCEN's 2002 amendments to the BSA regulations into Rule 17a-8 in 2002. In adopting the new regulations, however, FinCEN recognized that Rule 17a-8 enabled the SEC to examine for BSA compliance and noted that it expected the SEC to "address broker-dealer compliance with this rule." *Id*. at 44049. And by at least December 2007, the SEC took the public position that brokers and dealers that failed to comply with Treasury's SAR requirements violated the Exchange Act and the then existing version of Rule 17a-8. *See, e.g.*, *In re Park Financial Group, Inc.*, Exchange Act Release No. 56,902, 92 S.E.C. Docket 232 at *4 (Dec. 5, 2007) ("The failure to file a SAR as required by 31 C.F.R. § 103.19 is a violation of Section 17(a) of the Exchange Act and Rule 17a-8 thereunder."); *In re Louis J. Akers*, Exchange Act Release No. 60,628, 96 S.E.C. Docket 2204 at *1 (September 4, 2009) ("Ferris willfully violated Section 17(a) of the Exchange Act and Rule 17a-8 thereunder by failing to file Suspicious Activity Reports ('SARs')."); *In re Gilford Securities, Inc.*, Exchange Act Release No. 65,450, 102 S.E.C. Docket 207 at *7 (Sept. 30, 2011) ("Exchange Act Rule 17a-8 requires broker-dealers to comply with the reporting, recordkeeping and record retention requirements of the rules promulgated under the BSA. The failure to file a SAR as required by the SAR Rule is a violation of Section 17(a) of the Exchange Act and Rule 17a-8 thereunder.").

In October 2010, FinCEN adopted a final rule moving its BSA regulations from Part 103 of Title 31 of the Code of Federal Regulations ("C.F.R.") to a new chapter in the C.F.R.—Chapter X. Transfer and Reorganization of Bank Secrecy Act Regulations, 75 Fed. Reg. 25806 (Oct. 6, 2010). Because the then existing version of Rule 17a-8 made express reference to Part

103 of Title 31 of the C.F.R., which had been removed by FinCEN's 2010 reorganization of its BSA regulations, the SEC followed suit in March 2011 by making what it referred to as "technical amendments"[5] to Rule 17a-8 to cross-reference the BSA regulation that were relocated to Chapter X. Technical Amendments to Rule 17a-8; Financial Recordkeeping of Currency and Foreign Transactions, 76 Fed. Reg. 11327 (March 2, 2011). Therefore, as of March 2, 2011, Rule 17a-8 expressly incorporated by reference FinCEN's then existing BSA regulations, including the 2002 regulations requiring brokers and dealers to file SARS.

Scottsdale is a retail brokerage firm that trades securities and has been registered with the SEC as a broker-dealer since 2002. (First Am. Compl. at ¶ 23, ECF No. 29.) In February 2009, Scottsdale entered a "Fully Disclosed Clearing Agreement" with Alpine Securities Corporation ("Alpine"), a "self-clearing broker-dealer specializing in the microcap market." (*Id*. at ¶¶ 17, 24.) Under the agreement, Scottsdale agreed to act as an introducing broker-dealer for transactions cleared through Alpine. (*Id*. at ¶ 25.) Under the agreement, Scottsdale had the sole responsibility for "(1) complying with all applicable laws, regulations, and self-regulatory requirements regarding transactions and accounts, including [anti-money laundering] obligations, (2) maintaining procedures to ensure compliance, and (3) knowledge of the customer, including 'all essential facts' relating to each customer and their accounts." (*Id*.)

In June 2017, the SEC filed an enforcement action against Alpine Securities Corporation ("Alpine") in the United States District Court for the Southern District of New York (hereinafter "Alpine Enforcement Action"), claiming that Alpine failed to comply with SAR regulations in

---

[5]     Because the S.E.C. considered its 2011 amendments to Rule 17a-8 to be merely technical, it did not submit the amendments for notice and comment.

violation of Rule 17a-8. Compl., *S.E.C. v. Alpine Securities Corp.*, Case No. 1:17-cv-04179-DLC (S.D.N.Y. June 5, 2017), ECF No. 1. The SEC sought to permanently enjoin Alpine from continuing to violate the SAR regulations and to impose civil penalties under the Exchange Act. *Id*. at ¶ 6. Scottsdale alleges that the Alpine Enforcement Action constituted the "first litigated SAR enforcement action by the SEC in federal court." (First Am. Compl. at ¶ 18.)

In January 2018, Alpine brought a motion for summary judgment in the Alpine Enforcement Action arguing that (1) the SEC did not have authority to enforce the BSA regulations adopted by FinCEN, (2) to the extent Rule 17a-8 purported to grant the SEC authority to enforce BSA regulations, it exceeded the scope of the rule-making authority granted by the Exchange Act, and (3) the SEC failed to allege that Alpine had the requisite scienter needed to substantiate a violation of the BSA. *See* Mem. Supp. Cross-Mot. for Summ. J. and J. on Pleadings, *S.E.C. v. Alpine Securities Corp.*, Case No. 1:17-cv-04179-DLC (S.D.N.Y. Jan. 19, 2018), ECF No. 84.

On March 30, 2018, the court in the Alpine Enforcement Action denied Alpine's motion, holding that the SEC was not purporting to enforce FinCEN's BSA regulations but was instead bringing the action pursuant to the Exchange Act and Rule 17a-8. *See S.E.C. v. Alpine Sec. Corp.*, 308 F. Supp. 3d 775, 795 (S.D.N.Y. 2018). The court also held that the SEC correctly interpreted the scope of Rule 17a-8 as incorporating FinCEN's BSA regulations by reference and that Rule 17a-8 did not exceed the scope of rule-making authority granted by the Exchange Act. *Id*. at 795-97. Finally, the court held that because the action was brought pursuant to Rule 17a-8 and the Exchange Act, the SEC was not required to allege the scienter necessary to sustain a violation of the BSA. *Id*. at 797-98.

In the same decision, the court granted partial summary judgment in favor of the SEC, holding that Alpine failed to comply with SAR recordkeeping and reporting requirements with respect to numerous representative SAR's that were submitted to the court. *Id*. at 798-811.

After failing to obtain summary judgment in the Alpine Enforcement Action, Alpine and Scottsdale together brought the current action in this court, which initially sought a declaration that the SEC's attempt to enforce FinCEN's BSA regulations pursuant to Rule 17a-8 violated the Administrative Procedures Act ("APA") and to enjoin the SEC from taking any further action to enforce the BSA regulations pursuant to Rule 17a-8. (*See* Compl., ECF No. 2.) Alpine and Scottsdale also filed a motion, concurrently with their complaint, seeking a preliminary injunction prohibiting the SEC from "using Exchange Act Rule 17a-8 to enforce and penalize purported violations of the Bank Secrecy Act." (*See* Mot. for Prelim. Inj. at 1, ECF No. 6.)[6]

In response, the SEC filed a motion in the Alpine Enforcement Action seeking to enjoin Alpine and Scottsdale from continuing to prosecute the current action in this court under the first-filed rule, *see* Mem. Supp. Mot. to Enjoin Prosecution, Case No. 1:17-cv-04179-DLC (S.D.N.Y. July 3, 2018), ECF No. 133, and a motion in this court seeking to stay proceedings pending the New York court's decision on the SEC's motion to enjoin Alpine and Scottsdale, (Mot. for Stay of Proceedings, ECF No. 15). The New York court granted the SEC's motion on July 11, 2018, enjoining Alpine and Scottsdale from litigating the current action until "the conclusion of any appeal from the entry of final judgment in [the Alpine Enforcement Action]."

---

[6]     Alpine also sought a writ of mandamus from the Second Circuit compelling the Southern District of New York to dismiss the Alpine Enforcement Action on the grounds raised in Alpine's summary judgment motion, which was denied. *See In re Alpine Sec. Corp.*, Case No. 18-1875 (2d Cir. Sept. 28, 2018).

Opinion & Order, Case No. 1:17-cv-04179-DLC (S.D.N.Y. July 11, 2018), ECF No. 140. The following day, this court entered an order staying the current action until "thirty days after the SDNY Injunction is dissolved." (Order Granting Stay, ECF No. 21.)

While this action was stayed, the court in the Alpine Enforcement Action entered summary judgment on the SEC's remaining claims, concluding that "[t]he SEC has shown as a matter of law that Alpine violated Rule 17a-8 repeatedly by filing required SARs with deficient narratives, failing to file SARs for groups of suspicious liquidation transactions, and failing to maintain a produce SAR support files." *S.E.C. v. Alpine Sec. Corp.*, 354 F. Supp. 3d 396, 445 (S.D.N.Y. 2018). In a subsequent decision, the court imposed a civil penalty against Alpine in the amount of $12 million and permanently enjoined Alpine from engaging in further violations of Rule 17a-8. *S.E.C. v. Alpine Sec. Corp.*, 413 F. Supp. 3d 235, 251 (S.D.N.Y. 2019). The district court's judgment was affirmed by the Second Circuit on appeal. *S.E.C. v. Alpine Sec. Corp.*, 982 F.3d 68 (2d Cir. 2020).

Following final resolution of the Alpine Enforcement Action, the stay on the current action was lifted, Alpine voluntarily dismissed its claims against the SEC, and Alpine and Scottsdale withdrew their motion for preliminary injunction against the SEC. (Notice of Voluntary Dismissal, ECF No. 27; Notice of Withdrawal of Mot., ECF No. 28.) Scottsdale, however, chose to proceed with its claims, filing an Amended Complaint on February 1, 2022 which dropped Alpine as a plaintiff but largely mirrored the original claims asserted against the SEC under the APA. (Am. Compl., ECF No. 29.)

Shortly thereafter, the SEC filed a motion seeking to dismiss Scottsdale's remaining claims, which is now before the court.

## Legal Standard

The SEC brings its motion pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

Motions brought pursuant to Rule 12(b)(1) seek dismissal based on a lack of subject-matter jurisdiction. A party may seek dismissal under Rule 12(b)(1) by either (1) "facially attack[ing] the complaint's allegations as to the existence of subject matter jurisdiction," or (2) "going beyond the allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests." *Graff v. Aberdeen Enter.*, 65 F.4th 500, 507 (10th Cir. 2023) (citation omitted). Here, the SEC challenges Scottsdale's allegations with respect to subject matter jurisdiction and does not seek to present evidence outside the complaint. Accordingly, the "court must accept the allegations in the complaint as true." *Id*. If the court concludes that Scottsdale has failed to allege facts sufficient to demonstrate that the court has subject matter jurisdiction to consider the merits of Scottsdale's claims, it must dismiss the action.

A motion brought pursuant to Rule 12(b)(6) seeks to dismiss a claim when the plaintiff fails to state a claim upon which relief can be granted. "'The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties may present at trial but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted.'" *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citation omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1108 (10th Cir. 1991) (citing *Scheuer v. Rhodes*, 416 U.S. 232 (1974)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff has alleged facts that allow the court to draw a reasonable inference that the defendant is liable for the misconduct alleged.

## Analysis

The SEC argues that Scottsdale's remaining claims should be dismissed for three reasons. First, it argues that Scottsdale has failed to adequately allege Article III standing because it has not plausibly alleged that it has sustained a legally cognizable injury in fact as the result of any final SEC action that could be redressed by the relief Scottsdale seeks. Second, it argues that Scottsdale has failed to identify any "final agency action" that is subject to review under the APA. Finally, it argues that Scottsdale is barred by the relevant statute of limitations from challenging any SEC action that could have been subject to APA review.

## I.       Scottsdale Lacks Standing under the APA.

Before reaching the SEC's argument with respect to Article III standing, the court must first consider whether Scottsdale has alleged facts sufficient to show that it has standing under the APA. *See Colo. Farm Bureau Federation v. United States Forest Service*, 220 F.3d 1171, 1173 (10th Cir. 2000) (citing *Jean v. Nelson*, 472 U.S. 846, 854 (1985)) ("courts should avoid reaching constitutional issues when statutory determinations are decisive"). *Cf. Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) ("[A] federal court has leeway

'to choose among threshold grounds for denying audience to a case on the merits.'") (citations omitted). If the court concludes that Scottsdale has not adequately alleged a basis for APA standing, it will not need to reach the complicated constitutional standing issues implicated by Article III. *Colo. Farm Bureau*, 472 U.S. at 854 ("Because we agree plaintiff have failed to demonstrate APA standing, we do not reach the Article III standing issue.").

Under current Tenth Circuit precedent, Scottsdale's obligation to demonstrate that it has statutory standing under the APA is a jurisdictional requirement that must be satisfied before the court can consider the merits of its claims. *See Sinclair Wyoming Ref. Co., LLC v. United States Env't Prot. Agency*, 72 F.4th 1137, 1139 (10th Cir. 2023) (dismissing petition for lack of jurisdiction as a result of failure to show standing under the APA); *Lystn, LLC v. Food & Drug Admin.*, No. 20-1369, 2021 WL 4006184, at *4 (10th Cir. Sept. 3, 2021) (unpublished) ("Under the APA, courts have jurisdiction to review only final agency actions.") (citation omitted); *McKeen v. U.S. Forest Serv.*, 615 F.3d 1244, 1253 (10th Cir. 2010) ("Pursuant to the APA, we have jurisdiction to review only 'final agency actions.'") (citation omitted). Accordingly, to the extent the SEC's motion is based on the argument that Scottsdale lacks APA standing, it is brought pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure and will be evaluated as such.

The right to seek judicial review of agency action under the APA is governed by 5 U.S.C. § 702, which provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." Thus, to demonstrate standing under the APA at the pleading stage, Scottsdale must allege facts sufficient to satisfy two requirements. First, Scottsdale must

show that it is seeking judicial review of a "final agency action." *See Kansas v. United States*, 249 F.3d 1213, 1222 (10th Cir. 2001) ("To establish statutory standing under § 702 of the APA, a plaintiff must first identify 'final agency actions.'") (citation and internal footnote omitted). Second, Scottsdale must allege facts showing that it has suffered a "legal wrong" or been "adversely affected or aggrieved" because of that action,[7] within the meaning of the relevant statute. *Id*.

### A.     Scottsdale Must Identify a Final Agency Action.

Initially, Scottsdale appears to argue that it should not be required to identify any specific final agency action that it is seeking review of because to do so would allow the SEC to "make their actions unreviewable by failing completely to engage in any required process to promulgate or amend a rule before imposing new substantive obligations." (Mem. Opp. Mot. to Dismiss at 29, ECF No. 41.) In support, Scottsdale cites the D.C. Circuit's decision in *United States v. Picciotto*, 875 F.2d 345, 347 (D.C. Cir. 1989).

*Picciotto* does not support Scottsdale's position. In *Picciotto*, the D.C. Circuit held that "additional conditions" that were imposed on demonstrators in Lafayette Park across from the White House by the Regional Director of National Capital Parks were unlawful because the

---

[7]     Although section 702 only requires that a plaintiff by injured be agency action, section 704 of the APA makes clear that that only "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Neither party claims that any of the actions at issue in this case have been "made reviewable by statute." Therefore, when read together, sections 702 and 704 require Scottsdale to allege facts showing that it has been injured by agency action and that the action causing the alleged injury qualifies as "final agency action." *See Corner Post, Inc. v. Bd. of Govs. of Fed. Reserve Sys.*, 603 U.S. ----, 144 S. Ct. 2440, 2450 ("Note that § 702's injury requirement and § 704's finality requirement work hand in hand: Each is a 'necessary, but not by itself . . . sufficient, ground for stating a claim under the APA.") (citation omitted).

conditions were not submitted for notice and comment as required by the APA. *Id*. at 349. The conditions were adopted pursuant to regulations properly promulgated by the United States Park Service, in accordance with notice and comment requirements, that allowed park directors to impose "reasonable conditions and additional time limitations" on permits "in the interest of protecting park resources, the use of nearby areas by other persons, and other legitimate park value concerns." *Id*. at 346. The court reasoned that to interpret the Park Service's regulation to allow the adoption of new substantive restrictions applicable to all demonstrators, without engaging in the notice and comment procedure, would be akin to permitting the agency to "grant itself a valid exemption to the APA for all future regulations." *Id*. at 346-47. According to the court, allowing such a regulation "would frustrate Congress' underlying policy in enacting the APA by rendering compliance optional" and would permit the Park Service to "construct its own veto of Congressional directions." *Id*. at 247 (citations omitted).

There was no discussion in *Picciotto*, however, about final agency action. Indeed, it appears that there was no dispute that both the Park Service's regulation and the adoption of additional conditions on demonstrators in Lafayette Park were both final agency actions properly subject to review under the APA. *Picciotto*, therefore, does not support Scottsdale's contention that it need not identify any final agency action to seek judicial review of the SEC's enforcement of SAR reporting and recordkeeping requirements under the APA.

Scottsdale's contention appears to be based on the presumption that requiring Scottsdale to identify a specific final agency action might allow the SEC to evade judicial review of its incorporation of FinCEN's SAR requirements into Rule 17a-8. Scottsdale is mistaken. As the New York court held in the Alpine Enforcement Action, the plain text of Rule 17a-8 "requires

broker-dealers to 'comply with the reporting, recordkeeping and record retention requirement of chapter X of title 21 of the Code of Federal Regulations." *Alpine Sec. Corp.*, 308 F. Supp. 3d at 795 (citing 17 C.F.R. § 240.17a-8).[8] Those regulations include the SAR requirements that Scottsdale is seeking review of in this case. The adoption of Rule 17a-8 in 1981, and its amendment in 2011, are both final agency actions that were subject to APA review. But Scottsdale does not seek review of either the 1981 or 2011 rulemakings in this case,[9] likely

---

[8]      Although the court in the Alpine Enforcement Action referred only to Rule 17a-8 as it was amended in 2011, the language of the rule prior to 2011 should also fairly be interpreted to incorporate the SAR regulations adopted by FinCEN in 2002. The rule adopted in 1981 made explicit reference to "Part 103 of Title 31 of the Code of Federal Regulations," where FinCEN's SAR regulations were codified when they were adopted in 2002. When adopting the rule in 1981, the SEC stated that it referred generally to Part 103 of Title 31 "so as to allow for any revisions the Treasury may adopt in the future." Record Keeping by Brokers and Dealers, 46 Fed. Reg. at 61455. Thus, to the extent there was any ambiguity in the language of Rule 17a-8 as to whether the rule was intended to incorporate only those regulations that were in effect at the time of Rule 17a-8's adoption or to incorporate future amendments to Treasury's regulations, that ambiguity was resolved by the SEC's own contemporaneous statements. *See Kisor v. Wilkie*, 588 U.S. 558, 570 (2019) (requiring courts to give deference to agency interpretations of its regulations when made contemporaneously with the adoption of the regulation).

While Scottsdale may have good arguments against the propriety of the SEC incorporating by reference future regulations that were not contemplated at the time Rule 17a-8 was originally adopted, it cannot reasonably dispute that the SEC intended to do just that when it promulgated Rule 17a-8 in 1981.

[9]      Scottsdale suggests that there was no opportunity to seek APA review of the incorporation by reference of FinCEN's SAR regulations into the Rule 17a-8 because the SAR regulations were not promulgated until 2002, more than 20 years after Rule 17a-8 was adopted in 1981. But as the Supreme Court recently made clear, the statute of limitations on a claim under the APA does not accrue until a plaintiff has been injured by final agency action. *See Corner Post*, 144 S. Ct. at 2450 ("An APA plaintiff does not have a complete and present cause of action until she suffers an injury from final agency action, so the statute of limitations does not begin to run until she is injured."). To the extent Scottsdale claims that it was injured by the incorporation of FinCEN's SAR regulations into Exchange Act Rule 17a-8, that injury could not have occurred prior to 2002, providing Scottsdale with adequate time to bring a challenge once the rule was adopted.

Moreover, Scottsdale cannot claim that it was unaware of the SEC's understanding that Rule 17a-8 incorporated the SAR regulations when they were adopted. As discussed above, the SEC has repeatedly taken the public position, since at least 2007, that Rule 17a-8 gave it

because it understands that such challenges would be barred by the relevant statute of limitations. But the fact that review of the final agency actions that incorporated the SAR regulations that Scottsdale is seeking review of are no longer subject to challenge under the APA by Scottsdale as a result of the statute of limitations does not mean the SEC's actions have improperly evaded review completely. Nor does the statute of limitations excuse Scottsdale from the requirement to identify a final agency action within the statute of limitations in order to have standing to pursue this action.

The Tenth Circuit has made clear that identifying a final agency action is a jurisdictional prerequisite for seeking judicial review under the APA. *Sinclair Wyo. Ref.*, 72 F.4th at 1139 ("Because the email was not a final agency action, we dismiss the petition for lack of jurisdiction."); *McKeen*, 615 F.3d at 1253 ("[W]e have jurisdiction to review only 'final agency actions.'"); *Kansas*, 249 F.3d at 1222 ("To establish statutory standing under § 702 of the APA, a plaintiff must first identify 'final agency action.'"). Thus, if Scottsdale has not alleged facts sufficient to identify a final agency action that is subject to review, its claims must be dismissed.

**B.    The SEC's Decision to File the Alpine Enforcement Action was not Final Agency Action Subject to APA Review.**

In addition to arguing that it need not identify a specific final agency action to demonstrate standing under the APA, Scottsdale alternatively argues that the SEC's "approval of the filing of the Alpine Enforcement Action" constitutes final agency action subject to judicial

---

authority to enforce the SAR regulations under the Exchange Act in administrative enforcement actions. And if there was any doubt, the 2011 amendment to Rule 17a-8 specifically referenced portions of the Code of Federal Regulations that included FinCEN's SAR regulations on brokers and dealers. The fact that the SEC labeled the 2011 amendment "technical" did not preclude Scottsdale from bringing an APA challenge at that time if it believed the amendment actually imposed substantive changes to Rule 17a-8.

review. The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). In *Federal Trade Commission v. Standard Oil Company of Calif.*, 449 U.S. 232, 238 n.7 (1980), the Supreme Court construed this language to include the issuance of a complaint to initiate an administrative enforcement action.

The court sees no basis for distinguishing the complaint that initiated the Alpine Enforcement Action from the complaint that initiated the administrative proceedings at issue in *Standard Oil* with respect to whether those actions constitute "agency actions" under section 551(13). Thus, the question here is not whether the SEC's decision to initiate the Alpine Enforcement Action constituted "agency action"—it is whether that action can be considered final for purposes of APA review.

To show that an agency's action is final for purposes of APA review, Scottsdale must allege facts satisfying two conditions. First, it must show that the action "marks the 'consummation' of the agency's decisionmaking process"; second, it must show that the action is one "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). *Accord Sinclair Wyo. Ref.*, 72 F.4th at 1143 (quoting *Bennett*, 520 U.S. at 177-78); *Center for Native Ecosystems v. Cables*, 509 F.3d 1310, 1329 (10th Cir. 2007) (same).

In support of its contention that the SEC's decision to file the Alpine Enforcement Action constitutes final agency action, Scottsdale cites *Athlone Industries, Inc. v. Consumer Product Safety Commission*, 707 F.2d 1485 (D.C. Cir. 1983). In *Athlone Industries*, the D.C. Circuit held, in a footnote, that the Consumer Product Safety Commission's ("CPSC") decision to file an

administrative complaint seeking civil penalties was a final agency action because it constituted the CPSC's "final determination that such proceedings were within its statutory jurisdiction." *Id.* at 1489 n. 30.

To put *Athlone* in its proper context, it is important to first understand the Supreme Court's ruling in *FTC v. Standard Oil of California*, which the court in *Athlone* purported to distinguish. In *Standard Oil*, Standard Oil of California ("Socal") filed an action under the APA alleging that the FTC had unlawfully initiated an administrative enforcement action against it and seven other major oil companies under the Federal Trade Commission Act without having the requisite "reason to believe" that that Socal was violating the act. 449 U.S. at 234-35. Socal alleged that the FTC did not have any evidentiary basis to support a belief that Socal had violated the act, but instituted the proceedings anyways under political pressure from certain members of Congress in response to increased prices caused by gasoline shortages. *Id.*

On appeal, the Supreme Court held that the FTC's issuance of a complaint that initiated administrative proceedings against Socal and other oil companies was not final agency action that was subject to review under the APA. *Id.* at 239. The Court first explained that the FTC's determination that it had "reason to believe" Socal had violated the act was "not a definitive statement of position," but was instead merely "a threshold determination that further inquiry is warranted and that a complaint should initiate proceedings." *Id.* at 241. While filing the complaint did represent a definitive determination that there was a reasonable belief that the FTC Act was violated, it did not constitute the consummation of the FTC's determination regarding whether a violation occurred. *Id.* Therefore, the administrative complaint at issue in *Standard Oil* did not meet the first condition of the later announced *Bennett* test.

Second, the Court held that the administrative complaint filed by the FTC had "no legal force" comparable to the legal consequences resulting from other action found to be "final agency action" for purposes of the APA and did not have "any comparable effect upon Socal's daily business." *Id*. at 242. The Court recognized that the burden of responding to the FTC's complaint might be substantial but explained that that burden "is different in kind and legal effect from the burdens attending what heretofore has been considered to be final agency action." *Id*. It reasoned that if the "disruptions that accompany any major litigation" were sufficient to support APA review, "every respondent to a Commission complaint could make the claim that Socal had made," delaying "resolution of the ultimate question whether the Act was violated." *Id*. at 242-43.

In *Athlone Industries*, the plaintiff (Athlone) brought an action under the APA seeking to enjoin the CPSC from continuing with administrative proceedings initiated to impose civil penalties against Athlone for violations of the Consumer Products Safety Act. According to Athlone, the Act did not grant the CPSC jurisdiction to impose civil penalties through an administrative enforcement action. 707 F.2d at 1487. Instead, Athlone argued, such penalties could only be imposed by filing an enforcement action in federal court. *Id*. The D.C. Circuit agreed with Athlone and ordered the CPSC to terminate its administrative proceedings. *Id*. at 1492.

In doing so, the court only briefly addressed the CPSC's argument that its decision to initiate the administrative proceedings at issue was not a final agency action subject to APA review. The court, purporting to distinguish *Standard Oil*, held that while the FTC's determination that there was "reason to believe" Socal was violating the FTC Act was not a

definitive statement of position in *Standard Oil*, the CPSC's initiation of proceedings against Athlone constituted "a final determination that such proceedings were within its statutory jurisdiction." *Id*. at 1489 n. 30. Thus, according to the D.C. Circuit, the administrative complaint did qualify as final agency action subject to APA review.

The court is not persuaded by the D.C. Circuit's reasoning in *Athlone Industries*. First, as discussed above, the Supreme Court in *Standard Oil* provided two rationales for its determination that the administrative complaint issued by the FTC was not final agency action—(1) because it did not constitute a definitive determination that Socal had violated the FTC Act and (2) because the burden of responding to the FTC's complaint did not impose the type of legal obligations that would support APA review. The cursory analysis in *Athlone* is devoid of any discussion of the second rationale discussed in *Standard Oil*. And there is nothing in the decision in *Athlone* that suggests the burdens that were imposed by the CPSC's complaint against Athlone were different in kind from the burdens that the Supreme Court held to be insufficient in *Standard Oil*.

Moreover, the court's determination in *Athlone Industries* that the CPSC made a definitive determination that it had jurisdiction to bring administrative proceedings against Athlone does not appear to be substantively different from the Supreme Court's conclusion in *Standard Oil* that the FTC had made a definitive determination that there was "reason to believe" that Socal had violated the FTC Act and, thus, that it had jurisdiction to bring administrative proceedings. *See Standard Oil*, 449 U.S. at 241 ("To be sure, the issuance of the complaint is *definitive* on the question whether the Commission avers reason to believe that the respondent to the complaint is violating the Act.") (emphasis added). The issue in *Standard Oil* was not

21

whether the FTC's decision to file its administrative complaint was definitive—the Court acknowledged that it was—the issue was that it represented only a threshold determination that further proceedings were warranted to determine whether the act was violated. *Id*. The Court did not hold in *Standard Oil* that the FTC's decision to file its administrative complaint was not reviewable; instead, it held only that it was not reviewable on an interlocutory basis pursuant to an action brought under the APA. *See id*. at 245 (citing 5 U.S.C. § 704) ("[A] court of appeals reviewing a cease-and-deist order has the power to review alleged unlawfulness in the issuance of a complaint.").

The same was true in *Athlone Industries*. The CPSC's determination that it had jurisdiction to bring administrative proceedings against Athlone was definitive, but it was only a threshold determination that administrative proceedings should commence. It did not constitute a final determination that Athlone had violated the relevant statute and did not definitively impose any penalties or other legal obligations on Athlone. Thus, this court sees no basis for distinguishing the circumstances at issue in *Athlone Industries* from those that were at issue in *Standard Oil*. Indeed, *Athlone Industries* appears to be in direct conflict with *Standard Oil* on the issue of finality. At least one judge from the D.C. Circuit agreed in a subsequent case. *See Ticor Title Ins. Co. v. Fed. Trade Comm'n*, 814 F.2d 731, 748 (D.C. Cir. 1987) (Williams, J., concurring) (opining that *Athlone* seems to be "in direct conflict with the Supreme Court's *Socal* opinion"). And the Ninth Circuit has also found *Athlone* to be unpersuasive on the issue of finality. *See Ukiah Valley Med. Ctr. v. Fed. Trade Comm'n*, 911 F.2d 261, 265-66 (9th Cir. 1990) ("[B]ecause finality rather than exhaustion is at issue here, *Athlone* is not persuasive.").

Scottsdale also cites *AT&T v. E.E.O.C.*, 270 F.3d 973, 975 (D.C. Cir. 2001) in support of its contention that the SEC's decision to file the Alpine Enforcement Action was final agency action subject to APA review. In *AT&T*, the plaintiff, AT&T, brought an APA action seeking a declaratory judgment that it was "not required to give former employees credit for work time they missed due to pregnancy before passage of the Pregnancy Discrimination Act of 1979." *Id.* at 974. Because the EEOC had not initiated any enforcement action against AT&T at the time it sought APA review, the court held that there was no final agency action. *Id*. AT&T argued that it was clear from its communications with the EEOC that the EEOC had made a final decision to sue AT&T to enforce the act and that those communications, when viewed in the aggregate, should constitute final agency action. *Id*. at 975. In rejecting this argument, the D.C. Circuit stated, hypothetically, that "there clearly would be final agency action if the Commission filed a lawsuit against AT&T." *Id*. The court did not, however, conduct any legal analysis or provide any reasoning to support its conclusion.

Moreover, in the sentence following the quote Scottsdale relies on from *AT&T*, the D.C. Circuit made clear that the decision to file a lawsuit could not be reviewed under the APA, because the party against whom the lawsuit was filed could simply defend itself in the action. *See id*. ("Of course, the Company could not challenge that decision as final agency action under the APA; it would instead simply defend itself against the suit."). *See also United States v. Estate of Hage*, 810 F.3d 712, 720-21 (9th Cir. 2016) (citing *AT&T*, 270 F.3d at 975) (rejecting district court's reliance on *AT&T* to support conclusion that filing of judicial enforcement action could be reviewed as final agency action under the APA). Thus, *AT&T* does not provide support for

Scottsdale's contention that the filing of the Alpine Enforcement Action constituted final agency action reviewable under the APA either.

Having concluded that neither *Athlone* nor *AT&T* support Scottsdale's contention that filing the Alpine Enforcement Action constituted final agency action for purposes of the APA, the court must consider whether an application of the factors set out in *Bennett v. Spear* support the conclusion that the filing of the Alpine Enforcement Action constituted final agency action.

As discussed above, the first factor to consider when evaluating whether an agency action is final for purposes of APA review is whether the action marks "the 'consummation' of the agency's decisionmaking process." *Bennett*, 520 U.S. at 178.

The SEC's decision to file the Alpine Agency Action differs in an important way from the decision to file an administrative action that was at issue in *Standard Oil* and *Athlone*. Where the filing of an administrative action constitutes only a threshold determination that further agency inquiry and decisionmaking is appropriate, the decision to file an enforcement action in federal court arguably represents the conclusion of the agency's deliberations and a final decision that judicial action is necessary. Once an agency initiates a judicial action, the progress of the enforcement proceedings are outside of its exclusive control and further decisionmaking is lodged in the court. And any judgment that would be entered in the action would be entered by the court, rather than the agency. Thus, the court will assume for the sake of argument that the SEC's decision to file the Alpine Enforcement Action constituted the consummation of the SEC's determination that Alpine had violated Rule 17a-8 and the Exchange Act.

The second *Bennett* factor requires the court to consider whether an agency's action was one by which "rights or obligations have been determined," or from which "legal consequences will flow." *Bennett*, 520 U.S. at 178.

The SEC's decision to file the Alpine Enforcement Action did not determine any rights or obligations with respect to Alpine or Scottsdale. Nor did it impose any legal consequences that are cognizable for purposes of the APA. While the court has no doubt that Alpine and Scottsdale have spent substantial resources in their attempt to defend against the claims asserted in the Alpine Enforcement Action, the burden imposed by needing to defend against the SEC's allegations are no different than those that would be imposed on any other party that vigorously defends themselves in major litigation. And as the Supreme Court held in *Standard Oil*, those burdens are not cognizable legal consequences for purposes of APA review. 449 U.S. at 494 (the burden of responding to an agency's charges are "different in kind and legal effect from the burdens attending what heretofore has been considered final agency action").[10]

Because the SEC's decision to file the Alpine Enforcement Action did not effect Alpine or Scottsdale's rights or obligations, and did not impose any legal consequences that are

---

[10]     Scottsdale characterizes the Alpine Enforcement Action as an attempt to "amend Rule 17a-8 . . . through adjudication." (*See* Mem. Opp. Mot. to Dismiss at 31 n. 40, ECF No. 41.) It is certainly true that an action that substantively amended a federal regulation would impose legal consequences that would support a finding that the action was a final agency action. Scottsdale does not explain, however, how merely filing a complaint in federal court could substantively amend a regulation. The SEC's filing of the Alpine Enforcement Action imposed no legal obligations on Alpine other than the obligation to respond to the SEC's complaint. And it imposed no obligations on Scottsdale at all. The fact that the SEC successfully obtained judgment against Alpine in the Alpine Enforcement Action cannot transform the complaint filed in that action into final agency action.

cognizable under the APA, it was not final agency action. Scottsdale, therefore, lacks statutory standing to bring its claims in this action and the SEC's motion must be granted.[11]

### C.      Scottsdale Has Not Adequately Alleged that it was Injured by the Initiation of the Alpine Enforcement Action.

Even if the court were to conclude that the SEC's decision to file the Alpine Enforcement Action was final agency action reviewable under the APA, Scottsdale would still fail to demonstrate its statutory standing to bring claims under the APA because it has not alleged facts sufficient to show that it has suffered a "legal wrong" or been "adversely affected or aggrieved . . . within the meaning of the relevant statute" as a result of that decision. 5 U.S.C. § 702.

In its complaint, Scottsdale alleges that it has been harmed by the SEC's enforcement of FinCEN's SAR regulations because it has been required to spend additional time and resources to update its BSA compliance program. (Am. Compl. at ¶¶ 69-71, ECF No. 29.) It also alleges that since the SEC's SAR filing standard purportedly differ from FinCEN's, it faces regulatory uncertainty resulting from having to comply with two inconsistent SAR filing regimes. (*Id.* at ¶ 71.) Scottsdale also alleges that it faces contractual liability for any enforcement action taken against Alpine under its Fully Disclosed Clearing Agreement with Alpine. (*Id.* at ¶ 72.)

The court assumes, as it must, that Scottsdale's allegations regarding its injuries are true. It is not enough, however, for Scottsdale to merely allege that it has been injured. Instead, to establish standing under Section 702 of the APA, Scottsdale must allege facts showing that its

---

[11]      Because the court has concluded that the SEC's decision to bring the Alpine Enforcement Action was not final agency action under the factors set forth in *Bennett*, it does not consider the SEC's alternative arguments that there was an adequate remedy in court for review of that decision or that the decision was one that was committed to agency discretion by law.

injuries were caused by the agency action it is seeking review of—in this instance, the SEC's decision to file the Alpine Enforcement Action. The court must, therefore, consider whether Scottsdale's allegations establish a causal connection between any of the injuries alleged in its complaint and the SEC's decision to file the Alpine Enforcement Action.

The first injury Scottsdale complains of is its purported need to increase its time and expenditures on its BSA compliance program based on the SEC's articulation of SAR regulation requirements. (*Id*. at ¶ 69.) Scottsdale alleges that its need to bolster its compliance program arose from the aggressive stance the SEC has taken with respect to enforcement of SAR requirements and the New York court's decision in the Alpine Enforcement Action to adopt a "bright-line rule" regarding when SARs must be filed and what information they must include. (*Id*. at ¶ 70.)

Scottsdale's allegations, however, do not show how the filing of the Alpine Enforcement Action imposed any new or different legal obligations on Scottsdale with respect to SAR regulation compliance. To the extent the *outcome* of the Alpine Enforcement Action has caused Scottsdale to increase the resources it has devoted to ensuring compliance with SAR regulations, that would be a result of decisions made by the court in that action, not by the filing of the complaint. The APA does not grant this court authority to review the final judgment of another federal court. And indeed, Scottsdale insisted at oral argument that it was not bringing this action to collaterally attack decisions made in the Alpine Enforcement Action.

Therefore, the court concludes that Scottsdale's purported need to increase the resources it has devoted to its BSA compliance program were not caused by the SEC's decision to file the Alpine Enforcement Action.

Scottsdale next alleges that it has been injured as a result of regulatory uncertainty created by having to comply with purportedly inconsistent SAR filing regimes enforced by FinCEN and the SEC. The only purported inconsistencies identified in Scottsdale's complaint, however, are the result of judicial decisions made in the Alpine Enforcement Action. The complaint filed in the Alpine Enforcement Action did not impose any obligation on Scottsdale to comply with any SAR regulations other than those that were in place before the action was filed. Nor could it. To the extent the Alpine Enforcement Action has imposed any new or different SAR requirements on Scottsdale, they are the result of decisions made by the Southern District of New York, which this court does not have occasion to review.

Scottsdale also argues in its motion that the fact that the SEC sought to enforce SAR regulations under the Exchange Act in the Alpine Enforcement Action, rather than under the BSA, shows that it is subject to two materially different enforcement regimes. (*See* Mem. Opp. Mot. to Dismiss at 20, ECF No. 41 ("[T]he SEC cannot deny that the enforcement scheme under the Exchange Act is materially distinct from the enforcement scheme under the BSA.").) Scottsdale cites the fact that the Exchange Act allows for the imposition of penalties that exceed those that would be permitted for a SAR regulation violation under the BSA. (*Id*.) Moreover, it contends that by enforcing the SAR regulations under the Exchange Act, rather than the BSA, the SEC can avoid having to prove the *mens rea* required to establish a BSA violation. (*Id*.)

While the court agrees that enforcement of the SAR regulations under the Exchange Act is different in material ways from enforcement under the BSA, Scottsdale has not shown that its exposure to materially different enforcement regimes was caused by the filing of the Alpine Enforcement Action. The complaint in the Alpine Enforcement Action did not, and could not,

incorporate FinCEN's SAR regulations into a rule promulgated under the Exchange Act. Instead, as discussed above, the BSA regulations were incorporated by reference into Rule 17a-8 when it was first promulgated in 1981. That incorporation was reaffirmed when the SEC amended Rule 17a-8 in 2011, which specifically referenced portions of the Code of Federal Regulations that included FinCEN's then existing SAR regulations.

To the extent Scottsdale believes it was injured by being subject to materially different SAR enforcement regimes, its remedy was to challenge the rule that incorporated the SAR regulations under the Exchange Act. It has not done so in this action and would likely be barred from doing so by the relevant statute of limitations if it had. Scottsdale cannot evade its failure to bring a timely challenge to Rule 17a-8's incorporation by reference of FinCEN's BSA regulations by shoehorning that decision into a judicial complaint that imposed no legal obligations on Scottsdale whatsoever.

Finally, Scottsdale argues that it has been exposed to increased contractual liability as a result of the Alpine Enforcement Action. The SEC's decision to file the Alpine Enforcement Action, however, did not cause Scottsdale to enter a contract with Alpine. To the extent Scottsdale has incurred increased contractual liability to Alpine because of decisions made by the court in the Alpine Enforcement Action, it is the result of its own voluntary decision to enter a contract with Alpine, not because of any action taken by the SEC. Accordingly, the court cannot conclude that the SEC's decision to file the Alpine Enforcement Action caused Scottsdale to incur any increased contractual liability either.

Scottsdale's failure to allege facts showing that the SEC's decision to file the Alpine Enforcement Action caused it any injury is, therefore, another basis for concluding that Scottsdale lacks statutory standing to seek review under the APA.

Because the court has concluded that Scottsdale lacks standing under the APA to bring this action, it need not consider whether Scottsdale has Article III standing. And because Scottsdale has not purported to seek review of any agency action other than the SEC's decision to bring the Alpine Enforcement Action, the court need not consider whether Scottsdale would be barred by the applicable statute of limitations from challenging any other action by the SEC.

## Conclusion

For the reasons stated herein, the court GRANTS the SEC's motion and dismisses all of Scottsdale's claims WITHOUT PREJUDICE.

SO ORDERED this 5th day of November, 2024.

BY THE COURT:

Clark Waddoups
United States District Judge